**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **NEXPOINT STRATEGIC OPPORTUNITIES FUND,** | § § § | |
| *Plaintiff,* | § § | |
| **v.** | § § | **Cause No.** _____ |
| **ACIS CAPITAL MANAGEMENT, L.P., U.S. BANK, N.A., JOSHUA N. TERRY, BRIGADE CAPITAL MANAGEMENT, L.P.,** | § § § § § § | |
| *Defendants.* | § § | |

## ORIGINAL COMPLAINT

### I.

## INTRODUCTION

Plaintiff NexPoint Strategic Opportunities Fund ("NexPoint" or "Plaintiff") respectfully files this action to recover damages caused by the gross malfeasance of Defendants U.S. Bank National Association ("U.S. Bank"), as a trustee, and Acis Capital Management, L.P. ("Acis" or "Acis"), Brigade Capital Management, LP ("Brigade"), and Joshua N. Terry ("Terry"), as registered investment advisors ("RIAs", together with U.S. Bank, "Defendants" and each a "Defendant"). The Defendants are jointly and severally liable for mismanaging certain collateralized loan obligations that NexPoint invested in. The acts and omissions which have recently come to light reveal breaches of fiduciary duty, a pattern of violations of the Investment Advisers Act of 1940 and the Trust Indenture Act of 1939, and conversion, among others, which have caused and/or likely will continue to cause Plaintiff damages.

At all relevant times, the Defendants have managed and advised ACIS CLO-2014-2, Ltd., ("ACIS 2"), ACIS CLO-2014-3 Ltd. ("ACIS 3"), ACIS CLO-2014-4 Ltd. ("ACIS 4"), ACIS

CLO-2014-5 Ltd. ("ACIS 5"), and ACIS CLO-2015-6, Ltd. ("ACIS 6") (any two or more, the "CLOs"). In a classic "let's rob Peter to pay Paul" scheme, the RIAs have—and the Trustee has allowed the RIAs (for their own sole benefit):

- Knowingly charge the CLOs exorbitant amounts of "expenses" without accountability or justification;

- Knowingly cause the CLOs to purchase loans that fail to meet credit quality tests and average life test, and caused the entire portfolio to fail the applicable collateral quality tests;

- Knowingly cause the CLOs to sell valuable assets cheaply; and

- Knowingly breach industry standards for best execution when buying and selling.

Furthermore, U.S. Bank knowingly breached the provisions of the CLOs' indentures by failing to object to and by not allowing the noteholders to vote on the entry of Plan D as part of the Chapter 11 Trustee's Joint Plan in the Acis Bankruptcy,[1] which contains provisions that adversely affect the noteholders and equity of the CLOs and their ability to make optional redemptions from the CLOs.

To put it simply, since February 16, 2019, forward, through the combined effect of the above malfeasance, Defendants have wiped out more than $50 million in value from the CLOs and have hamstrung NexPoint from recouping its investments in the CLOs.

The impact on NexPoint is substantial. It owns $5 million of ACIS 3's Class-F debt tranche, and approximately $7.5 million of the equity of ACIS 6. Defendants have caused the net asset value of the equity of ACIS 3 to be completely wiped out, which losses have now crept up into the Class-F Tranche of ACIS 3. That debt is worth 40 cents on the dollar. Defendants

---

[1] On January 31, 2019, in a consolidated adversary proceeding involving the Acis CLOs, the United States Bankruptcy Court for the Northern District of Texas entered a Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("Plan D"). *See* Case No. 18-30264-SGJ-11 and Case No. 18-30265-SGJ-1, Jointly Administered Under Case No. 18-30264-SGJ-11), referred to herein as the Adversary Proceeding.

have also caused the net asset value of the ACIS 6 equity to be worth a mere 30 cents on the dollar. Defendants have thus caused Plaintiff to suffer over $8 million in losses.

These are not just ephemeral numbers. Plaintiff represents the interests of thousands of investors who rely on the promised security of these types of investments to provide cash flow and to fund things like retirements and college tuitions. Plaintiff invested in the CLOs because, if managed in the way provided for in the indentures and portfolio management agreements ("PMAs"), they are secure and relatively safe, diversified investments.

The economic purpose is obliterated where, as here, the RIAs manage the CLOs for their own ends, extending the life of the existing portfolio so as to maximize fees and prohibiting the noteholders from making redemptions. Meanwhile, the trustee, U.S. Bank, looks the other way (whether intentionally or negligently) while the value of the CLOs is decimated. The Defendants are legally obligated fiduciaries who have to look out for the best interests of the advised funds, i.e., the CLOs and their investors.

## II.

## THE PARTIES

1.      Plaintiff NexPoint Strategic Opportunities Fund ("NexPoint"), a Delaware statutory trust, is a closed-end retail fund managed by NexPoint Advisors, L.P. Its principal place of business is in Dallas, Texas. Interests in NexPoint trade on the New York Stock Exchange (NYSE: NexPoint).

2.      Joshua N. Terry is an individual resident of Texas located at 3509 Princeton Avenue, Dallas, Texas, 75205, who may be personally served wherever he may be found. Terry is the owner and President of Acis.

3.      Defendant Acis Capital Management, L.P. ("Acis") is a Delaware limited

partnership. Acis may be served through its registered agent Capitol Services, Inc., located at 1675 S. State Street, Suite B, Dover, Delaware 19901, or wherever it may be found. Acis is a registered investment advisor.

4.      Defendant Brigade Capital Management, LP is a Delaware limited partnership that is registered to do business in New York, with its principal place of business in the state of New York. Brigade may be served through Donald E. Morgan III, 399 Park Avenue, 16th Floor, New York, New York, 10022, or wherever it may be found. Brigade is a registered investment advisor.

5.      Defendant U.S. Bank, N.A. ("U.S. Bank", also, the "Indenture Trustee" or "Trustee") is a national banking association that is Trustee of the Acis Indentures, as defined further herein. Defendant U.S. Bank may be served at its corporate office located at 190 South LaSalle Street, 8th Floor, Chicago, IL 60603, or wherever it may be found.

## III.

## **JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because one or more claims "arises under" federal law—namely, the Investment Advisers Act of 1940 and the Indenture Trust Act of 1939 (as amended). This Court also has original jurisdiction over all claims alleging violations of the Advisers Act or its regulations or commission rules, and venue is proper herein for same under 15 U.S.C. § 80b-14. All such other claims are properly before this Court under its supplemental jurisdiction supplied by 28 U.S.C. § 1367.

7.      Personal jurisdiction and venue over Acis and U.S. Bank are proper because the governing documents—the indentures and portfolio management agreements—to which they are bound, required them to agree to submit to the jurisdiction of New York and to waive any

objection to New York as a forum and venue. Both Defendants are authorized to and do regularly conduct business in the state of New York and are accused of torts directed at the state of New York, at least in part. Furthermore, the acts and/or omissions giving rise to the causes of action herein occurred in whole or in part in this District and affect property situated in this District.

8.  Jurisdiction and venue over Brigade are proper in this district because Brigade is registered to do business in New York, and the transactions and occurrences that are the subject of NexPoint's claims against Brigade, including certain advice, communications, and trading activity with brokers or dealers, took place in whole or in part in this District.

9.  Jurisdiction and venue over Terry are proper in this District because Terry is bound by the indenture clauses cited above, and he committed torts that are the subject of NexPoint's claims against him that occurred within or were directed to New York, including through certain trading activity with brokers or dealers within New York or to New York.

## IV.

## FACTUAL BACKGROUND

### A.  A BRIEF PRIMER OF THE ACIS CLOs

10.  In order for one unversed in the business to appreciate the issues raised in this lawsuit, Plaintiff introduces the relevant players, relationships, and terms in the business of "collateralized loan obligations" or "CLOs" as they pertain to the Acis CLOs.

11.  The CLOs were intended as investment vehicles whereby a special purpose issuer entity raises equity funds from one or more equity investors, and then raises additional cash in the form of debt, usually from the public markets by issuing notes to third-party investors (collectively, the "CLO Notes").

12.  The debt, as it often is, was arranged in tranches, whereby the most senior debt

bears the lowest coupon rate (i.e., *interest*) but is paid back first, and so is the least risky; and the most junior debt is paid the highest coupon but is paid next-to-last (before the equity), and so it is the riskiest of the debt tranches. Last to be paid (behind all the debt)—and taking on defaults first--is the equity. The character of incoming funds cascading down the tranches to pay the debt in descending seniority order, and then the equity last, is frequently referred to as the "payment waterfall."

13.     The pool of cash raised from the issuance of the debt and equity was then used to purchase a mixture of publicly available, floating rate, senior-secured debt instruments issued by corporations (altogether, "CLO Assets").

14.     The CLO Assets become the source of the cash flow to pay the CLO's expenses, then the CLO's noteholders' principal and interest payments due on the CLO Notes. And typically, the rest was paid to the equity holders on a quarterly basis.

15.     Thus, the equity holders took on the most risk but were the beneficiaries of the spread between the incoming cash flows from the CLO Assets, minus the operating expenses and the interest on the CLO Notes, due to the respective debt tranches.

16.     The key parties to this transaction's success or failure are the portfolio manager, the adviser, and the indenture trustee.

17.     The document that binds the parties – the issuer, the noteholders, the equity, the portfolio manager, and the indenture trustee—is a contract referred to as an "indenture."

18.     The portfolio manager's role is two-fold: The first is to identify and purchase the CLO Assets, and to do so in a manner that creates the requisite cash flow to meet the CLOs debt service requirements (i.e., that it meets the payout, diversification, credit quality and average life requirements), while not exposing the CLO to non-market risks. The second is to monitor the

CLO Assets to ensure that over time, the individual CLO Assets continue to meet various collateral quality tests designed to ensure that the CLO can meet its debt service requirements and still produce income for the CLO's equity holders. This usually requires the portfolio manager to monitor each of the assets in order to ensure that the CLO has a mix of assets in different industries or markets, with differing maturity dates within acceptable risk profiles, and within a variety of credit ratings. This often means selling assets that are deteriorating and buying assets that are superior to assets in the portfolio. Otherwise, investing too much of the portfolio in any one of these categories exposes the CLO to too much risk and to losses.

19.     The portfolio manager is typically subject to an agreement separate from the indenture called the portfolio management agreement, or "PMA." The portfolio manager also often serves as the investment advisor (or hires an advisor), who may also outsource or delegate certain functions to a sub-advisor. Advisors are required to be "Registered Investment Advisors" under federal law, which imposes a strong fiduciary duty on them as discussed below. One of those duties is to maintain the best interest of the investors and to make decisions on investment that is suitable to the investors' assumption of risk.

20.     The indenture is governed by federal law—namely, the Trust Indenture Act of 1939, and the Trust Indenture Reform Act of 1990, as well as their enacting regulations.

21.     Pursuant to these laws, the indenture trustees are required by federal law to safeguard the interests of the investors (debt and equity), as a watchdog of sorts to ensure the portfolio manager's compliance with the indenture, and with good and sound collateral management practices.

22.     The law imposes a fiduciary duty and a "prudent person" standard on indenture trustees, which governs their performance of their duties under the indenture.

23.     The role of the indenture trustee is critical because the portfolio manager is paid as a percentage of "assets under management," or "AUM," which is determined by the face value, or par, of the debt instruments owed.

24.     Because the asset management and advisory fees are a percentage of the par value of the CLO Assts, if left unchecked, the portfolio manager is incentivized to purchase instruments with the highest par value irrespective of their quality. That way, the portfolio manager can achieve the largest par value in aggregate as possible and, thus, the largest fees. Because lower-credit-quality instruments are cheaper than higher credit instruments, a -portfolio manager could spend the cash pool on lower-quality, younger instruments because it could buy more of them and therefore manipulate its fee structure. Despite exposing the CLO to greater risk due to longer maturities and lower credit ratings, the portfolio manager would actually earn more fees this way and for a longer period of time.

25.     The indenture trustee's job is, in part, to prevent that from happening by monitoring changes in the CLO Assets and in the portfolio's credit quality and maturity.

26.     To that end, it has tools for ensuring the security and soundness of the CLO Asset pool, such as the metrics called the "WARF" and the "WAL".

27.     The "WARF" or the "weighted average rating factor" determines what the credit quality of the entire portfolio is. The credit quality of the pool of assets can be adjudged by taking the ratings of each debt issuance held by the CLO, relative to the amount of that bond issuance as a percentage of the total portfolio and aggregating those to a factor of the total notional balance of the portfolio. The better the WARF, the lower the risk to the CLO's investors.

28.     The WAL or the "weighted average life" test is another metric that judges the riskiness of the entire portfolio with respect to the time until the principal is repaid.

29.     The WAL is the average number of years for which each dollar of unpaid principal on an investment remains outstanding. Generally, investors want to be paid back sooner rather than later.

30.     And because no one can see that far into the future, longer payouts typically mean exposure to greater risk because of unforeseen circumstances such as inflation, default risk, or the issuer calling the notes. Thus, the better the WAL (i.e., the shorter maturity dates,) the lower the risk to the CLOs investors.

31.     Together, the WARF and the WAL serve as a shorthand way to judge whether the pool of CLO Assets is getting too risky.

32.     Thus, the indenture trustee has several metrics that it can and should use to monitor the activity of the portfolio manager in order to protect the CLO investors, debt and equity alike (generally, by protecting the equity, the trustee as a matter of course will protect the noteholders who get paid before equity).

**B.  NexPoint Invests in THE ACIS CLOs**

33.     The Acis CLOs are issuers under the above rubric. Acis is the Portfolio Manager. Terry is President of Acis, an entity which he also owns and for which he serves as the primary advisor. and Brigade is the sub-advisor to Terry and Acis.

34.     Between 2014 and 2016, NexPoint became a secured noteholder and beneficiary under the indenture for Acis CLO 2014-3 Ltd., as issuer, and Acis CLO 2014-3 LLC, as co-issuer (together "ACIS-3"). The value of the Series-F notes purchased was approximately $5,000,000.

35.     During that time period, NexPoint also became an equity holder under the indenture dated April 16, 2015, among Acis CLO 2015-6 Ltd., as issuer, and Acis CLO 2015-6 LLC as co-issuer (together "ACIS-6"). The value of the equity was approximately $7,500,000.

36.     U.S. Bank agreed to serve as the Trustee for these ACIS indentures, with Acis as the portfolio manager, and Highland Capital Management L.P. as the sub-adviser.

37.     NexPoint made these investments as part of its mission and as a relatively secure and safe investment on behalf of *its* investors.

38.     NexPoint is a party to the indentures for ACIS-3 and ACIS-6 (the "Acis Indentures").

39.     The Acis Indentures impose a number of obligations on Acis as Portfolio Manager and on U.S. Bank in connection  with its role as Trustee.

40.     Separately, the Portfolio Management Agreements (the "PMAs") between the Acis CLOs and Acis impose obligations on Acis in connection with its role as Portfolio Manager and also impose a liability on the Trustee as a third-party beneficiary to the PMAs. In general, the PMAs provide that, subject to the terms of the Acis Indentures,  Acis is obligated to "supervise and direct the investment and reinvestment of the Assets" and to  "monitor the Assets."

41.     As of August 2018, when Terry took over Acis, Acis continued to serve as PM to the Acis CLOs, but had Terry as the advisor.

42.     Acis, as a result of it having no apparent employees nor wherewithal to manage the Acis CLOs itself, retained Brigade to assist it and its principal Terry in providing these portfolio management services as a sub-advisor.

43.     Acis, Brigade, and Terry are registered investment advisors, all subject to the Investment Advisors Act of 1940 (the "Advisors Act") (Acis, Brigade, and Terry, the "RIA Defendants").

44.     As part of the Acis bankruptcy proceeding under Case No. 18-30264-SGJ-11 (the "Acis Bankruptcy"), in which Terry became 100% owner of Acis (as well as its President and

owner of its general partner),[2] the United States Bankruptcy Court for the Northern District of Texas formally approved Acis's appointment of Brigade as sub-advisor and shared services provider to Acis in connection with Acis's management of the Acis CLOs.

45.     Brigade has provided these services at all pertinent times through the present.

46.     As a sub-advisor, Brigade is the agent of Acis and, therefore, of the Acis CLOs. Upon information and belief, Terry needed help managing the Acis CLOs, and he retained Brigade to provide advisory services, as well as back-and middle-office functions, including, but not limited to, accounting, payments, operations, technology, and finance, among other things, in connection with Acis's obligations under the PMAs.

47.     Terry also employed Brigade to provide assistance relating to the negotiation and execution of any documents necessary to acquire or dispose of an asset under the PMAs.

48.     Further, Terry delegated certain tasks related to the Acis CLOs to Brigade, including, but not limited to, research services, strategy, identifying potential assets, buyers and sellers of same, modeling of ratings, default, and price scenarios as needed. In providing these critical portfolio management services for the Acis CLOs, Brigade works directly with and for Terry. Terry testified in the Acis bankruptcy proceedings that this was the intention.

49.     Given Brigade's extensive level of involvement of the portfolio management of the CLOs, Brigade's conduct, and by extension Acis's conduct through Terry's direction and control, severely and adversely impacts the collateral portfolios in which NexPoint is a noteholder and equity holder under the Acis CLOs.

50.     As of February 20, 2019 (and also prior to Acis's emergence from bankruptcy), Brigade had charged Acis fifteen basis points on total Acis CLO assets under management for

---

[2] The two case numbers in the consolidated Bankruptcy Proceeding include Case Nos. 18-30264-SGJ-11 and 18-30265-SGJ-11.

these portfolio management services, a fee which Brigade represented it negotiated in good faith with Acis. In short, it is paid like another portfolio manager or advisor.

51.     Of note, although Terry effectively approves all trading activity for the Acis CLOs, Terry and Acis have no executive level employees aside from Terry, and upon information and belief, they do not have the wherewithal to effectively manage the investment vehicles. As President and owner of Acis, Terry exercises complete dominion over Acis. With no chain of command besides himself at Acis, Terry answers to no one but himself and his greed.

52.     Prior to the Acis Bankruptcy (and for a period of time up until August 2, 2018), the Acis CLOs were managed by Highland Capital Management L.P. ("Highland"), which served as sub-advisor to Acis.

53.     One of the original investment vehicles, Acis CLO-7, continued to be managed by Highland after the RIA Defendants took over control of the Acis CLOs.

54.     Effective February 15, 2019, the Bankruptcy Court issued an order that purported to release any claims against Acis or Terry that had accrued prior to that date and enjoined any lawsuit being filed by any entity or person against Acis or Terry to recover for any claims that accrued prior to that effective date (the "BK Order").[3]

55.     The BK Order, through Plan D, imposes several provisions that directly affects the noteholders of the CLOs. Among other restrictions, Plan D impedes the ability of the equity and noteholders to make optional redemptions and therein prohibits beneficial trading that would serve to protect the noteholders' interest. Put differently, the noteholders are stuck with Acis against their will, and Acis has captured the CLOs for the time being.

---

[3] That release is the subject of an appeal, and if overturned, may cause certain released claims to be added later.

56.     Since February 15, 2019, and moving forward, the Acis CLOs have been managed and advised by Acis, Terry and Brigade subject to the PMAs and indentures.

57.     Under the indentures and PMAs, the RIA Defendants must "comply with all [applicable] terms  and conditions of the [Acis Indentures]" and "perform [their] obligations . . . in good faith and with  reasonable care".

58.     The applicable "terms and conditions" of the Acis Indentures include an obligation to ensure compliance with the collateral quality tests described above.

59.     Furthermore, the PMAs at Section 8 prohibit the portfolio manager from "taking any action that would intentionally or with reckless disregard… which would knowingly and willfully and adversely affect the interest of the Holders in the Assets in any material respect,"[4] unless approved in writing by the Board of Directors of the Issuer and a majority of both the controlling class and the subordinate noteholders.

60.     The PMAs hold Acis liable for its acts or omissions, including, but not limited to, acting in bad faith, willful misconduct, gross negligence, or reckless disregard in the performance of its obligations under the Acis indentures.

61.     Critically, Section 11(a)(i) of the PMAs expressly holds Acis liable for any decrease in the value of the CLOs that was accomplished by bad faith, willful misconduct, gross negligence or reckless disregard in the performance of its obligations.

62.     As Portfolio Manager, Acis, through Terry and sub-advisor Brigade, were aware that Acis, Terry and Brigade performed services for the Acis CLOs for a particular purpose.

---

[4] *See* Portfolio Management Agreement between Acis CLO 2015-6 and Acis Capital Management, L.P. Section 8, page 15.

63.     Likewise, the Portfolio Manager had further awareness that secured noteholders and the equity holders under the Acis CLOs, like NexPoint, relied on Acis and Brigade to perform services in furtherance of their particular purpose of managing the portfolio of the Acis CLOs.

64.     The RIA Defendants understood that noteholders and equity interest holders under the Acis CLOs, including Plaintiff, relied on them to perform services in furtherance of their particular purpose of managing the portfolio of the Acis CLOs.

65.     Despite the extra-contractual duties that the RIA Defendants owe to Plaintiff as of, and in furtherance of clear and impermissible conflicts of interest, from February 16, 2019 to the present, the RIA Defendants caused the Acis CLOs to incur astronomically unprecedented expenses well outside historical expense patterns in the Acis CLOs and very clearly outside market and industry norms, as discussed in more detail below.

## C. How Did the RIAs Decimate the Acis CLOs' Value?

66.     Since February 15, 2019, and moving forward, few payouts have been made to equity holders despite a history of consistent distributions during the years Highland managed them, and the equity holders, by means of Plan D, have been prevented from forcing redemptions in the funds.

67.     Since February 15, 2019, under Acis's and Brigade's "management" of the Acis CLOs, the WARF of the portfolios has become one of the dirtiest pools in the market. Specifically, as of October 2019 and through December 2020, the WARF of each such indenture has dramatically worsened, as follows:

| |
|---|
| ACIS 3: 2522---> 2678 |
| ACIS 6: 2627 ---> 3055 |

Counterintuitively, the higher the number, the worse the "WARF."

68.     This should not have happened given that, normally over time, the CLO noteholders (the senior debt) are paid off. As that happens and there is less debt to unencumber the equity, the equity becomes *less* risky, and thus, more valuable. The benefit would be realized at the junior tranches, and the equity holders would receive less-levered, lower interest payments but those investors' residual principal value would have more certainty.  The opposite happened here.

69.     Furthermore, as shown below, Acis replaced shorter term debt with longer terms, extending the WAL of the entire portfolio.

70.     By keeping the average life extended and avoiding prepayments, (1) risk increased, (2) residual principal value fell, and (3) interest accrued for an artificially longer period.

71.     Thus, the Acis CLOs' values have been decimated due to these tactics, as explained more fully below. Yet, meanwhile, at the same time, the revenues and profits to Acis and Terry have become inflated due to increased fees, the exorbitant-but-unexplained and unaccounted for expenses foisted on the Acis CLOs, and the protected, extended life of the CLOs.

72.     The value of the CLOs is referred through a net-asset-value assessment, or "<u>NAV</u>" of the equity. Because the equity is junior to all debt, healthy equity signifies healthy debt. Unhealthy equity, or worse, equity that has been wiped out, signals potential default to at least the junior debt tranches.

73.     The Acis CLOs' NAV over time (counting the distributions made to equity) can be seen via the following graphic illustration:



74.    Accordingly, the NAV of the ACIS-3 equity has been completely wiped out.  The Series-F tranche of debt owned by NexPoint has been reduced to 40 cents on the dollar.

75.    As shown in the illustration, the NAV of ACIS-6 equity is approximately 30 cents on the dollar (as of April 1, 2021).

76.    It is no wonder that national rankings of CLOs have every Terry-managed CLO at the bottom of their list as the worst performing.

77.    Yet, despite having similar profiles and investment goals as the other Acis CLOs at its inception, the Highland-managed ACIS-7 did remarkably well, returning almost 100 cents on the dollar. While Acis is likely to blame COVID for the downfall of its performance, the relative performance of ACIS-7 should debunk that excuse fairly readily.

78.    Plaintiff has been able to discern four primary ways that the RIAs have decimated the value of the Acis CLOs.

1. **Mis-Accruing and Mis-Allocating Expenses**

79.     Prior to Terry and Brigade advising the Acis CLOs, the Acis CLOs paid out millions of distributions to the equity holders, and expenses, as a percentage of those distributions, were remarkably low.

80.     The expenses saddled on the Acis CLOs since February 15, 2019, have been nothing short of impressive. They literally inverted the relative cost-to-distributions ratio that had been in place for years prior.

81.     The following graphic depicts that inexplicable inversion:

**Expenses Paid before Highland was removed**

| Date | A3 | A4 | A5 | A6 | Total |
|---|---|---|---|---|---|
| 11/1/2017 | 53,366 | 74,533 | 75,099 | 97,077 | 300,075 |
| 2/1/2018 | 45,996 | 79,541 | 97,729 | 149,641 | 372,907 |
| 5/1/2018 | 32,194 | 15,635 | 11,723 | - | 59,552 |
| 8/1/2018 | - | 27,653 | 39,900 | 33,217 | 100,771 |
| **Total** | **131,557** | **197,363** | **224,450** | **279,935** | **833,305** |

**Equity Distirbutions Paid before Highland was removed**

| Date | A3 | A4 | A5 | A6 | Total |
|---|---|---|---|---|---|
| 11/1/2017 | 1,068,208 | 1,434,935 | 1,220,175 | 1,499,862 | 5,223,179 |
| 2/1/2018 | 471,645 | 898,027 | 640,095 | 870,666 | 2,880,433 |
| 5/1/2018 | 229,888 | 1,231,081 | 1,096,471 | 1,313,207 | 3,870,646 |
| 8/1/2018 | - | - | 166,472 | 651,402 | 817,874 |
| **Total** | **1,769,741** | **3,564,043** | **3,123,213** | **4,335,136** | **12,792,132** |

82.     The below chart further illustrates the expenses and distributions paid before Terry and Brigade took over advising and managing the Acis CLOs:



The ratio was approximately $13 million in equity distributions to shareholders versus less than $900,000 in expenses, or 14.4 to 1 distributions to expenses.

83.     The expenses paid after Highland's removal are reflected here:

| Expenses Paid to Date since Highland was removed | | | | | |
|---|---|---|---|---|---|
| Date | A3 | A4 | A5 | A6 | Total |
| 11/1/2018 | - | - | 121,235 | 469,662 | 590,897 |
| 2/1/2019 | - | 70,977 | 159,488 | 270,667 | 501,132 |
| 5/1/2019 | - | 93,000 | 27,135 | 56,452 | 176,586 |
| 8/1/2019 | 649,832 | 822,224 | 609,974 | 1,046,612 | 3,128,643 |
| 11/1/2019 | 614,335 | 1,025,723 | 437,613 | 1,074,214 | 3,151,885 |
| 2/1/2020 | - | 867,277 | 822,864 | 699,384 | 2,389,524 |
| 5/1/2020 | - | - | - | - | - |
| 8/1/2020 | - | - | - | 94,611 | 94,611 |
| 11/1/2020 | - | 101,043 | 239,750 | - | 340,793 |
| 2/1/2021 | - | 25,585 | 186,834 | 32,549 | 244,968 |
| **Total** | **1,264,167** | **3,005,828** | **2,604,893** | **3,744,152** | **10,619,040** |

84.    The equity distributions since Highland was removed are here:

**Equity Distirbutions Paid to Date since Highland was removed**

| Date | A3 | A4 | A5 | A6 | Total |
|---|---|---|---|---|---|
| 11/1/2018 | - | - | - | - | - |
| 2/1/2019 | - | - | - | 256,518 | 256,518 |
| 5/1/2019 | - | - | - | 791,696 | 791,696 |
| 8/1/2019 | - | - | - | - | - |
| 11/1/2019 | (0) | (0) | 0 | 102,378 | 102,378 |
| 2/1/2020 | - | - | (0) | 170,447 | 170,447 |
| 5/1/2020 | - | - | - | - | - |
| 8/1/2020 | - | - | - | 48,966 | 48,966 |
| 11/1/2020 | - | 376,910 | - | 732,260 | 1,109,169 |
| 2/1/2021 | - | 158,415 | - | 94,863 | 253,278 |
| **Total** | **(0)** | **535,325** | **0** | **2,197,129** | **2,479,175** |

85.    Since the RIA Defendants have taken over managing the Acis CLOs, the distributions-to-expense ratio has thus fallen from what it used to be, 14–1, to what it is now, an anemic 0.25–1.

86.    Because of the way these CLOs have been managed, the expenses were distributed proportionately amongst the Acis CLOs, thereby impacting ACIS-3 and ACIS-6, *pro rata*.

87.    Assuming that remains true, and given the amount of revenue that Acis is supposed to have earned, which was about $12 million, Acis has taken well over $24 million in revenue through its manipulation of the portfolio and expenses.

88.     Relevant to this case, from May 2019 through May 2020, the Acis CLOs (Acis 3 through 6) accrued over $22 million in revenue:

| | | | ACTUAL | | | | | |
|---|---|---|---|---|---|---|---|---|
| DATE | TOTAL AUM | ACTUAL REV | ACTUAL EXP | LEG/ADM | ACTUAL NET | UNSEC DIST | CASH BEG | CASH END |
| 2/1/2019 | 1,890,604,000 | 2,172,029 | 959,039 | - | 1,212,990 | | 3,824,839 | 5,037,827 |
| 5/1/2019 | 1,885,797,000 | 2,532,027 | 960,950 | 1,022,062 | 549,015 | | 5,037,827 | 5,586,841 |
| 8/1/2019 | 1,861,154,000 | 4,251,742 | 745,071 | 327,111 | 3,179,560 | 21,260 | 5,586,841 | 8,745,140 |
| 11/1/2019 | 1,738,471,000 | 4,718,511 | 1,043,539 | 4,629,967 | (954,935) | 2,479,244 | 8,745,140 | 5,310,961 |
| 2/1/2020 | 1,600,692,519 | 3,925,389 | 1,076,914 | - | 2,848,475 | 40,494 | 5,310,961 | 8,118,942 |
| 5/1/2020 | 1,372,412,410 | 1,057,251 | 649,671 | - | 407,580 | | 8,118,942 | 8,526,522 |
| 8/1/2020 | 1,143,864,482 | 3,305,967 | 936,538 | - | 2,369,429 | 1,500,000 | 7,809,535 | 8,678,963 |
| 11/1/2020 | 1,015,929,000 | 2,321,662 | 1,778,177 | - | 543,485 | | 8,678,963 | 9,222,448 |
| 2/1/2021 | 814,796,995 | | | | - | | 9,222,448 | 9,222,448 |
| | | 24,284,638 | 8,149,900 | 5,979,140 | 10,155,598 | 4,040,998 | | |

89.     The Acis CLOs had never incurred such profoundly high expenses and fees to Acis. This includes roughly $2.3 million in extra profits to Acis, as well as substantial legal fees incurred by Acis itself (not by the CLOs, and not for the benefit of the CLOs). For it to all come at the expense of the investors in Acis CLOs 3 through 6 is gobsmacking.

90.     Meanwhile, the Indenture Trustee has done nothing about it, despite having been warned several times.

91.     That they were incurred by the RIAs, who are defendants in this case, only after they had secured through the Acis Bankruptcy certain protections for themselves against redemptions, gives rise to a strong inference that they are not properly allocated as Acis CLO expenses. Rather, they are something else.

92.     That Acis has represented these expenses as having been charged on behalf of, or for the benefit of, the managed Acis CLOs, and then unilaterally collected those expenses under the same pretense, gives rise to a strong inference that the RIA Defendants (as defined herein) knowingly misrepresented the nature and proper allocation of these expenses.

93.     That the RIA Defendants have complete control over this information and have not disclosed it, while misrepresenting the nature of the fees and expenses, is a bad-faith manipulation of their duties and rights under the Acis Indentures and the PMAs.

**2.  The Scheme to Manipulate Advisory Fees**

94.     Because of the life cycle of a CLO, the Acis CLOs are currently outside the period of reinvestment. Therefore, the CLOs are stuck with the collateral they have.

95.     The problem is that prior to the close of the reinvestment period, Defendants have caused the CLOs to buy and hold collateral that would not have qualified for the risk parameters delineated in the PMAs and indentures.

96.     Certain loans have maturity dates further out than what is necessary or appropriate. Certain loans simply lacked the creditworthiness on their own to qualify. The purchase of these loans violated the PMAs, as well as the course of performance, and good industry practices.

97.     Equally important, the purchase of these loans violated the requirements in the indentures and the PMAs that any trading should maintain or improve the credit quality of the portfolio.

98.     This has caused the Acis CLOs to suffer substantial losses. Several examples are shown here.

99.     <u>Chief Power.</u> Throughout the relevant time period, Defendants held the Chief Power loan which bore a very dismal Caa1/B- rating when it initially purchased in 2019. Critically, it had a December 2020 maturity date. The lack of creditworthiness of the loan is evidenced not only by its low credit rating, but also by the fact that it was not refinanced when it could have been in 2018-2019. The loan was then downgraded to Caa2/CCC in late 2019. It was only then that Defendants went on to sell this loan at 51 cents on the dollar within a year, locking in $4.7mm of realized losses to the Acis CLOs. The manager had purchased this loan with a Dec 2020 (1+ year)

maturity date on the same day it bought multiple loans with 2025 (6+ year) and 2024 (5+ year) maturities. This is important because the 2025 and 2024 loans do not maintain or improve failing WAL Tests in existence at the time of purchase. However, the addition of Chief Power was plainly to generate the appearance of a *blended* WAL that did maintain or improve the failing WAL Test. This type of chicanery is not allowed nor is it in the spirit of the CLOs' indentures, and ended up directly leading to almost $5 million in losses to the Acis CLOs. There was no pro-investor justification for how Defendants managed this investment.

100.     Glass Mountain Pipeline. Defendants purchased $2 million of this loan in April 2019 on a single day (April 30, 2019). It had B3/B ratings at the time of purchase, indicating heightened credit risk, and also had a December 2024 maturity date, which was 5.5+ years from when it was purchased. The WAL Tests for the CLOs that bought this were failing at this time, meaning a loan purchased needed to main or improve the failing WAL Tests, which were all standing at 4.0 years or shorter. This was a purchase that in addition to heightened credit risk and increasing the average maturity date of the portfolios, also violated the CLOs' indentures' credit quality requirements. Similar to other situations, Defendants bought nineteen loans on a single day, likely in a scheme to circumvent the WAL test restrictions. The loan is currently still held in the portfolios and is quoted in the low 20s due to a continuing and apparently uncurable default, which is a $1.5 million in losses to the Acis CLOs. Defendants should have known and foreseen this risk because of the low credit ratings. Had Defendants abided by the indenture and PMA requirements, as well as prudent investing standards, these losses to the Acis CLOs would have been avoided. There was no pro-investor justification for how Defendants managed this investment.

101.    KCA Deutag. Defendant purchased this loan with a Caa1/CCC+ rating at the time of its purchase in April through May 2019. There was no justification to purchase loans with a Caa1/CCC rating as the implied credit quality is far too risky for a levered CLO structure. The purchase price averaged 85 cents on the dollar (i.e., of the face value of the loan), which also implies significant credit risk. Defendants ended up selling this loan six months later, on November 18, 2019, at 65 cents on the dollar, locking in $1.8 million in losses to the Acis CLOs. The low credit rating and the fact that the loan had a long maturity date would have warned the Defendants that the loan lacked the credit quality and would not maintain or improve the credit quality of the portfolio; in fact, it would have certainly dragged the credit quality down. There was no pro-investor justification for how Defendants managed this investment.

102.    Libbey Glass. This loan was being held by Acis for no apparent reason. Its credit was weak, B2/B, which is why it had not refinanced/extended already during a very strong 2018-2019 market. Defendants inexplicably held on to the loan which was downgraded to B3 in November 2019 and again to Caa2/CCC in March 2020. The issuer corporation filed for bankruptcy, and the loan was restructured into reorganized equity, essentially wiping out all the value from the lenders. Defendants' decision to hold the loan throughout the entire downward process locked in $12.7 million of tangible losses to the Acis CLOs. There was no pro-investor justification for how Defendants managed this investment.

103.    Carestream Health. This loan had B3/B- ratings. The credit was very weak, which was reflected by the ratings, and is why it had not refinanced/extended already during a very strong 2018-2019 market. Following an S&P downgrade from B- to CCC+ in February 2020 (plus it remained on Creditwatch Negative), Defendants sold this loan across all portfolios on the same day (3/3/2020) at 75 cents on the dollar, locking in $4.8mm of realized losses to the Acis CLOs.

104.   <u>Envision Healthcare.</u>  This loan had B2/B+ ratings at the time of purchase in April 2019, because the loan had been recently issued in October 2018 with a standard seven-year maturity date of October 2025.  The WAL of this loan was 6.5 years. The WAL Tests for the CLOs that bought this loan were failing at this time, meaning a loan purchased needed to main or improve the failing WAL Tests, which were all standing at less than 4.0 years or shorter. This was a purchase that clearly violated the CLOs' indentures. The loan would go on to be downgraded to its current Caa2/CCC ratings. The loan is currently still held in the Acis CLO portfolios at a $1.5mm loss thus far.

105.   <u>Doncasters.</u> This loan bore B3/B- ratings which means it was unlikely to be paid off or refinanced. While Defendants continued to hold the loan (which they should never have bought), Caa1/CCC-, and the manager sold the loan around July 1, 2020 at an average price of 80.51, locking in $1.2mm of realized losses to the Acis CLOs in less than a year.

106.   <u>Lumileds (Bright Bidco).</u> This loan is being held in violation of the CLOs' indentures. As of February 16, 2019, the loan had just recently been issued, and carried B1/B ratings and has a June 2024 maturity date, which was nearly six years from when it was bought in September 2018. The WAL Tests for the CLOs that bought this loan were failing at this time, meaning it failed to maintain or improve the failing WAL Tests, which were all standing at four years or shorter. In September 2019, the loan was downgraded to B3/CCC+, and in November 2019, the loan's ratings were downgraded again to Caa1/CCC+. The manager has not sold any of this loan to date. Today, the loan trades at 76-77, which is currently $2.2 million in losses to the Acis CLOs.

107.   <u>McGraw-Hill.</u> This loan had B2/B ratings on February 16, 2019, and was downgraded by Moody's to B3 in May 2019 and then again to Caa2 in August 2020. S&P

downgraded the rating to B- in May 2020 and to CCC+ in September 2020. This was a loan with a very weak credit profile, but seemingly one that the manager believed in, as this was one of the largest positions put on by the manager. However, after purchasing over $36mm across four CLOs from a period between August 2018 and December 2019, the manager decided to sell all of it on a single day – September 30, 2020 – at a price of 82.75, foregoing any chance of a par recovery. This loan was then fully paid off at 100 cents on the dollar <u>roughly three months</u> later in January 2021. The sale at 82.75 cost the four CLOs a total of $5.9mm compared to the full paydown the CLOs would have received in January 2021 had the loans not been sold.

108.    <u>GIP III Stetson.</u> The GIP Stetson loan bore low credit ratings of Ba3/B+, and more critically, was a loan that carried a 6+ year maturity (July 2025) that made purchasing it violate the indentures. The WAL of this loan did not maintain or improve the failing WAL Tests. By purchasing this loan—in addition to all the others herein—the manager was engaging in a scheme or artifice to deceive by manipulating the metrics of the indenture in bad faith. The manager was buying risky loans that never should have been included in the collateral pool. The loan was subsequently downgraded to B1/B-, and the manager sold this loan at 66 cents on the dollar between May 2020 and August 2020, locking in $1.5 million in damages to the Acis CLOs. It is also curious as to why the manager would then sell this loan down 34 points; not long after the loan was sold, the trading levels moved up materially, and is now trading at 96 cents on the dollar.

109.    <u>Boardriders.</u> Purchased in March 2019, the loan had B3/B- ratings at the time of purchase, indicating heightened credit risk, and also had an April 2024 maturity date, which was 5+ years from when it was purchased. The WAL Tests for the CLOs that bought this were failing at this time, meaning a loan purchased needed to main or improve the failing WAL Tests, which were all standing at 4.0 years or shorter. This was a purchase that in addition to heightened credit

risk, also violated the CLOs' indentures. The loan is currently still held in the portfolios, has been downgraded to B3/CCC, and trades in the low-mid 90s, several points lower than where it was purchased, and reflects a loss of $442,193.

110.    Premiere Brands (Nine West). This loan had B3/B- ratings at the time of purchase, including a Caa1 tranche rating on the loan, indicating heightened credit risk, and also had a March 2024 maturity date, which is almost five years from when it was bought in April 2019. The WAL Tests for Acis 6, the CLO that bought this loan was failing at this time, meaning a loan purchased needed to main or improve the failing WAL Tests, and stood at 4.15 years. This was a purchase that in addition to heightened credit risk, also violated the CLOs' indentures. Similar to other situations, the manager bought sixteen items on a single day which is a violation of the indenture and of best execution conventions. The loan has subsequently been downgraded to Caa2/CCC, is currently still held in the portfolios, and is quoted in the mid-high 60s, which is more than a $600,000 unrealized loss.

111.    This summarizes much of the losses:

| Issuer | Commitment Bought | Loss on Investment |
|---|---|---|
| Libbey Glass | 12,750,000 | $ (12,660,000) |
| Chief Power | 10,894,048 | (4,724,806) |
| Lumileds Holding | 9,732,632 | (2,181,083) |
| KCA Deutag UK Finance PL | 8,992,443 | (1,781,329) |
| Glass Mountain Pipeline | 1,994,949 | (1,548,280) |
| Envision Healthcare | 13,994,987 | (1,470,094) |
| Doncasters | 9,730,000 | (1,190,979) |
| Premiere Brands | 2,000,000 | (635,000) |
| Boardriders | 6,569,202 | (448,763) |
| **Total** | **76,658,262** | **$(26,640,333)** |

112.    Another problem with these purchases is that they were often executed on the same day (purchasing in a single day tends to make an asset more expensive to buy) and were executed at a time when the market was flying high.

113.    This violated the best execution duties of the Defendants.

114.    Additionally, many of the purchased "bad" assets were some of the cheapest assets on the market—but they were actually still overpriced. The market at the time was a seller's market—loans were scarce. The most prudent course would have been to remain in cash or find far more secure short-term investments.

115.    Defendants have furthermore caused the CLOs to sell certain collateral cheaply and prematurely. In other words, the RIA Defendants took over advising and managing the Acis CLOs with several credit-worthy assets, or they themselves luckily bought several credit-worthy assets.

116.    The problem is that they then sold those assets, inexplicably, at a time when they knew they could not replace them with equal or improved assets.

117.    Given that the Defendants had no intention of redeeming the CLOs (allowing investors to take their money out) or resetting them (raising new debt and opening a new investment period), the investors of the CLOs would have been best served had these "good" assets been allowed to simply mature.

118.    These are illustrated here:

| Issuer | Commitment Sold | Lost Value |
|---|---|---|
| McGraw-Hill Global Education | 34,288,241 | ($5,914,722) |
| Carestream Health | 20,644,508 | (4,799,848) |
| Advantage Sales & Marketing 1L | 27,038,364 | (3,622,316) |
| Advantage Sales & Marketing 2L | 10,688,828 | (2,820,378) |
| Mohegan Tribal Gaming | 12,153,419 | (1,830,609) |
| GIP III STETSON I | 5,169,653 | (1,518,878) |
| Advantage Sales & Marketing 1L | 6,510,157 | (890,963) |
| Party City | 8,826,376 | (822,638) |
| **Total** | 125,319,547 | ($22,220,350) |

119.    A more cynical person would be left to wonder who the purchasers of these assets were, and whether they were entities or persons related to Terry, or in which he had a hidden or surreptitious or beneficial interest.

120.    These assets were sold well after the start of COVID—in late 2020. And so they were sold *after* they had hit their "COVID lows"—but the market had already shown it was roaring back in the last quarter of 2020.

121.    The above assets were also sold on or about the same day, again, a breach of best execution practices.

122.    The mix of assets, because of these knowingly errant purchases and sales, falls well below the acceptable, reasonable WARF, and pushed maturity of the portfolio out past any acceptable, reasonable WAL.

123.    Both the indentures and the PMAs require Acis to seek best execution for all Acis assets.[5]

## C. The Indenture Trustee Is Nowhere to be Found

124.     In light of the foregoing, where was the adult in the room?

125.    The Acis Indentures provide that U.S. Bank shall hold in trust, for the "benefit and security" of the noteholders, all "Collateral Obligations" that secure the co-issuers' financial obligations to the noteholders.

126.    In connection therewith, the Acis Indentures also  provide that, for future purchases and sales of collateral obligations, the Portfolio Manager and the Trustee shall  only consummate these transactions where certain investment criteria are satisfied.

---

[5] PMA Section 4(a); Indentures Section 12.2.

127.    One such criterion in the indenture is that, in order for trades to be combined under the WAL test, they cannot be more than +/- 2 years difference in the maturity dates. Here, that requirement was violated in almost all, if not all, of the bundled trades that the Defendants made or allowed to occur.

128.    Another criterion is that, for all purchases, either (A) each requirement or test, as the case may be, of the Concentration Limitations and the Collateral Quality Test will be satisfied, or (B) if any such requirement or test was not satisfied immediately prior to such reinvestment, such requirement or test will be maintained or improved after giving effect to the reinvestment. *See, e.g.*, Indenture 5 § 12.2(a)(iv). The Acis Indentures define "Collateral Quality Test" as:

> A test satisfied if, as of any date of determination . . . in the aggregate, the Collateral Obligations owned (or, for purposes of *pro forma* calculations in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer satisfy . . . the Maximum Moody's Rating Factor Test . . . [and the] Weighted Average Life Test.

129.    These tests are defined, in turn, as follows:

> "<u>Maximum Moody's Rating Factor Test</u>": The test that will be satisfied on any date of determination if the Weighted Average Adjusted Moody's Rating Factor[6] of the Collateral Obligations is less than or equal to the lesser of (i) the sum of (A)the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the

---

[6] "Weighted Average Adjusted Moody's Rating Factor" means "[a]s of any date of determination, a number equal to the Weighted Average Moody's Rating Factor determined in the following manner: for purposes of this definition, the last paragraph of the definition of "Moody's Default Probability Rating," the second to last paragraph of the definition of "Moody's Rating" and the last paragraph of the definition of "Moody's Derived Rating" will be disregarded, and instead each applicable rating on credit watch by Moody's that is on (a) positive watch will be treated as having been upgraded by one rating subcategory, (b) negative watch will be treated as having been downgraded by two rating subcategories and (c) negative outlook will be treated as having been downgraded by one rating subcategory. *See, e.g.*, Indenture 5 at 64-65.

"Weighted Average Moody's Rating Factor" means "[t]he number (rounded up to the nearest whole number) equal to: (i) the sum of the products of (a) the Principal Balance of each Collateral Obligation (excluding Equity Securities) multiplied by (b) the Moody's Rating Factor of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such Collateral Obligations." *Id.*

---

> Moody's Asset Quality Matrix, based upon the applicable "row/column combination" chosen by the Portfolio Manager with notice to the Collateral Administrator . . . plus the Excess Recovery Adjustment Amount.
>
> "<u>Weighted Average Life Test</u>": A test that is satisfied if the Aggregate Weighted Average Life[7] on such date of determination is not later than November 18, 2022.

Indenture 6 at 37-38, 64.

130.    These provisions seek to maintain the integrity and performance of the portfolio of collateral securing the co-issuers' obligations by requiring certain parties, including the Portfolio Managers and the Trustee, to ensure that any purchase or sale of such collateral complies with detailed, industry-recognized, and bargained-for tests – the exact investor protections that Plaintiff relied on when it invested in the Acis CLOs.

131.    The Acis Indentures also provide that, in performing its duties as Indenture Trustee, U.S. Bank may not "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, any plan of reorganization, arrangement, adjustment or composition affecting the Secured Notes or any Holder thereof".[8]

132.    Similar to the provisions concerning collateral quality, these provisions also seek to ensure that the Trustee does not prejudice the rights of any noteholder under the ACIS Indentures, such as Plaintiff.

---

[7] "Aggregate Weighted Average Life" means "[w]ith respect to all Collateral Obligations as of any date of determination is a date equal to (A) the actual number of years (…) following such date obtained by (i) *summing* the products obtained by *multiplying* the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance at such time of such Collateral Obligation and (ii) *dividing* such sum *by* the Aggregate Principal Balance at such time of all Collateral Obligations *plus* (B) such date of determination. *Id*. at 6.

[8] *er*Acis Indenture Section 5.3.

---

133.    In addition to requiring that U.S. Bank observe certain safeguards, the ACIS Indentures also grant U.S. Bank the broad power to "execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, nominees, custodians, or attorneys."

134.    As set forth above, U.S. Bank and the Portfolio Manager must ensure that every purchase made under the Acis Indentures satisfies the Collateral Quality Tests, including the Weighted Average Life Test ("WAL Test") and the Minimum Weighted Average Moody's Recovery Rate Test ("WAM Test"), or maintains or improves any failing collateral quality tests. They failed to satisfy these obligations.

135.    For one thing, U.S. Bank and the Portfolio Manager effectuated or facilitated certain transactions that did not satisfy the WAL test or maintain or improve such failing WAL test.

136.    Specifically, they made multiple same-day trades and consolidated the weighted average maturity date for these trades. In so doing, they created the false appearance of a maintained or improved WAL test.

137.    Absent this consolidation, the same-day purchases could not have maintained or improved the failing WAL tests on individual bases.

138.    Furthermore, U.S. Bank is obligated to seek best execution on trades reasonably available to the Acis CLOs.

139.    By allowing multiple same day trades, U.S. Bank disregarded the Acis Indenture obligation which requires the maintenance or improvement of the Collateral Quality Test for each individual trade made in each respective Acis CLO.

140.   Also, U.S. Bank allowed, and continues to allow, a circumvention of these collateral quality requirements by allowing the consolidation of the weighted average maturity date of such same-day trades, and in so doing, created the false appearance of a maintained or improved WAL test. But, absent consolidation, the same-day purchases allowed by U.S. Bank cannot maintain or improve the WAL test on an individual basis.

141.   U.S. Bank cannot perform its duties by allowing such Acis CLOs to act as a market *taker*, nor by engaging in a practice of buying long collateral that is improper under the Acis Indentures.

142.   In short, U.S. Bank, as Indenture Trustee, should never have allowed the "bad" loans to have been bought at all—much less on the same day or bundled with other loans.

143.   And it should not have allowed the quality loans that were prematurely sold to have been sold—especially such that they were dumped in a short period of time.

144.   U.S. Bank was required to reserve and protect the CLO investors' rights impacted by the Acis Bankruptcy.

145.   It failed to protect the noteholders and the equity from certain rulings promoted by Terry and Brigade which have handicapped Plaintiff and those in its classes.

146.   It failed to mount any challenge or fight liability and expense that might be incurred as a result of Plan D.

147.   It failed to exercise any care in connection with the payment of expenses; collecting and distributing the interest and dividends due on the portfolio securities; and providing CLO noteholders with periodic reports concerning the interest received, amounts distributed and securities in the portfolio.

148.     Notably, no provisions of the Acis Indentures "shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct."

## V.

## CAUSES OF ACTION

### COUNT ONE
### Violations of the Advisors Act
### Against the RIA Defendants

149.     Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

150.     As registered investment advisors, the RIA Defendants are subject to the Advisers Act, 15 U.S.C. § 80b-1 *et seq.*

151.     The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[9]

152.     The RIA Defendants' fiduciary duties are broad and apply to the entire advisory relationship. The core of the fiduciary duty is to follow the indenture and the PMA, and to do so in a manner that always is in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

---

[9] *See, e.g,, SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis,* 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green,* 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains,* stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing Proxy Voting by Investment Advisers,* Investment Advisers Act Release No. IA-2106 (Jan. 31, 2003)).

153.    This is manifested in a duty of loyalty and a duty of utmost care, which include a duty of transparency. It also means that the RIA has to follow the terms of the agreements and the regulations that apply to the investment vehicle.

154.    The fiduciary duty that the RIA Defendants owed to Plaintiff is one that is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to reflect the RIA's fiduciary duties and to prevent the RIA from violating disclosure rules. *See* 17 C.F.R. § 275.206(4)-7. That also entails the RIA's duty to disclose all facets surrounding potential conflicts of interest and to report their own malfeasance to investors.

155.    Specifically, for all conflicts of interest, the RIAs must disclose those conflicts to the clients verbally, in writing, on Form ADV or a combination of the foregoing, [10] and obtain the client's consent. [11]

156.    Where an RIA trades on its own behalf or places its interests above the advisee or its investors, the Advisers Act holds such RIA liable to the advisee and its investors for breach of fiduciary duty.

---

[10] General Instruction 3 to Part 2 of Form ADV (stating that an adviser's disclosure obligation "requires that [the adviser] provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest [the adviser has] and the business practices in which [the adviser] engage[s], and can give informed consent to such conflicts or practices or reject them")

[11] Investment Advisers Act Release 3060, *supra*; General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your *clients* of all material facts relating to the advisory relationship. As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your *clients* that could affect the advisory relationship. This obligation requires that you provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest you have and the business practices in which you engage, and can give informed consent to such conflicts or practices or reject them."). *See also Robare Group, Ltd., et al. v. SEC*, 922 F.3d 468, 472 (D.C. Cir. 2019) ("[R]egardless of what Form ADV requires, [investment advisers have] a fiduciary duty to fully and fairly reveal conflicts of interest to their clients.").

157.    The Advisers Act's regulations and provisions require full transparency and accountability to an advisers' investors and clients.

158.    This duty is embodied in Section 206 of the Advisers Act, 15 U.S.C. § 80b-6, which prohibits registered investment advisors from using any instrumentality of interstate commerce, directly or indirectly, as a means or in support of "any device, scheme, or artifice to defraud any client or prospective client," "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client," or to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative."

159.    Section 206 of the Adviser's Act focuses on the use of the unlawful means or artifice —it does not require that the activity be in connection with an offer or sale of any security, or in connection with a purchase or sale to or from the advisee. It requires neither evidence of reliance or materiality.

160.    The RIA Defendants utilized the interstate wires and mails, including but not limited to utilizing telephones and email communications, and trading on national exchanges in order to effectuate one or more of the transactions referred to in this Complaint, all while engaged in a scheme to manipulate their fees earned by inflating the par value of the portfolio in aggregate.

161.    There is no plausible pro-investor reason for doing that.

162.    The RIA Defendants utilized interstate wires and mails as part of their business and transactions both in effectuating the inflated expenses, passing them on to the ACIS-3 and 6 accounts, withdrawing and manipulating the funds required to pay said expenses and fees, communications regarding same, and executing the purchases and sales of collateral that have decimated the value of ACIS-3 and ACIS 6.

163.    There is no plausible pro-investor reason for doing that.

164.     The RIA Defendants have engaged in a practice or course of business consisting of passing off expenses, without disclosure or accountability, that were incurred by Acis (the Advisor), as if they were expenses of the CLOs—the *advisees.* By doing so, the RIA Defendants affirmatively misrepresented the character and nature of those expenses and directly assessed their managed entities their pro rata share.

165.     There is no plausible pro-investor reason for doing that.

166.     The RIA Defendants have engaged in transactions as part of a course of business to manipulate, and which operates as a fraud or a deceit on the CLO investors. Its acts and omissions include purchasing non-creditworthy assets identified above at unfavorable prices and in an unfavorable market, in violation of their fiduciary duties and agreements (the indenture and the PMA). These include but are not limited to employing a scheme or artifice to charge millions in expenses that it incurred, to the advised funds; trading in securities as a naked means of maximizing the notional value of the CLO Assets which directly translates into higher fees, and at the same time purchasing loans with maturity dates far into the future, as a means of maximizing the time it can earn those fees. By doing so, the RIA Defendants have engaged in transactions that operate as a deceit or fraud upon their ultimate clients such as Plaintiff.

167.     There is no plausible pro-investor reason for doing that.

168.     The RIA Defendants have engaged in transactions such as selling qualified assets prematurely without being able to replace them, all to the detriment of the investors including the Plaintiff. The bona fide purpose of these acts and omissions, which doubtfully exists, has been concealed and not disclosed. However, the obvious reason for doing so is to increase the amount and duration that the RIA Defendants can continue to collect their fees.

169.     There is no plausible pro-investor reason for doing that.

170.    The RIA Defendants have engaged in a deceptive and manipulative course of conduct by purchasing bundled loans or loans on the same day as a means of making them appear to be creditworthy and have proper maturity dates and have misrepresented whether such transactions were compliant with the indenture and with the RIAs' fiduciary duties to the Plaintiff and to the Indenture Trustee. The obvious reasons for doing so was plainly to escape detection of their wrongful conduct.

171.    These trades not only violate the various fiduciary duties of the Advisers Act, but also violate the indentures' requirements not to bundle trades unless the maturity dates among the loans purchased and bundled are within +/- 2 years, and are part of a pre-approved trading plan. The RIA Defendants violated both of these planks, and such trades should not have been pre-approved even if they were presented prior to the trades.

172.    The RIA Defendants have engaged in a deceptive, manipulative course of conduct and continue to do so in violation of the Advisers Act and its regulations and rules thereunder.

173.    If it is discovered that the RIA Defendants have mislead or otherwise compromised the Indenture Trustee's ability or willingness to police their malfeasance by submitting misleading reports or documentation to the Trustee, or have otherwise manipulated the Trustee by submitting false reports or justifications, then those actions will be added as a basis for damages under this Count.

174.    Based upon the foregoing, Plaintiff has been injured and suffered damages due to the violations.

175.    The Adviser's Act declares any contract void that is made in violation of any of the Advisers Act's provisions, rules or regulations, or where the performance of the contract involves the violation of, or the continuance of any relationship or practice in violation of the

Advisers Act, or any rule, regulation, or order issued thereunder. *See* 15 U.S.C. § 80b-15. Thus, the agreements between Acis and any third party in any transaction in violation of the Advisers Act as alleged herein for ACIS-3 and/or ACIS-6, are void or voidable at the option of the aggrieved party, and the RIA Defendants are liable to Plaintiff to account for their share of the losses. Moreover, the RIA Defendants' rights under the indenture and PMAs are void due to the breaches of the Advisers Act committed in violation thereof, and thus the RIA Defendants are liable in restitution and disgorgement to Plaintiff for its pro rata share of the losses.

176.    Plaintiff thus seeks all legal and equitable remedies to which it is entitled.

## COUNT TWO
### Breach of Fiduciary Duty
### Against the RIA Defendants

177.    Plaintiff incorporates all foregoing factual averments and the factual and legal averments in Count One as if set fully set forth herein.

178.    As registered investment advisors, the RIA Defendants are subject to the Advisers Act. The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.

179.    The RIA Defendants' fiduciary duties are broad and apply to the entire advisory relationship. The core of the fiduciary duty is to always act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

180.    This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the agreements and the regulations that apply to the investment vehicle. The fiduciary duty that the RIA Defendants owed to Plaintiff is predicated on trust and confidence and to not commit corporate waste.

181.   The Advisers Act's regulations and provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality.

182.   These duties are extra-contractual and cannot be waived.

183.   The RIA Defendants have breached their fiduciary duties of transparency by failing to fulsomely justify and document their activities with investors. This is a breach of the duty of loyalty because it is plainly a means to concealing the true extent of the malfeasance and damage done.

184.   The RIA Defendants have breached their fiduciary duties by committing corporate waste in two forms: by incurring unnecessary expenses or improperly imposing expenses on the Acis CLOs that should not have been, and by prematurely selling quality assets for discounts without proper basis. The RIA Defendants should have known that the market was rising, and should not have sold the assets in such a short time span because doing so violated best execution rules. Those rules are in place to avoid precisely what happened here.

185.   The RIA Defendants have breached their fiduciary duties by recklessly and knowingly purchasing assets that were below the requisite creditworthiness and allowing the WARF and the WAL to expose Plaintiff to unjustified risk. As set forth in more detail above, Acis breached its duty by mismanaging the portfolios of the ACIS 3 and 6, and by failing to ensure that new trades complied with the collateral quality tests as set forth above.

186.   Key to these duties is the duty to preserve the equity interests NexPoint holds and to refrain from self-dealing. Among other things, the RIA Defendants assumed obligations that affected NexPoint's rights, and NexPoint detrimentally relied on Acis's continued performance of such obligations. However, the RIA Defendants plainly concocted a scheme to enrich themselves

at the expense of NexPoint, which is an independent breach of fiduciary duty.

187.    The RIA Defendants have further aided and abetted the breaches by U.S. Bank, as described in Count Three (the acts of which are incorporated by reference herein).

188.    The RIA Defendants are thus liable for damages, punitive damages, and all other such relief to which Plaintiff is justly entitled.

### COUNT THREE
### Breach of Contract
### Against Acis

189.    Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

190.    Section 11(a)(i) of the PMAs expressly holds Acis liable for any decrease in the value of the CLOs that was accomplished by bad faith, willful misconduct, gross negligence or reckless disregard in the performance of its obligations.

191.    The PMAs further give Acis the discretion to allocate and manage the CLO assets, and to incur expenses on behalf of the CLOs for services for the benefit of the CLOs.

192.    The indentures to which Acis is a party further require Acis to manage the CLO Assets in a manner so as to maintain or improve the credit quality of the portfolio, subject to the Collateral Quality Tests as defined above.

193.    The PMAs and indentures at issue here select New York law, and under New York law, every contract contains an implied duty of good faith and fair dealing.

194.    Acis has breached these agreements and caused the CLOs to incur expenses that, upon information and belief, go well beyond what is contractually permissible to allocate to the CLOs.

195.    Acis has breached these agreements and manipulated the CLO Assets in a way that prolongs itself and maximizes fees at the expense of the CLO investors such as NexPoint.

196.     These breaches of contract has caused damage to the CLOs and, therefore, to NexPoint.

197.     NexPoint alleges and avers that it may bring this breach of contract claim directly to the extent it and Acis are parties to the indentures, and to the extent the indentures incorporate the PMAs and the duties therein. If NexPoint is required to bring this claim derivatively, it hereby does so and avers that any pre-suit demand would have been futile because asking ACIS-3 or ACIS-6 to bring suit where they are controlled by the Defendants would have been futile.

198.     NexPoint thus seeks its damages, attorneys' fees, restitution, disgorgement, and any and all other remedies to which it is justly entitled.

<u>**COUNT FOUR**</u>
**Breach of Trust Indenture Act**
**Against US Bank**

199.     Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

200.     US Bank's role as trustee is governed in part by the Trust Indenture Act of 1939, as amended by the Trust Indenture Reform Act of 1990.

201.     The Trust Indenture Act of 1939 (the "<u>Act</u>"), codified at 15 U.S.C. §§ 77aaa et seq., is designed to protect bond investors.

202.     The Act, as amended, codifies under federal law an Indenture Trustee's fiduciary duty to the bondholders and holders of investors in debt securities.

203.     It also requires an issuer like ACIS-3 or ACIS-6 to provide periodic reports to the Indenture Trustee.

204.     An indenture trustee's core duty is to monitor and ensure that the issuer has not defaulted under the indenture or other transaction documents. It must report any such default that it recognizes.

205.    Prior to a default, an indenture trustee's primary duty is to follow the indenture.

206.    After a default, an indenture trustee's duty is to report the default within 90 days, and take all actions necessary and proper to protect the investors. Pursuant to Section 315 of the Trust Indenture Act, in the case of a default, the trustee must use the same degree of care and skills in the exercise of its rights and powers as a "prudent man would exercise or use under the circumstances in the conduct of his own affairs." Adequate notice must be provided to all security holders in accordance with Section 313 of the Trust Indenture Act so that they may also exercise their rights.

207.    Section 317 of the Trust Indenture Act provides the trustee with special powers, in the case of a default, to: recover judgment, in the trustee's own name and as trustee of an express trust, against the obligor for the whole amount of such principal and interest remaining unpaid, and file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the trustee and of the security holders allowed in any judicial proceedings.

208.    An Indenture Trustee may not have conflicts of interest.

209.    US Bank had a conflict of interest when it became a creditor of the Acis CLOs in the Acis Bankruptcy and sought to claim its exorbitant attorneys' fees—fees incurred for actions that in no way protected the interests of the investors in the Acis CLOs.

210.    None of these duties are waivable in any way. *See* 15 U.S.C.S. § 77aaaa ("Any condition, stipulation, or provision binding any person to waive compliance with any provision of this subchapter[Trust Indenture Act, as modified, 15 USCS §§ 77aaa et seq.] or with any rule, regulation, or order thereunder shall be void.").

211.    Here, US Bank as the Indenture Trustee had the obligation to submit the approvals

for Plan D, and to object to the effects of Plan D, on behalf of the noteholders, such as NexPoint.

212.    US Bank failed to do so.

213.    US Bank further failed to ensure that the RIA Defendants were managing the CLO Assets in a manner that "maintained or improved" the credit quality of the portfolio. Instead, it appears that US Bank assisted, or capitulated.

214.    US Bank has not reported, nor taken action against the RIA Defendants despite the obvious defaults committed by them as reported herein.

215.    US Bank has thus violated the Act in numerous ways and can and should be held liable for the losses suffered by Plaintiff.

216.    U.S. Bank's breaches, set forth herein, have damaged Plaintiff in not less than $8,000,000.00.

## COUNT FIVE
### Breach of Fiduciary Duty
### Against US Bank

217.    Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

218.    U.S. Bank has an extra-contractual duty to perform all basic, non-discretionary, ministerial tasks under the Acis indentures with due care.

219.    This duty subjects U.S. Bank to tort liability.

220.    U.S. Bank breached this duty in at least two ways.

221.    First, U.S. Bank breached this duty by permitting the Acis Indentures to incur exorbitant expenses, which have diminished the equity that Plaintiff owns indirectly pursuant to the Acis Indentures.

222.    Second, U.S. Bank breached its duty by negligently failing to act, and by accepting the entry of "Plan D" in the Bankruptcy Proceeding, which directly affects the secured

noteholders. Among other things, Plan D adversely impacts the rights of Plaintiff by imposing an injunction that prohibits beneficial trading activity and impeding the ability of noteholders to make optional redemptions.

223.     U.S. Bank's omission to act was not in good faith. In 2018, U.S. Bank filed multiple pleadings in the Bankruptcy Proceeding, including, but not limited to, a Reservation of Rights, and Limited Objections to the entry of the predecessor plans to Plan D. U.S. Bank failed to take any action whatsoever in regard to Plan D.

224.     These breaches were the proximate cause of damages to Plaintiff.

225.     Based on investigation to date, such damages include, but are not limited to, Plaintiff's inability to make certain trades or redemptions, which restriction has decreased the value of Plaintiff's investment across the capital stack of each contract.  They also include the diminished value of the collateral securing the issuer and co-issuer's financial obligations to Plaintiff. U.S. Bank's failure to reserve or otherwise protect Plaintiff's rights impacted by the Bankruptcy Proceeding has caused it to suffer damages.

226.     U.S. Bank has an extra-contractual duty to avoid conflicts of interest.

227.     This duty subjects U.S. Bank to tort liability.

228.     U.S. Bank is prohibited from advancing its own interests at the expense of Plaintiff, its investor.

229.     U.S. Bank breached this duty by, among other things, facilitating extensive portfolio mismanagement and failing to ensure compliance with the collateral quality tests in order to artificially maximize management fees. Such facilitation of noncompliant trades gives rise to an inference of bad faith.

230.    U.S. Bank also breached this duty by allowing the Acis indentures to incur exorbitant fees which have diminished the equity that Plaintiff owns indirectly pursuant to the Acis Indentures.

231.    U.S. Bank's breaches were the proximate cause of damages to Plaintiff.

232.    Based on investigation to date, such damages include, but are not limited to, the diminished value of the collateral securing the issuer and co-issuer's financial obligations to Plaintiff.

233.    U.S. Banks conduct was knowing and willful, and done in disregard of known and established safeguards which are implemented and created in the industry in order to avoid well known, foreseeable risks.

234.    Defendant's acts and omissions were taken in reckless disregard of these known risks. U.S. Bank's breaches, set forth herein, have damaged Plaintiff in not less than $8,000,000.00. U.S Bank is thus liable for damages, punitive damages, attorneys' fees, and costs, as well as restitution and disgorgement.

235.    Furthermore, US Bank knew, or should have known, that the RIA Defendants were violating the various regulations of the Advisers Act and the indenture. The Advisers Act thus declares US Bank's rights under the indenture void, and US Bank is liable for the return of all funds paid to it under the indenture.

<u>**COUNT SIX**</u>
**Negligence**
**Against All Defendants**

236.    Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

237.    To the extent any Defendant would be liable for any of the foregoing causes of action before their lack of sufficient intent or willful actions, Plaintiff pleads in the alternative that

such Defendant's acts or omissions were negligent.

238.     The Defendants owed Plaintiff a duty of care in managing the investments of the CLOs and in discharging their duties under the Investment Advisors Act, and under the indentures and PMAs.

239.     The Defendants acts and omissions in violation of the duties outlined herein have resulted in substantial losses to the Plaintiff, totaling $8,000,000 or more.

240.     The Defendants conduct was knowing and willful, and done in disregard of known and established safeguards which are implemented and created in the industry in order to avoid well known, foreseeable risks.

241.     Defendants' acts and omissions were taken in reckless disregard of these known risks.

242.     Defendants are thus liable for negligence, and gross negligence.

243.     Plaintiff is thus  entitled to damages, punitive damages, attorneys fees, and costs as the law provides and to which it is justly entitled.

**COUNT SEVEN**
**Conversion**
**Against Acis and Terry**

244.     Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

245.     The Acis CLOs are obligated to pay specific and identifiable Administrative Expenses and other costs and expenses. The payment of these expenses is pulled from a reserve of specific and identifiable equity which includes funds belonging to NexPoint, to the extent it is an equity holder under the Acis CLOs.

246.    As a noteholder and equity holder, NexPoint had ownership and a right to the property used to pay the Acis CLOs' administrative expenses and costs before the property's conversion.

247.    In allowing the payment of uncharacteristically high expenses upwards near twenty times their historical amount—Terry, upon information and belief, wrongfully and improperly reimbursed Acis, and potentially himself, using Plaintiff's property designated for the payment of the Acis CLOs' Administrative Expenses and costs.

248.    Upon information and belief, Terry wrongfully and improperly reimbursed Acis and potentially himself, by using Plaintiff's property designated for the payment of the Acis CLOs' administrative expenses and costs, and by allowing the payment of uncharacteristically high expenses upwards nearly 20 times their historical amount

249.    An action for the conversion of using Plaintiff's property designated for the payment of the Acis CLOs' administrative expenses and costs lies based on this conduct. The property at issue is a specific, identifiable fund that has an obligation to be returned or otherwise treated in a particular manner.

**VI.**

**REQUEST TO PIERCE ACIS CAPITAL MANAGEMENT'S CORPORATE VEIL**

250.    Plaintiff hereby alleges and incorporates the preceding allegations as if fully set forth herein.

251.    Terry has exercised complete domination over Acis.

252.    As described herein, Terry used such domination to commit a fraud or wrong that injured Plaintiff. Terry abused the privilege of doing business as Acis to amass the unprecedented

expenses of the Acis CLOs, which was up to twenty times their historical expense rate, among other wrongs.

253.    These expenses and Acis's refusal to provide the accounting requested by certain noteholders under the Acis Indentures, creates an inference of impropriety. Further, the foregoing conduct raises an inference that expenses under the Acis CLOs are being improperly reimbursed.

254.    The circumstances described herein warrant the disregard of Acis's corporate form, in particular, because Courts in this District will disregard the corporate form when necessary to prevent fraud or to achieve equity.

255.    Plaintiff respectfully requests that the Court pierce the corporate veil of Acis such that Acis and Terry are jointly and severally liable for the wrongful conduct described herein, to the extent such conduct would otherwise only be attributable to Acis alone.

## VII.

## **CONDITIONS PRECEDENT**

256.    Pursuant to Federal Rule of Civil Procedure 9(c), Plaintiff hereby pleads that all conditions precedent have occurred or been performed.  Although the Acis Indentures contain "no-action" clauses that require certain noteholders to make written request to U.S. Bank to institute any judicial proceedings in its own name, the Second Circuit has held that noncompliance with a no-action provision is excused in a suit against the indenture trustee. *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir. 1992) ("The district court held that the 'no action' clause applied only to the debenture holder suits against [the issuer], not the Indenture Trustees . . . This construction of [the limitation on suits provision] obviously is correct, as it would be absurd to require the debenture holders to ask the Trustee to sue itself.").

257.     To the extent any claim herein is more properly characterized as a derivative claim, Plaintiff submits that any condition precedent to such claim has been satisfied, and that any pre-suit demand would have been futile because the defendants control both ACIS-3 and ACIS-6, and the Trustee who is empowered to bring suit failed to do so despite numerous written requests.

## VIII.

## DEMAND FOR ATTORNEYS' FEES

258.     Pursuant to Section 5.15 of the Acis indentures, Plaintiff hereby makes a demand for the attorneys' fees and court costs it has sustained in bringing this action.

259.     Plaintiff further seeks attorneys fees to the extent they are authorized by contract, law, regulation, or common law.

## IX.

## PRAYER FOR RELIEF

260.     All causes of action and requested relief are hereby expressly intended to be predicated solely on the alleged acts and omission occurring after the effective date of the Bankruptcy Order dated February 15, 2019.

261.     Plaintiff respectfully request that judgment be entered in its favor and against Defendants U.S. Bank, Acis, Terry, and Brigade as follows:

A.    Damages in an amount to be determined at trial;

B.    Punitive damages in an amount to be determined at trial;

C.    Disgorgement of wrongfully paid fees and expenses and restitution thereof, in an amount to be determined at trial;

D.    Disgorgement of any and all ill-gotten gains in an amount to be determined at trial;

E.    Attorneys' fees and costs;

F.    Constructive trust;

**G.**   All other legal and equitable relief to which Plaintiff is justly entitled.


Dated:  May 14, 2021                              Respectfully submitted,

                                                  **SBAITI & COMPANY PLLC**

                                                  */s/  Mazin A. Sbaiti*
                                                  **Mazin A. Sbaiti**
                                                  NY Bar No. 275089
                                                  J.P. MORGAN CHASE TOWER
                                                  2200 Ross Avenue
                                                  Suite 4900W
                                                  Dallas, TX  75201
                                                  T: (214) 432-2899
                                                  F: (214) 853-4367
                                                  E: mas@sbaitilaw.com

                                                  ***COUNSEL FOR PLAINTIFF***