IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 161 OF 2018 (NSJ)

IN THE MATTER OF THE COMPANIES LAW (2018 REVISION)
AND IN THE MATTER OF CHINA SHANSHUI CEMENT GROUP LIMITED

AND

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: 93 OF 2019 (NSJ)

BETWEEN:

TIANRUI (INTERNATIONAL) HOLDING COMPANY LIMITED

Plaintiff

AND

CHINA SHANSHUI CEMENT GROUP LIMITED

Defendant

| | |
|---|---|
| Appearances: | Vernon Flynn QC and Jern-Fei Ng QC of counsel and Maples and Calder for the Company |
| | Thomas Lowe QC of counsel and Ogier for Tianrui |
| Heard: | 26, 27 and 28 November 2019 |
| Hearing transcript Produced: | 17 and 29 December 2019 |
| Application to adduce new evidence: | 4 March 2020 |
| Further submissions: | 16 March 2020 |
| Draft judgment circulated: | 30 March 2020 |
| Judgment delivered: | 6 April 2020 |



EXHIBIT

D

*HEADNOTE*

*Applications to strike out contributory's winding up petition for abuse of process and to strike out a separate writ action by the petitioner on the ground that the petitioner as shareholder did not have standing to bring the action since the claim could only be maintained as a derivative action. Applications in the alternative for a case management stay of the petition and writ action to await the conclusion of proceedings in Hong Kong*

## JUDGMENT

### Introduction and outline of my decision

1.   This is the latest round in a long running, hotly contested and multi-jurisdictional dispute relating to the control and management of China Shanshui Cement Group Limited (the *Company*). The dispute has resulted in multiple proceedings (and decisions) in this jurisdiction and Hong Kong. This judgment deals with four further applications made by the Company.

2.   The Company is a Cayman Islands exempted company that is also registered in Hong Kong as a non-Hong Kong company. Its shares are listed on the Hong Kong Stock Exchange (*HKSE*). It is the holding company of a number of operating subsidiaries, which subsidiaries are registered in Hong Kong and the People's Republic of China (*PRC*). The most important of these is Shandong Shanshui Cement Group Company (*Shandong Shanshui*). The group is principally engaged in the production, distribution and supply of cement and related construction products.

3.   The underlying dispute arises out of a bitter and prolonged battle for control of the Company. The contest for control has been between two main groups of shareholders. First, Tianrui (International) Holding Company Limited (*Tianrui*), a company incorporated in the British Virgin Islands. Second, China National Building Material Holding Co. Limited (*CNBM*), a company incorporated in the PRC and Asia Cement Corporation (*ACC*), which is incorporated in Taiwan. Zhang Caikiu (*Mr. Zhang Senior*) and his son, Zhang Bin (*Mr. Zhang Junior*) (Mr. Zhang Senior and Mr. Zhang Junior being together the *Zhangs*) have also been involved. They were directors of the Company and Tianrui alleges that Mr. Zhang Senior at relevant times controlled the composition of the

the Company's board and was a party to an unlawful means conspiracy with CNBM and ACC to damage Tianrui and the Company.

4.      Another significant shareholder in the Company, owning 25.09% of its shares, is China Shanshui Investments Co, Ltd (**CSI**). CSI is incorporated in Hong Kong and was part of an employees' stock ownership scheme for employees of the Company and its subsidiaries. Pursuant to the stock ownership scheme, Mr. Zhang Senior had become the holder of approximately 81.74% of the shares in CSI. The majority of these were held on trust for the employees who participated in the scheme (the **CSI Employee Beneficiaries**). In addition, there are a number of public shareholders (who are not involved in the disputes).

5.      In this jurisdiction, Tianrui has presented a winding up petition and subsequently commenced proceedings (by writ) against the Company. The winding up petition was originally dated 30 August 2018 (and issued on 4 September 2018). The writ was issued in May 2019.

6.      The Company has already unsuccessfully applied to have the petition struck out. In January 2019, before the filing by Tianrui of its writ action, the Court of Appeal allowed an appeal from the judgment of Mangatal J and held that if the allegations set out in the petition were true, they were capable of establishing that it would be just and equitable to wind up the Company. The Court of Appeal set out its reasons in a written judgment dated 5 April 2019 (the **Court of Appeal's Judgment**). The Privy Council has recently (on 20 February 2020) refused the Company's application for permission to appeal the Court of Appeal's Judgment.

7.      There have also been further proceedings in this jurisdiction arising out of and related to the petition. As I will shortly explain, one of Tianrui's complaints is that in carrying out their agreement to damage Tianrui, CNBM and ACC sought to dilute its shareholding in the Company by procuring the issue of convertible bonds and then new shares to their associates. Following the presentation of the petition, the Company sought a validation order to permit and validate the transfer of some of those new shares to the operator of the Hong Kong central clearing and settlement system. Tianrui contended that the transfer of shares would cause serious and irreversible consequences and would prejudice the outcome of the petition because it would become, if the transfer went ahead and the petition was successful, impossible to unwind the allegedly improper and dilutive share issue. Mangatal J made the validation order but the Court of

Appeal has recently (on 18 February 2020) allowed Tianrui's appeal and refused to validate the transfer.

8.   In Hong Kong, the Company has commenced two sets of proceedings (there have been a number of proceedings in Hong Kong commenced and determined during the course of the battle for control of the Company but two are of particular relevance to the applications now before me):

(a).   on 4 December 2015, the Company (and various subsidiaries) issued proceedings (HCA2880/2015) (the *First Hong Kong Proceedings*) against CNBM, ACC and eight individuals who had been directors of the Company. These included Mr Zhang Senior, Mr Zhang Junior and directors nominated by CNBM and ACC.

(b).   on 29 March 2019, the Company (and various subsidiaries) issued proceedings (HCA548/2019) (the *Second Hong Kong Proceedings*) against Tianrui (and its shareholders) and sixteen other defendants. The third to seventeenth defendants were at various times directors or officers of the Company while Tianrui was in control of the composition of the Company's board. These included Stephen Liu and David Yen of Ernst & Young who had, before taking an appointment as a director of the Company, been appointed by the Hong Kong court as receivers of the shares held by Mr. Zhang Senior in CSI (the *CSI Receivers*). The eighteenth defendant was Ernst & Young Transactions Limited (*EYTL*). Mr. Liu and Mr. Yen had been directors of EYTL.

9.   The various proceedings were therefore commenced in the following order: the First Hong Kong Proceedings; then the Cayman winding up petition; then the Second Hong Kong Proceedings and finally the Cayman writ action.

10.   On 12 August 2019, the Company filed two summonses. The first sought to strike out or stay the petition. The second sought to strike out or stay the Cayman writ action. After failing to strike out the petition on the grounds relied on in its earlier strike out application, and after failing to obtain a validation order, the Company now seeks to strike out the petition on the basis that having commenced the Cayman writ action it is now an abuse of process for Tianrui to continue to pursue the petition. In the alternative, the Company seeks a temporary case management stay of the petition pending the conclusion of both of the Hong Kong proceedings. In addition, it seeks to

strike out the Cayman writ action either on the basis that it is an abuse of process for Tianrui to pursue both the petition and the Cayman writ action or because the cause of action relied on in the Cayman writ action can only be constituted as a derivative claim on behalf of the Company and is currently improperly constituted as a personal claim by Tianrui qua shareholder (in its written submissions the Company argued that the Cayman Writ Action should be struck out as an abuse both because Tianrui does not have standing to bring a personal claim and separately because, in so far as the claim is a derivative claim, it failed to comply with the provisions in the Grand Court Rules regulating such actions). Alternatively, the Company seeks a case management stay of the Cayman writ action pending the conclusion of both of the Hong Kong proceedings.

11.    Accordingly, the Company's four applications are:

    (a).    for an order that the petition be struck out on the basis that it is an abuse of the process of the Court for Tianrui to continue its pursuit of the petition in view of the position it had taken in its appeal to the Court of Appeal (the ***Petition Strike Out Application***).

    (b).    in the alternative, for an order that Tianrui's writ be struck out on the basis that it is an abuse of the process of the Court for Tianrui to pursue both the writ and the petition simultaneously (the ***First Writ Strike Out Application***).

    (c).    further, or in the alternative, for an order that the writ be struck out on the basis that it is defective in so far as a derivative claim is being pursued, since it fails to comply with GCR O.15, r.12A. Since the issues arising are closely connected, I also deal under this heading with the Company's claim to strike out the Cayman writ action on the basis that it is not properly constituted as a personal claim (the ***Second Writ Strike Out Application***).

    (d).    further, or in the further alternative, for an order that the petition and/or the writ be stayed on case management grounds until the Hong Kong court has delivered judgment at trial in both of the outstanding proceedings in Hong Kong (the ***Stay of the Petition and Writ Action Application***).

12.    After having carefully considered the submissions made and evidence filed by both parties and for the reasons set out below, I have concluded as follows:

(a).    the Petition Strike Out Application should be dismissed.

(b).    the First Writ Strike Out Application should be dismissed on the basis that Tianrui has agreed that the Cayman writ action and the petition be heard together; that the evidence filed in relation to the petition stand as evidence in the Cayman writ action and that no orders for (further) discovery be made in the Cayman writ action.

(c).    the Second Writ Strike Out Application should be dismissed. The Company's claim to strike out the Cayman writ action on the basis that it is not properly constituted as a personal claim fails. In my view, both as a matter of principle and in accordance with the authorities, properly understood, Tianrui has standing to bring the claim set out in the Cayman writ action against the Company (in its capacity as shareholder, on its own or as a representative of all shareholders) for relief in respect of the alleged abuse and improper exercise of the directors' powers and the Company's breach of the statutory contract in the articles. But the declaratory relief available in the action can (as I understand Tianrui now accepts) only properly relate to the validity of the directors' exercise of their powers and cannot seek to affect the rights or position of third parties. Relief against or affecting third parties including a declaration that the issue by the Company of the convertible bonds and new shares challenged by Tianrui be set aside would require a derivative claim to which such third parties were joined (and satisfaction of other relevant procedural requirements applicable to such an action). The statement of claim in the Cayman writ action therefore needs to be amended and a suitable application needs to be made by Tianrui.

(d).    the Stay of the Petition and Writ Action Application should also be dismissed. On balance, I do not consider that the Company has met the very real burden and high threshold which needs to be satisfied to justify a case management stay either in relation to the petition or the Cayman writ action.

(e).    on this basis, the petition and the Cayman writ action should continue. Various further applications now need to be made promptly to allow this to happen. In particular, an application to amend the Cayman writ action needs to be made by Tianrui as soon as possible. And directions for the further conduct of the petition also need to made as soon as

possible. I decline to give directions in the form sought by Tianrui without the parties providing written submissions (and if required a further hearing) on certain important issues which arise on such a directions application.

(f).    I would ask counsel to prepare a suitable form of order for my approval and to file short written submissions of no more than five pages as to the appropriate costs order to be made, if the parties cannot agree on this.

13.   I should note that on 10 February I informed the parties (via my personal assistant) that since I had to be away from 21 February to 2 March judgment would be circulated by the end of the week of 2 March 2020. During that week, on 4 March, Tianrui's Cayman attorneys, Ogier, sent an email to the Court explaining that there had been recently developments in the Hong Kong proceedings, as a result of the coronavirus emergency, which they considered to be material and about which they wished to file further evidence. Subsequently, the Company's Cayman attorneys, Maples and Calder, indicated that their client considered that it was a matter for the Court to decide whether to permit further evidence to be adduced but that if the Court decided to do so the Company also wished to have permission to file further evidence and to file further written submissions as to the impact of the further evidence and the delays in Hong Kong to the Company's applications for a case management stay. I granted permission for the filing of further evidence and allowed the parties seven days in which to file further written submissions, which submissions I have taken into account in reaching my decision on the Company's applications.

**The background – the battle for control of the Company**

14.   The relevant background to and basis of the petition are set out in the Court of Appeal's Judgment. There is also some discussion of the background in the Court of Appeal's validation order judgment. While it would be convenient just to cross-refer to the relevant parts of the Court of Appeal's Judgment, and doing so would reduce the length of this long judgment, I consider that I need to review and rehearse the relevant background and procedural history since, in order to deal with the Company's applications, it is necessary to see the big picture and how each of the proceedings and the issues arising within them relate to one another. In addition, the Court of

Appeal's Judgment does not deal with the Hong Kong proceedings and various subsequent developments, including Tianrui's Cayman writ action.

15.    It appears that the trigger for the takeover battle was the decision of the PRC government, in November 2014, to prohibit any expansion of capacity or development of new projects in the cement industry. This meant that cement producers could not expand through the development of new projects; they could only do so by acquiring or merging with other existing producers. As a result, Tianrui, CNBM and ACC all identified the Company as a target and acquired or expanded their shareholdings in it.

16.    There followed the battle for control of the Company. As I have noted, this has ended up as a battle primarily between Tianrui on the one side and CNBM and ACC on the other (but has also included the Zhangs who Tianrui allege to have been in the CNBM/ACC camp). The initial or preliminary steps taken by the different parties appear to have started early in 2014 before the announcement of the PRC government's decision mentioned above. Since then, Tianrui, CNBM and ACC acquired shares in the Company and at different times appointed their representatives to the Company's board. Tianrui says that CNBM and ACC agreed to act together against it in order to prevent Tianrui obtaining control, to dilute its shareholding and to cause it (and the Company) loss and damage. Tianrui says that CNBM and ACC did so by acting unlawfully (and in combination at different times with the Zhangs and CNBM/ACC's nominees or representatives on the board, who also acted in breach of duty and unlawfully). In turn, CNBM and ACC allege that Tianrui's action in seeking to obtain control of the Company was improper and unlawful and caused the Company loss and damage. They also assert that Tianrui's nominees or representatives, when on the Company's board, acted unlawfully and in breach of duty and in combination with Tianrui and that they all caused loss and damage to the Company.

17.    During the period in which the battle has raged, different factions have been in control of the Company's board at different times and this explains why proceedings have been brought by the Company against both CNBM/ACC and Tianrui. In the period before 13 October 2015, according to Tianrui, Mr. Zhang Senior (assisted by Mr. Zhang Junior) controlled the composition of the Company's board. Mr. Zhang Senior was removed as a director of the Company at an extraordinary general meeting (*EGM*) of the Company's shareholders held on 13 October 2015. According to Tianrui, in the period from that date to 1 December 2015 Mr. Zhang Senior with CNBM and ACC

controlled the composition of the board (because they collaborated and were parties to an unlawful conspiracy). From 1 December 2015 until 23 May 2018, Tianrui controlled the composition of the board (and Tianrui appointed its own representatives to the board). The First Hong Kong Proceedings were commenced by the Company shortly after Tianrui took control and covered Tianrui's complaints about the conduct of the Company's directors (in particular Mr. Zhang Senior), CNBM and ACC during the period before 1 December 2015. On 23 May 2018, Tianrui lost control of the Company's board and its representatives were replaced by representatives of CNBM and ACC. The Second Hong Kong Proceedings were not commenced immediately but only in March 2019, after the presentation of the petition in August 2018. The Second Hong Kong Proceedings covered the Company's (CNBM's and ACC's) complaints about the conduct of Tianrui, and its representatives on the board, during the period in which Tianrui controlled the composition of the board.

18.   The petition (as I explain below) relied heavily on the conduct of CNBM, ACC and the Company's board in the period after Tianrui lost control of the Company, to demonstrate that CNBM and ACC had acted unfairly or oppressively towards Tianrui and/or that the Company's affairs had been conducted with a lack of probity. In particular, the petition covers conduct occurring in the period between August and October 2018 and avers that the Company's board (acting at the instigation of and in concert with CNBM and ACC) had caused the Company to enter into a number of convertible bond issues (and to issue new shares to the holders of such bonds, who were alleged to be connected with CNBM and ACC) to dilute Tianrui's shareholding in the Company. But the petition does not rely exclusively on conduct occurring after Tianrui lost control. In addition, reliance was also placed on the conduct of CNBM, ACC and their nominees on the board in the period before Tianrui took control of the board, once again to demonstrate unfair and oppressive conduct and improper management. Accordingly, as the Court of Appeal noted in the Court of Appeal Judgment, while Tianrui's presentation of its case on occasions gave the impression that the dilution of its shareholding was its sole complaint, when properly understood the case made in the petition went further and comprised serious allegations of conspiracy over a longer period by covert agreements and arrangements designed to damage Tianrui – so that the steps taken to dilute its shareholding were to be understood as merely the latest stage in the conspiracy.

19.   The Cayman writ action relates only to the conduct taking place between August and October 2018, after Tianrui lost control. It challenges the validity of the issue of the convertible bonds and

new shares and seeks orders declaring that they were issued for an improper purpose and are to be treated as void and of no effect.

20.　CNBM and ACC (and the Zhangs) have denied Tianrui's allegations. They assert that they acted properly in the period before Tianrui acquired control of the Company and that the Company's board acted properly when issuing the convertible bonds (and the new shares). They claim that the action that the Company took during the period they were in control of the board was a proper response to the financial problems caused by Tianrui's rapid acquisition of a large shareholding and to Tianrui's improper attempts to obtain and retain control. They deny that they acted unlawfully or that there was a conspiracy to damage Tianrui. They make counter allegations against Tianrui. They assert that Tianrui, and others, including the directors nominated by Tianrui to the Company's board during the period when Tianrui controlled the board conspired together, using unlawful means, to injure the Company (and its subsidiaries).

21.　I now turn to consider in further detail the basis of and factual allegations made in the four sets of proceedings to which the Company's applications relate. I do so in the order in which the proceedings were commenced since it is easier to see how they relate to one another if viewed chronologically.

**The First Hong Kong Proceedings**

22.　The board appointed by Tianrui on 1 December 2015 caused the Company, Shandong Shanshui and two other subsidiaries of the Company to bring the First Hong Kong Proceedings against the Zhangs and others who had acted as directors of the Company or the other plaintiff companies (together the ***Director Defendants***) as well as CNBM and ACC. The Director Defendants included Chang Zhangli (***Mr. Chang***) of CNBM (who had been nominated by CNBM and appointed a director of the Company in May 2015) and Wu Ling-Ling (***Ms. Wu***) of ACC (who had been nominated by ACC and appointed a director of the Company in October 2015). Initially, on 4 December 2015, the proceedings were issued against the Zhangs and James Li. Subsequently, on 17 December 2015, CNBM, ACC and the individuals associated with them were joined as defendants.

23.     I summarise below the claims and factual allegations made in these proceedings. In essence, the allegations focus on conduct from the first quarter of 2014 until 1 December 2015. The Company claims that for a time Mr. Zhang Senior controlled the Company's board and exercised control for his personal benefit, that he mismanaged and misappropriated assets from the Company and its subsidiaries and is liable to the Company for the resulting loss. The Company also claims that when action started to be taken against Mr. Zhang Senior, he sought and obtained support from CNBM, which eventually resulted in Mr. Zhang Senior (and Mr. Zhang Junior) and CNBM (and subsequently ACC) acting together as a concert party (as the term is defined in and such conduct is regulated by the Hong Kong Takeovers Code) and being parties to an unlawful means conspiracy. Their purpose was to enable the concert party's members unlawfully to obtain control of the Company without providing fair value to the Company's minority shareholders (namely Tianrui and CSI) and without making a general offer to shareholders in the terms and as required by the Takeovers Code. All the defendants have filed defences denying the allegations made against them and the account of events provided by the Company.

24.     The claims made in the First Hong Kong Proceedings are set out in the re-amended statement of claim dated 27 May 2017 (the *First Hong Kong Proceedings Statement of Claim*). The drafting is, I have to say, less than limpid and not always easy to follow. Subject to that qualification, I would summarise the factual allegations and the claims made as follows:

        (a).    claims were made against Mr. Zhang Senior and Mr. Zhang Junior based on mismanagement and misconduct and against other Director Defendants for assisting or failing to prevent such conduct. It was asserted that during the period in which Mr. Zhang Senior had controlled the Company's board (and the management of the Company and its subsidiaries), he had treated the Company (and CSI) as his own property and in breach of his fiduciary duties made and received improper payments from the Company's assets (and caused the Company to incur substantial losses). The other members of Company's board had failed to exercise meaningful control over him or take action with respect to his breaches of duty.

        (b).    claims were also made based on an alleged unlawful means conspiracy to which the Zhangs, CNBM and ACC (and some of the other Director Defendants) were parties and the formation of an undisclosed concert party:

(i).    it was alleged that the Zhangs (together with another executive director of the Company, Mr. James Li) in breach of their fiduciary duties, combined in a conspiracy with CNBM (which was later joined by ACC and the other Director Defendants) first, to assist Mr. Zhang Senior to retain management control of the Company and avoid liability for his breaches of duty and secondly, to help CNBM and ACC obtain control of the Company without complying with the requirements of Hong Kong company law or the Hong Kong Takeovers Code or Listing Rules.

(ii).    it was alleged that following complaints made in March 2014 by the CSI Employee Beneficiaries and the minority shareholders in CSI about Mr. Zhang Senior's conduct as a shareholder in CSI (and disputes as to the nature and extent of the trust on which Mr. Zhang Senior held the shares), Mr. Zhang Senior had approached CNBM (which was not then a shareholder in the Company) for assistance. Following this approach, it was agreed that in exchange for CNBM's support and assistance in dealing with the complaints and maintaining Mr. Zhang Senior's control of the Company, Mr. Zhang Senior would procure the Company to allot shares to CNBM at an undervalue so as to allow it to become the largest or second largest shareholder in the Company. Thereafter, the Zhangs (together with another executive director of the Company, Mr. James Li) in bad faith conspired together and with CNBM unlawfully to change the proportions in which the Company's shares were held. They did this by exercising CSI's voting rights as a shareholder of the Company, causing the Company in October 2014 to enter into a subscription agreement with CNBM for the issue of shares at an undervalue and granting new share options to the Zhangs.

(iii).    it was further alleged that the collaboration between CNBM, ACC and the Zhangs resulted in there being a concert party for the purpose of the Hong Kong Takeovers Code. The purpose of the concert party was as I have described above. The action taken pursuant to the concert party included the Zhangs (together with Mr. James Li) arranging in March and April 2015, for the amendment of existing loan notes so as to include, or including in new loan notes (issued by the Company to record the terms on which the Company received certain loans), a change of control clause whereby any removal of Mr. Zhang Junior as chairman or an increase in the shareholding of any shareholder in the Company above 30% would render the loan notes immediately

repayable; in May 2015, voting the shares under their control so as to change the composition of and exercise control over the Company's board; in June and July 2015, the Zhangs (together with Mr. James Li) dishonestly caused the Company to make a series of false and misleading public announcements in breach of the Takeovers Code (in particular in relation to the effect of shareholder resolutions proposed by Tianrui and by failing to disclose full details of the concert party relationship); in September 2015, the Zhangs (with Mr. James Li's assistance) caused a subsidiary of the Company to draw down funds under a loan facility that were not needed for operational reasons thereby incurring unnecessary interest expense; the Zhangs (together with Mr. James Li) engaged in improper and wasteful litigation (against Tianrui and others), thereby improperly incurring legal and unrelated expenses; and in October 2015 improperly and unlawfully managing, conducting and exercising votes at an EGM of the Company in order to reconstitute the Company's board so as to appoint directors who owed their allegiance to the members of the concert party and ensure that the other large shareholders in the Company (namely, Tianrui and CSI) had no representation on the board.

(c).   in addition, it was alleged that in anticipation of being removed from office by Tianrui and CSI:

    (i).   in October 2015, the Zhangs in bad faith and breach of duty improperly exercised their powers to change the articles of Shandong Shanshui so as to ensure that they remained, with an associate, and could not be removed, as directors of Shandong Shanshui. This was done to remove the Company's control over, and give to the concert party control of, the Company's most valuable subsidiary and asset. It amounted to an unlawful misappropriation of the Company's assets. The changes to the articles of Shandong Shanshui and the entrenchment of the position of the Zhangs was concealed until it was discovered by Tianrui after 1 December 2015. In addition, in the period up to 1 December 2015, funds and the books and records of Shandong Shanshui were also misappropriated.

    (ii).   in November 2015, the Company's board resolved to present a winding up petition in this Court and to apply for the appointment of provisional liquidators. It was alleged

that Mr. Zhang Junior (Mr. Zhang Senior was by then not a *de jure* director although he was alleged to be a shadow director and Mr. James Li was also no longer a director) and the other Defendant Directors had acted in bad faith and for the benefit of the concert party in exercising their powers and passing the relevant resolutions. They had acted to pre-empt the forthcoming EGM on 1 December 2015 at which they knew they would be removed from office. The petition and application were improper and made without proper authority and evidence was filed in bad faith in support of the petition and applications.

(d).  the plaintiff companies sought various types of relief against the Zhangs, the other Director Defendants, CNBM and ACC. The relief sought included a negative injunction against the Zhangs to prevent them from exercising the powers granted under the amended articles of Shandong Shanshui and a mandatory injunction requiring them to deliver up the books and records of Shandong Shanshui; an order that CNBM account as a constructive trustee for benefits improperly received in respect of the profits made as a result of the improper allotment in 2014 of shares at an undervalue; damages, restitution and/or equitable compensation against the Zhangs for property misapplied and for breaches of duty and against the other Defendant Directors for breach of duty; and damages, restitution and/or equitable compensation against CNBM and ACC as parties to the unlawful means conspiracy.

25.  The defendants to the First Hong Kong Proceedings have filed defences. In summary, they all deny the allegations made against them:

(a).  the Zhangs have denied all the allegations made against them. In particular, they deny that they collaborated or were parties to a conspiracy with CNBM or ACC or that they were able to control or decisively influence the composition of the Company's board. They deny the existence of a concert party, having acting in bad faith or having acted for the benefit of such a concert party.

(b).  ACC (after identifying what is asserts to be inconsistencies in the conspiracy allegations as it relates to ACC) deny that it was involved in unlawful collaboration with any conspiracy.

26.    The First Hong Kong Proceedings have been set down for a forty-one-day trial (8 weeks) in the Hong Kong High Court before Coleman J commencing on 19 April 2021 (and no application has been made to stay these proceedings).

27.    The First Hong Kong Proceedings involve the Company, whose board is controlled by CNBM/ACC, suing CNBM, ACC and their nominees on the board. Two current directors, Mr. Chang and Ms. Wu, are also Director Defendants. The Company's evidence is that, in order to deal with the obvious, conflict, and following the reconstitution of the board in May 2018, arrangements have been made to allow the Company's independent non-executive directors to manage the conduct of the litigation. The petition originally contained an averment that the Company had failed to take proper steps to advance these proceedings and resolve Mr. Chang's and Ms. Wu's conflict of interest but this was deleted in the Amended Petition. Nonetheless, Tianrui has filed evidence and made submissions challenging the adequacy and reliability of these arrangements.

**The Cayman winding up proceedings**

28.    The winding up petition was originally dated 30 August 2018 (and issued and served on 4 September 2018). At the same time as presenting the petition, as required by Order 3 r.11(1) of the Companies Winding Up Rules (2018) (the *CWRs*), Tianrui filed a summons for directions (the *Summons for Directions*).

29.    On 11 September 2018, the Company applied for orders that the petition be struck out (the *First Strike Out Application*) on the grounds that it constituted an abuse of process, due to the alleged failure to pursue alternative remedies, presentation of the petition for a collateral purpose, and misleading the Court by non-disclosure.

30.    On 19 October 2018, Mangatal J dismissed the petition. She held that Tianrui had an alternative remedy that it had unreasonably failed to pursue and that the petition was presented for an improper purpose.

31.    On 16 January 2019, the Court of Appeal overturned the decision of Mangatal J. It gave its reasons for so deciding on 5 April 2019 in the Court of Appeal's Judgment. I summarise below the basis for the Court of Appeal's decision. An application to the Privy Council for permission to appeal the

Court of Appeal's decision was still pending and undecided at the date of the hearing of the Company's application but, as I have already noted, after the hearing, on 20 February, the parties were notified that the Privy Council had refused to give permission to appeal.

32.    Following the Court of Appeal's Judgment, the petition was reinstated and on 4 July 2019, Tianrui's application (made on 27 May 2019) for leave to amend the petition was heard and granted. The petition was amended in the manner set out in the amended draft petition attached to Tianrui's amended summons for directions dated 27 May 2019 (the **Amended Petition**). The petition was amended so as, *inter alia*, to remove allegations based on the continued suspension of the Company's shares and the fact that the Company faced being delisted from the Hong Kong Stock Exchange.

33.    The Amended Petition seeks a winding up order on the just and equitable ground. Tianrui's case is that there is a justifiable lack of confidence on Tianrui's part in the Company's management. Tianrui alleges that CNBM and ACC have acted unfairly and/or oppressively towards it and/or that the affairs of the Company have been conducted with a lack of probity and that as a result it no longer has confidence in the management of the Company (which is conducted by the board controlled by directors appointed by CNBM and ACC).

34.    The Amended Petition sets out the factual basis for Tianrui's claims that justify Tianrui's loss of confidence in the Company's management. The facts relied on in the Amended Petition are substantially the same as, although not identical to, those contained in the petition. The Court of Appeal's discussion of the basis of Tianrui's case is therefore still applicable. The basis on which Tianrui seeks a winding up order can be summarised as follows:

(a).    the Amended Petition states that since 2014, CNBM and ACC have exercised their rights as shareholders at EGMs and through their representatives appointed as directors to take control of and cause loss to the Company. The Amended Petition identifies conduct that Tianrui asserts demonstrates that CNBM and ACC have acted unfairly and/or oppressively towards it and/or that the Company's affairs have been conducted with a lack of probity. The particulars of the conduct complained of are set out under two headings "*Control of Shandong Shanshui*" and "*Improper Share Issue*" and cover two different periods.



(b). in 2015, in the period leading up to its appointment of a new board on 1 December 2015, and while CNBM and ACC were in control of the Company's board, steps were taken to prevent the new board from having full oversight and control of Shandong Shanshui. In the period from 22 May 2015 to 1 December 2015, Mr. Chang of CNBM (**Mr. Chang**), and from 14 October 2015 to 1 December 2015, Ms. Wu of ACC (**Ms. Wu**), had been directors of the Company. After the new board had removed certain directors of Shandong Shanshui, Mr. Chang and Ms. Wu conspired with the former directors to oppose the action of the new board to regain control of Shandong Shanshui. In return for their support, Mr. Chang and Ms. Wu agreed to cause CNBM and ACC to support the re-appointment of the former directors to the board of Shandong Shanshui.

(c). in the period between August and October 2018, the Company's board (with and controlled by CNBM and ACC) purported to issue convertible bonds on uncommercial, non-arm's length, terms, modified the terms governing the conversion of the bonds into the Company's shares and then issued shares pursuant thereto in order to dilute Tianrui's shareholding below twenty-five per cent of the Company's share capital, thereby preventing Tianrui from being able to block the passing of special resolutions:

   (i). the Company entered into a subscription agreement on 8 August 2018 (the **First Subscription Agreement**) with Cithara Global Multi-Strategy SPC (**Cithara**) for the issue of convertible bonds and issued bonds pursuant. The total principal amount of these bonds was US$210,900,000 and the conversion price was HK$6.29. The Company has confirmed that Cithara held the bonds for the benefit of Guotai Junan International Holdings Ltd (**Guotai**).

   (ii). on or about 30 August 2018, the Company entered into another subscription agreement with Cithara and six further subscription agreements with other parties for the issue of convertible bonds (the **Further Subscription Agreements**). The total principal amount of these bonds was US$320,700,000.

   (iii). on or about 6 October 2018, the Company proposed to allot new shares in exchange for some of the convertible bonds and entered into deeds of amendment (the **Conversion Agreements**) with each of the subscribers to accelerate the conversion of

US$456,600,000 of the bonds into shares. Pursuant to the Conversion Agreements, each subscriber agreed that the Company had the right to convert the bonds at an early conversion date (being a date after which approval for the listing on the HKSE of the converted shares and shareholder approval in general meeting for the issue of the conversion shares had been obtained). The conversion price was reduced to HK$4.20.

(iv). on 30 October 2018, at an EGM of the Company's shareholders, an ordinary resolution was passed (66.62% to 36.38% with CNBM, ACC and CSI voting in favour of the resolution) authorising the allotment and issue of 1,067,830,759 new shares at HK$4.20 per share. This involved the allotment and issue of new shares pursuant to the Conversion Agreements (980,352 shares representing US$456,600,000 of the bonds' aggregate principal of US$531,600,000) together with the issue of a further 85,845,636 shares to other subscribers (the *New Shares*). The resolution also approved the issue of further new shares to other subscribers who had yet to agree to the conversion terms. On the same day, the board completed the share conversion and issued the New Shares.

(v). the effect of the issue the New Shares was to dilute Tianrui's interest in the Company from 28.16% to 21.85%. If new shares were also issued to the other subscribers who had yet to agree to the conversion terms, Tianrui's interest in the Company would be reduced to 21.40%.

(vi). according to Tianrui, the bonds were not issued on arms' length terms and it can be inferred that Cithara (or Guotai or the ultimate owners of the bonds) and the other holders of the bonds were associated or otherwise connected with CNBM and ACC. Tianrui asserts that the issue of the bonds and the share conversion was done on uncommercial terms and for an improper purpose.

(d). in these circumstances, there was a need for an independent insolvency practitioner to be appointed to investigate the availability of claims against the current and former directors of the Company (including those covered by the First Hong Kong Proceedings); the Company's financial position; the above mentioned transactions including the issue of the New Shares and the allegedly unlawful control of Shandong Shanshui.

35.   The important parts of the Court of Appeal's Judgment appear in paragraphs [32] - [34] and [36] - [38] and [52] as follows:

32.   *As we have indicated, the judge thought that both principles [the principle that (a) where there is an available alternative remedy that can be seen, without full examination of the facts, to be capable of satisfying the petitioner's concerns to an extent that would make it clearly impossible for him to persuade the court that it would be just and equitable to wind up the company, the petition should be struck out and (b) the principle that a winding up petition will be restrained or struck out if it is brought for an improper collateral purpose] applied. It is evident from the reasons she gave, however, that she understood Tianrui's complaint to relate only to the issue of the convertible bonds and the subsequent issue of shares. Thus the alternative remedies she identified - a writ action complaining of the dilution of Tianrui's shareholding; injunctions restraining use of the proceeds, or the issue of shares, or the holding of meetings to confirm or approve transactions; a derivative action on the basis of the alleged lack of commerciality of the bonds; and a writ action claiming declaratory relief - were all directed in one way or another at unravelling the issue of the bonds and shares and the consequent dilution of Tianrui's shareholding.*

33.   *The judge can be forgiven for having understood that the dilution of its shareholding was Tianrui's sole complaint: even on appeal, Tianrui's skeleton argument said that its "complaint is, in summary, that the Board, aided by ACC and CNBM, have taken successive steps to dilute [Tianrui's] shareholding in the Company and issued shares to parties with whom ACC and CNBM has voting arrangements." It is plain, however, that the case made in the petition goes further than this: it comprises serious allegations of conspiracy by covert agreements and arrangements designed to damage Tianrui, the steps taken to dilute its shareholding being merely the latest stage in the conspiracy.*

34.   *This is not simply a case where a minority is unhappy with the actions of the majority......*

.......

36.   *If the allegations set out in the petition are true, it seems to us clear that they are capable of establishing that it would be just and equitable to wind up the Company. Put simply, Tianrui's position as evinced by its petition is that it cannot be expected to remain in association with CNBM and ACC in light of their conduct towards it. None of the remedies identified by the judge deals with that underlying complaint.*

37.   *The Company suggests that, if the underlying complaint is as we have identified, Tianrui can bring its association with CNBM and ACC, and with the Company, to an end by selling its shares on the Hong Kong stock exchange. It accepts that Tianrui could only sell the shareholding it now has, and that a 21.40% shareholding might fetch proportionately less than the 28.16% shareholding that Tianrui originally had, since its former shareholding enabled Tianrui to block special resolutions; but the*

*Company says that the effect of selling would be to crystallise a claim for damages which could then be pursued by means of an action for conspiracy. In our view, these assertions epitomise what is wrong with the Company's position. If the actions of the Company, prompted by directors appointed at the instance of a majority of its shareholders, have resulted in a justifiable loss of confidence in the management of the Company, Tianrui has a statutory right to petition for the winding up of the Company on the just and equitable ground. It cannot be deprived of that right merely because the Company can point to other remedies which, alone or in combination, might arguably go all or some of the way to compensating Tianrui for what has occurred. In our judgment, Tianrui may legitimately take the view that it prefers the Company to be wound up to having to pursue piecemeal a series of actions, by litigation or otherwise, or by a combination of litigation and other steps, that might be capable of redressing some, or even all, of its concerns. It is entitled to have the circumstances investigated in the context of a winding up petition that it is entitled to bring; and if it succeeds in establishing its complaints it is entitled under the statutory scheme to have the court consider at the end of the investigation whether the appropriate remedy is winding up or another of the remedies set out in section 95(3) of the Law. The suggestion that Tianrui need not have all the contents of the petition determined upon evidence because it is obvious that a derivative action, or some other combination of actions, will provide substantial justice to Tianrui is untenable in circumstances where the range of facts, and of inferences from fact, to which the petition gives rise have not been determined.*

38.  *At paragraph 122 of the judgment, the judge said that an examination of Tianrui's complaints would require the kind of trial process carried out in Howard Smith v Ampol, and so would be more amenable to an action by writ or some other process that was not a just and equitable winding up petition. This is to put the cart before the horse. If Tianrui is entitled to petition, as we consider it is, the procedures of the court will have to be adapted so that the issues of fact can be resolved in the petition. This is in fact commonplace in just and equitable petitions and (in England and Wales) in unfair prejudice petitions. It is illogical to say that, because the procedure adopted will be similar to that adopted in a writ action, therefore the matter should be determined by way of writ instead of by way of petition."*

………………

52.  *There is no doubt that a shareholders' meeting is capable of ratifying an unauthorised act of the directors. In the present case however, ratification of the issue of the bonds and shares addresses only part of Tianrui's complaints – just as the alternative remedies propounded by the judge fail to deal with the whole substance of the petition. Tianrui's complaint is about a course of conduct pursued by the Company at the instance of CNBM and ACC. Ratification by a majority including CNBM and ACC is not an answer to that complaint; it is a further instance of the conduct of which Tianrui complains.*

[underlining added]

36.    On 27 September 2019, the Company filed its defence to the Amended Petition (the ***Defence to the Petition***). In summary, the Company's position is as follows:

   (a).    the Company says that Tianrui's case is based on and arises from the issue of the convertible bonds, the subsequent conversion of the bonds into shares and the allotment and issue of the new shares

   (b).    the Company asserts that these actions were proper and justified in the circumstances:

       (i).    they were necessary to deal with the adverse impact of the de-listing of the Company's shares and the Company's financial problems which were caused by Tianrui's acquisition of shares and actions. In particular, the bond issues were needed to restore the public float (that is, remedy the breach by the Company of the requirement under the Main Board Listing Rules of the HKSE that at least 25% of the Company's issued shares must at all times be held by public investors - the ***HK Public Float Rule***) to enable the Company to resume trading in its shares on the HKSE and to raise funds to repurchase the 2020 Notes.

       (ii).    were all unanimously approved by the Company's board (including the executive directors and the independent non-executive directors).

   (c).    the Company also argues that the case pleaded by Tianrui in the Amended Petition was incomplete and misleading, in that it took a snapshot of selective events and omitted to plead adequately to all of the relevant circumstances which gave rise to the need for the convertible bond issues. In fact, the bond issues and the action taken by the Company's board were ultimately caused by Tianrui.

   (d).    Tianrui had been planning a hostile takeover of the Company from at least 2014 and took action to gain effective control of the Company to promote its own economic objectives and interests. During the execution of its hostile takeover plan and while Tianrui was in effective control of the Company, Tianrui caused and/or procured various improper steps to be taken on behalf of the Company which caused loss and damage to the Company. These included causing the Company to breach, and to continue to breach, the HK Public Float Rule (which

triggered the suspension in the trading of the Company's shares); causing the Company to default on US$500 million loan notes issued by the Company on 4 March 2015, which would otherwise only have been repayable in March 2020; causing the Company to default on other financial obligations thereby sending the Company into a financial crisis; and causing the Company to be exposed to the threat of being delisted by the HKSE.

(e). in the period between February and April 2015, Tianrui acquired shares and became the largest shareholder in the Company. Subsequently, between August 2014 and August 2015, Tianrui took steps to obtain control over CSI (to control CSI's 25.09% shareholding in the Company). It did so by supporting and funding the action against Mr. Zhang Senior taken by the CSI Employee Beneficiaries and CSI's minority shareholders, thereby procuring the appointment of the CSI Receivers on 20 May 2015 and 14 July 2015. Between July and August 2015, the CSI Receivers appointed themselves and their/Tianrui's nominees as the majority of the directors of CSI and acted with and for the benefit of Tianrui. Tianrui therefore obtained effective control of CSI's 25.09% voting right in the Company and, when combined with its own shareholding, a majority shareholding in the Company. Having obtained the majority voting rights in the Company, Tianrui proceeded to take over and reconstitute the board of the Company and its subsidiaries. Between June and October 2015, Tianrui and/or CSI (controlled by the CSI Receivers) issued six requisitions for EGMs to reconstitute the Company's board. The sixth requisition was effective and an EGM was convened for 1 December 2015.

(f). on 16 October 2015, the CSI Receivers obtained a direction from the Hong Kong High Court to vote at the EGM, including for the purpose of reconstituting the Company's board (although the Hong Kong court subsequently - on 31 January 2018 - found that there were material non-disclosures by the CSI Receivers on that application and ordered that the CSI Receivers be discharged).

(g). before the EGM took place and prior to the replacement of the board, on 10 November 2015 the Company's directors presented a petition to this Court to wind up the Company and for provisional liquidators to be appointed to restructure the Company's finances. The applications were dismissed. On or about 17 November 2015, Tianrui provided an undertaking to the Company and the Cayman Court that if (i) the board were to be

reconstituted, (ii) the Company was not wound up and (iii) provisional liquidators were not appointed, Tianrui "*shall procure that [the Company] has sufficient funds to redeem the [2020] Notes in full within thirty (30) calendar days*" of Tianrui gaining effective control of the Company's board (the ***Cayman Undertaking***). However, Tianrui did not intend nor was it in a financial position to honour the Cayman Undertaking when it was given and ultimately did not honour the Cayman Undertaking when the conditions set out therein were satisfied.

(h).   on 1 December 2015, the EGM was held and resolutions for the removal of the old and the appointment of new directors were passed.

(i).   Tianrui's wrongful acts while it was in effective control of the Company's board left the Company on the verge of collapse. Throughout that period, steps were not taken to rescue the Company, resolve its financial problems, increase the percentage of the Company's share capital held by public investors to the level required by the HK Public Float Rule or resume the trading of the Company's shares. The board controlled by Tianrui's representatives only took steps calculated to benefit Tianrui with an agenda to facilitate Tianrui taking over the Company.

37.   During the hearing, I noted that procedural directions had yet to be given for the further conduct of the Amended Petition. The Summons For Directions had not yet been heard or dealt with. I noted that a number of important issues had to be dealt with on the hearing of the Summons For Directions, including the characterisation of the proceedings and who were to be the respondents to the Amended Petition. Until the Summons For Directions had been determined it was unclear who were the parties to the Amended Petition. It might well be the case, although a decision on the issue would need to await the hearing of and the filing of submissions, that the proper respondents in this case should be or include CNBM and ACC. And it might be relevant to the Company's applications for a case management stay to know what decision had been made with respect in particular to the proper parties to the Amended Petition. Mr. Lowe pointed out that in Tianrui's skeleton argument for the hearing, Tianrui had invited the Court, in the event that the Court decided to dismiss the Company's applications, to give directions now (without a further hearing) for the ongoing conduct of the Amended Petition and the Cayman Writ Action and that a draft order had been attached to the skeleton (the ***Draft Order***). The Draft Order sought to address the matters

covered by the Summons For Directions and required to be dealt with by Order 3 r.11(1) of the CWRs. It sought an order that the Amended Petition be treated as a proceeding against the Company and orders for the service of the Amended Petition, the filing of Tianrui's response to the Defence to the Petition by 8 December 2019, for discovery by list on 1 February 2020 and inspection within seven days; the filing of evidence to be completed by early April 2020 to be followed by the listing of a hearing with a time estimate of twenty days. In addition, the Draft Order included an order that the Amended Petition shall proceed and be heard in conjunction with the Cayman Writ Action. I discuss further below the impact of this proposed order on the Cayman Writ Action.

## The Second Hong Kong Proceedings

38.   In the Second Hong Kong Proceedings, the claims were set out in the statement of claim dated 29 March 2019 (the *Second Hong Kong Proceedings Statement of Claim*). This is a clear and well drafted document.

39.   This stated that the claims were based on an unlawful means conspiracy. It asserted that the defendants conspired by acting in concert using unlawful means with the intention of injuring the Company and its subsidiaries. The unlawful means were said to be breaches of fiduciary duty and other dishonest assistance and/or criminal intimidation or violence. The object of the conspiracy was the acquisition of control of the Company and its subsidiaries and illegitimately to maximise the economic benefits therefrom for the benefit of the conspirators (especially Tianrui) at the expense of the Company and its subsidiaries. The conspiracy was one whereby Tianrui could seize control of its competitor for its own benefit. The conspiracy would have continued, and the Company would have continued to suffer losses, had Tianrui not lost control of the Company's board on 23 May 2018.

40.   It was alleged that the conspiracy had been instigated by Tianrui and that Li Heping (*Mr. Li Heping*) (the former CEO of Tianrui's shareholder and one of the defendants) and Li Liufa (*Mr. Li Liufa*) (the chairman of Tianrui's shareholder and also a defendant) had been parties to the conspiracy from the outset. As a result of the conspiracy, the directors nominated by Tianrui (or CSI's receivers) had been paid excessive remuneration in breach of duty and had approved the decisions that had the effect of diverting assets to Tianrui.

41.   The conspiracy was said to have evolved over time and eventually involved the following twelve
      steps or phases (from sometime before August 2014 until May 2018):

   (a).   the acquisition of shares in the Company so as to cause the Company to be in breach of the
          HK Public Float Rule and the suspension of trading in its shares.

   (b).   acquiring control of the Company through the appointment of the CSI Receivers.

   (c).   installing directors and officers aligned to Tianrui on the boards of the Company and its
          subsidiaries to enable decisions beneficial to Tianrui and disadvantageous to the Company to
          be approved.

   (d).   embarking on litigation in Hong Kong against those who were opposed to Tianrui.

   (e).   abandoning the Company's investigation of Tianrui's acquisition of the interests of the CSI
          Employee Beneficiaries.

   (f).   procuring the Company (and its subsidiaries) to raise funds through wholly uncommercial
          means which would have had the effect of releasing Tianrui from the Cayman Undertaking;
          diluting the shareholding of non-Tianrui shareholders (to cement Tianrui's control and
          facilitating the diversion of assets to Tianrui) and driving down the Company's share price so
          as to make it easier for Tianrui and its associates to purchase more shares and reinforce its
          control.

   (g).   releasing Tianrui from the Cayman Undertaking and instead (i) raising funds for the
          repurchase of the 2020 Notes through various attempted share-issuance and placement offers
          and (ii) causing the Company to pay interest on the 2020 Notes in the sum of US$85 million.

   (h).   pledging away the assets of Shandong Shanshui.

   (i).   procuring the Company to provide a corporate guarantee for a RMB 400 million loan facility
          advanced by the Bank of China to Tianrui.

(j).     orchestrating acts of criminal intimidation and violence in relation to the allegedly violent acts taken or orchestrated by Tianrui in March – April 2017 to seize control of Shandong Shanshui's premises at Jinan.

(k).     attempting to disguise or conceal Tianrui's intention of not honouring the Cayman Undertaking.

42.     The Second Hong Kong Proceedings Statement of Claim also alleges that the failure by Tianrui's nominees on the board to enforce the Cayman Undertaking resulted in the Company having to issue in 2018 the convertible bonds in order to raise funds for the repurchase of the 2020 Notes (see [135] - [137]). The Second Hong Kong Proceedings Statement of Claim includes a claim reimbursement by the defendants of the high rate interest paid by the Company on those bonds.

43.     The relief sought in the Second Hong Kong Proceedings was as follows:

(a).     as against Tianrui, a declaration that Tianrui was liable to account to the plaintiff companies as constructive trustee for benefits received as a result of the breaches of fiduciary duty, knowing receipt and conspiracy complained of and equitable compensation for dishonest assistance and/or knowing receipt or damages for unlawful means conspiracy.

(b).     as against the directors nominated by Tianrui, a declaration that the directors were liable to account to the plaintiff companies as constructive trustees for benefits received as a result of the breaches of fiduciary duty, knowing receipt and conspiracy complained of; equitable compensation for breach of fiduciary duty, dishonest assistance and/or knowing receipt or damages for unlawful means conspiracy and damages for breaches of their duty to use reasonable care, skill and diligence.

(c).     as against EYTL, relief in the same terms as that claimed against the Tianrui directors.

44.     On 14 August 2019, Tianrui issued an application in the Hong Kong court for an order staying the Second Hong Kong Proceedings in favour of the Amended Petition (the ***Hong Kong Reverse Stay Application***). Tianrui has applied for:

(a).    a declaration that the Hong Kong court has no jurisdiction over Tianrui in respect of the subject matter of the Second Hong Kong Proceedings on the grounds that the plaintiffs have failed to show any serious issues to be tried; they have failed to demonstrate a good arguable case that their claims are within the gateways for service out or to demonstrate that Hong Kong is clearly and distinctly the more appropriate forum for the trial of the claims since Tianrui has presented the Amended Petition and there are substantial overlapping issues between the Second Hong Kong Proceedings and the Amended Petition, considering the best interests and convenience of the parties the issues raised in the Second Hong Kong Proceedings should be determined by this Court.

(b).    in the alternative, a case management stay against Tianrui pending the final determination of the Amended Petition, on the same grounds.

(c).    in the alternative, that the declaration or stay be granted in relation to Tianrui, Tianrui Group Company Limited and Mr. Li Liufa only.

45.    The Hong Kong Reverse Stay Application was originally listed to be heard before Keith Yeung J in the Hong Kong High Court on 10-11 March 2020. However, as I have noted above, on 4 March 2020 the Court was informed by the attorneys for Tianrui that they had been notified earlier in the week commencing 2 March by the Hong Kong court that the hearing had been vacated because of the public health crisis being experienced by Hong Kong (as a result of the coronavirus outbreak). The further evidence filed by both parties showed that the the Hong Kong Court had invited the parties to make submissions as to whether the hearing of the Hong Kong Reverse Stay Application was suitable for disposal on the papers. Tianrui and the Company were given the opportunity to, and did, make extensive submissions, including by reference to authorities, in response to the Hong Kong Court's letters. While the Company was prepared to consent to the application being dealt with on the papers, Tianrui considered that a hearing was required (which approach was criticised by the Company). Having considered the submissions, the Hong Kong Court decided that the Hong Kong Reverse Stay Application ought to be adjourned until a hearing could be scheduled. Subsequently, the Company's Hong Kong solicitors wrote to the Hong Kong court seeking an expedited hearing and Tianrui's Hong Kong solicitors confirmed that Tianrui agreed to an expedited hearing. An order granting an expedited hearing was then made on 12 March 2020.

46.    It appears that detailed defences have been filed by most of the defendants in the Second Hong
       Kong Proceedings, denying the Company's allegations. However, Tianrui (and it appears EYTL)
       have not yet filed their defences. Tianrui does not need to file its defence until the Hong Kong
       Reverse Stay Application has been resolved. The defences that have been filed deny and deal with
       the claim made in the Second Hong Kong Proceedings Statement of Claim that the defendants'
       conduct caused the Company to issue, and therefore they should compensate the Company for the
       interest paid on, the convertible bonds. The defences assert that there was no need to issue the
       bonds because other cheaper financing was or should have been made available including by
       CNBM and ACC (and that since the limitation period for enforcing the Cayman Undertaking had
       not expired the Company still had the right to do so).

**The Cayman Writ action**

47.    On 27 May 2019, after the Court of Appeal had handed down the Court of Appeal's Judgment, but
       before the hearing of the Summons for Directions, Tianrui issued further proceedings against the
       Company, this time by writ (the ***Cayman Writ Action***). The Company seeks declarations that the
       convertible bonds issued by the Company in August and September 2018 (together with the
       conversion of the bonds into shares and the New Shares issued pursuant to the conversion) be
       treated as void together with an order setting aside the issue of the bonds, the share conversion and
       the New Shares.

48.    The statement of claim in the Cayman Writ Action was filed on 27 June 2019. It refers to the First
       Subscription Agreement, the Further Subscription Agreements, the Conversion Agreements and the
       issue of the New Shares and claims that:

       (a).    the convertible bonds were issued by the Company's board to persons connected with or
               acting in concert with CNBM and/or ACC for the improper purposes of enabling CNBM and
               ACC by themselves or with others to control the Company;

       (b).    the issue of the convertible bonds and/or the New Shares was invalid; and



(c).   the shareholder resolution passed at the EGM on 30 October 2018 could not have ratified the issue of the convertible bonds or the New Shares as CNBM, ACC and/or CSI were not acting bona fide and without their votes the resolution would not have been passed.

49.   The relief sought in the statement of claim in the Cayman Writ Action is as follows.

> "(1).   A declaration that the Bond Issues and/or the Share Conversion and the New Share Issue and that all shares and securities issued after 1 August 2018 are void;
>
> (2).   An order setting aside the Bond Issues and/or the Share Conversion and the New Share Issue and/or all shares and securities issued after 1 August 2018."

50.   In the Sixth Affirmation of Ms. Li Xuanqi (*Ms. Li*) sworn in August 2019 in opposition to the Company's applications, Ms. Li explains Tianrui's reasons for commencing the Cayman Writ Action:

> "21.   The Petitioner commenced the Writ Action because the relief available in the Petition proceedings does not include an order that the Convertible Bond issue be unwound. Even where the Petition proceeding is stayed pending determination of one or both of the proceedings on foot in Hong Kong, there will nevertheless still need to be a full trial to determine whether the power to issue the Convertible Bonds was improperly exercised and what consequences follow from that.
>
> 22.   The Writ Action by itself, while addressing the narrow question of the propriety of the Convertible Bond issue, could also not address the Petitioner's underlying loss of trust and confidence in the Company and its management. To the extent that there is commonality of issues between the Writ Action and the Petition proceedings, the Petitioner respectfully submits that the two proceedings should be heard together."

51.   On 27 September 2019, the Company filed its defence to the Cayman Writ Action (the *Defence to the Writ*). The facts pleaded in the Defence to the Writ are in substance the same as those pleaded and relied on in the Defence to the Petition.

52.   During the hearing I raised with Mr. Lowe some concerns regarding the nature (or at least the formulation and drafting) of the relief sought in the statement of claim in the Cayman Writ Action. I was doubtful, although since I had not heard submissions on the point was only expressing a preliminary view, that the Court could or should make a declaration in the terms sought. This was because the declarations in the statement of claim dealt with the validity of the bond issues, the share conversions and the issue of the New Shares and orders were sought that they be declared to

be void and set aside. Such orders would relate to and affect the position of the bondholders and holders of the New Shares who were not parties to the Cayman Writ Action. I said that I could see how a declaration could be framed to reflect the fact that the cause of action and claim relied on was only against the Company. This could be done by limiting the declaration to the validity of the corporate decision making process – that is, to the board's decision to approve the issuing of the bonds and the New Shares (and the conversion). The effect on third parties of a decision that the bond and New Share issues had not been validly or properly approved would then need to be dealt with in proceedings to which the third parties were joined. Mr. Lowe accepted that the statement of claim will need to be amended since, as currently formulated, the Court could not properly make the declarations in the terms sought.

53.   Tianrui also proposed in the Draft Order, as I have explained, that certain case management directions be given to ensure that the Cayman Writ Action proceeds in parallel with the Amended Petition. Mr. Lowe expanded on and explained Tianrui's position during the hearing. The following exchange took place during the second day of the hearing (see the transcript for 27 November, pages 11-12):

> "Segal J    Do you submit the writ, as currently drafted, all the relief as set out in the statement of claim, is a proper claim with proper relief?
>
> Lowe QC:   Well, what .... we submit it's a proper claim and we disagree with my learned friend's submissions on [the Gao case, referred to below] ......
>
> Segal J:   That I understand.
>
> Lowe QC:   But the relief that's sought [in the statement of claim in the Cayman Writ Action]?
>
> Segal J:   Yes.
>
> Lowe QC:   The declaration would have to be, we have to amend that because as your lordship's, for the reasons your lordship said, that the second paragraph of that writ is not a claim we can make on the basis of the allegations made and the parties who are joined.
>
> Segal J:   Do I need to see the proposed amendment?
>
> Lowe QC:   We can produce, I mean at the moment we were dealing with a strike out based on whether the action could be constituted at all and we will have to amend, you will have to look at an amended declaration but not for the purpose of deciding what you're being asked to decide. And of course, an amendment like that we can formulate from... In the terms that your lordship suggested would be

*appropriate, with which we would respectfully agree…………. What we have in mind with the writ is really this scenario. If we win hands down in the winding up, then the writ won't achieve anything because we'd have got the findings of improper purpose and so on. But the flip side to that is we won't have inconvenienced anybody very much because it'll have been tried together. There won't be any separate evidence. It won't take up any extra time or cost from here on in if it's case managed. Secondly, if we lose on the factual case in the winding up petition, then we would obviously lose the writ action as well. But again it will not have added to the costs in any real material sense, it won't have cost any more time. But the problem is that we could lose the winding up petition in a number of different ways. For example, my learned friend's leave to appeal might cause …. the petition to be struck out. Also when your lordship's, if the case goes ahead and your lordship decides on the winding up, you might as an exercise of discretion, not grant us any remedy and in the course of these proceedings we have no doubt that my learned friend's ingenuity would invent other reasons for the petition to fail, but they are obviously, we're at an early stage. There are obviously other reasons why the petition might not achieve what we want it to in terms of relief. The point is, if we have a judgment on the facts, your lordship, finds that the improper share issue is exactly that. But nevertheless refuses relief, you could give us the declaratory relief in the writ and then, of course, there's no liquidator and we would have to see whether we can then go on to establish anything in a derivative sense against anybody else. But we would have a declaration, which as far as the company's concerned would be final."*

[underlining added]

## The Petition Strike Out Application – the Company's submissions

54.   The Company argues that Tianrui resisted the First Strike Out Application on the basis that there were no viable and adequate alternative remedies to, and that it was thus not unreasonable for Tianrui to have filed, the petition. Tianrui's position had been that the petition was the only way in which it could seek adequate redress. However, it has now commenced proceedings seeking alternative remedies. Tianrui's approach is inconsistent with its previous position on the First Strike Out Application. In the circumstances, it would be an abuse of process for Tianrui to continue its pursuit of the Amended Petition, and the Amended Petition should be struck out.

55.   The Company submits that it is an abuse of process for a party to seek to advance its case in respect of an aspect of the litigation on a specific basis and then change its position on another aspect when it suited it to do so. It says that by commencing the Cayman Writ Action, Tianrui should be treated

as having elected to pursue the Cayman Writ Action as an adequate alternative remedy in substitution for the Amended Petition.

56. The Company says that for many months Tianrui sought to persuade this Court, and succeeded in persuading the Court of Appeal, that the petition was the only manner in which it could seek adequate redress and asserted that a writ action would be pointless. Tianrui never gave the impression that it would be bringing the Cayman Writ Action, whether on its own or in conjunction with the Amended Petition.

57. The Company relied on the following statement of the principle in the a judgment of the Court of Appeal in Singapore in *Suntech Power Investment Pte Ltd v Power Solar System Co Ltd (in liquidation)* [2019] SGCA 522:

> *"...This term [abuse of the process of the Court] signifies that the process of the court must be used bona fide and properly and must not be abused. The court will prevent the improper use of its machinery. It will prevent the judicial process from being used as a means of vexation and oppression in the process of litigation. The categories of conduct rendering a claim frivolous, vexatious or an abuse of process are not closed and will depend on all the relevant circumstances of the case. A type of conduct which has been judicially acknowledged as an abuse of process is the bringing of an action for a collateral purpose, as was raised by the respondents. In Lonrho plc v Flayed (No 5) [1993] 1 WLR 1489, Stuart-Smith LJ stated that, if an action was not brought bona fide for the purpose of obtaining relief but for some other ulterior or collateral purpose, it might be struck out as an abuse of the process of the court. [emphasis added]" (at [49], citing Gabriel Peter & Partners (suing as a firm) v Wee Chong Jin and others [1997] 3 SLR(R) 649 at [22])*

58. In his written and oral submissions, Mr. Flynn QC for the Company reviewed Tianrui's case before both Mangatal J and the Court of Appeal:

   (a). he noted that the argument which Tianrui advanced in its skeleton argument served for the hearing before Mangatal J on 10-11 October 2018 was that it had "*no alternative remedies*" and that "*in particular*" it could not have applied for an injunction. In other words, that it had no alternative remedies including, but not limited to, an injunction. He cited the flowing extract from that skeleton argument ([75] to [76]):

> "75.  The question is whether there is an alternative remedy which it is unreasonable for [Tianrui] to refuse to pursue (see Asia Pacific Ltd v ARC Capital LLC [2015] (1) CILR 299). [Tianrui] has no alternative remedies available to it in this instance, notwithstanding the Company's suggestions to the contrary (Wu 1, paragraph 72 [A/16/15]).
>
> 76.  In particular, [Tianrui] could not have issued injunctions after the event. The Company's suggestion that it could have sought an injunction to the extent that [Tianrui] "objects to the issue of the [convertible bonds]" fails to recognise that [Tianrui] had a 24-hour window between notification of the First Subscription Agreement's existence and confirmation that the [convertible bonds] had been issued. There was nothing left for [Tianrui] to injunct, which was no doubt the Company's intention in completing the transaction so rapidly." (emphasis added by the Company)"

(b).  as regards the appeal to the Court of Appeal, Mr. Flynn submitted that Tianrui made it clear that it was not pursuing a writ action because: (a) it would need to join the holders of the convertible bonds as parties; (b) it would be more efficient and cost-effective for a liquidator to take such action as it saw fit; but (c) if the liquidator refused to take action, then Tianrui might do so "at a later date, at least with more information." He noted the following passages from Tianrui's skeleton argument in the appeal (with his highlighting in bold):

> 48.  The Appellant [Tianrui] accepted before the Judge (as it does now) that it could have attempted to set aside the share issues by means of a derivative claim or writ action. The Appellant [Tianrui] would have a direct claim based on an allegation that the power to dilute was not exercised for a proper purpose according to Howard Smith v Ampol…… The nature of such a claim was recently explored by the Supreme Court in Eclairs Group v JXK Oil [2016] BCC 79.
>
> 49.  In terms of practicalities it is important to note that an action of that kind would achieve nothing unless the [convertible] Holders were joined.
>
> (a)  The share issues could not be stopped or set aside unless the contractual rights of the [convertible] holders could be rescinded. The Company had already issued the [convertible bonds] and received consideration. The [convertible bonds] carried contractual rights for the holders to convert the same to shares, and a corresponding obligation on the Company to issue those shares;
>
> (b)  **The [convertible] holders would need to be joined and served overseas in their own jurisdiction**. Prior to the hearing the Company had not identified the CB holders and the true beneficial owners of the [convertible bonds] are still not known. The subscription agreements

*eventually disclosed suggested that the nominal parties were in Hong Kong and Taiwan.*

50. **In contrast, a liquidator would have powers to investigate the true ownership and relationship of ACC and CNBM with the [convertible] holders and could challenge the [convertible] holders in the place of the liquidation in summary proceedings** *(see paragraph 62 below).*

............

62. *Moreover the setting aside of the share issue could be more efficiently achieved in a liquidation than by means of a Howard Smith v Ampol claim, coupled with a derivative claim against the [convertible] holders.* **A liquidator could attempt to set aside the share issue by separate action, or by using powers under Section 112 of the Companies Law**.... *Section 112 allows a liquidator to settle a list of members and to adjust the rights of members.* **This represents a much more efficient and cost effective means of determining whether the share issue was proper. It does not, for example, require service of proceedings on the [convertible] holders overseas.**

63. *It might be the case that a liquidator would decline to take action,* **but in those circumstances the Appellant [Tianrui] could decide whether or not to do so directly itself at a later date, at least with more information.** *Finally, in circumstances where section 95(3)(c) of the Companies Law...contemplates a derivative claim as potential relief on a just and equitable winding up petition, a derivative claim is not an "alternative remedy" to a winding up." (emphasis added by the Company)*

59. During his oral submissions, Mr. Flynn QC formulated the submission as follows (see the transcript of the first day of the hearing at pages 98-99 and 102).

*"Now, in the Court of Appeal, Tianrui went so far as to say it would not bring a writ action and would only pursue the petition. And that is in our submission very important because it is wrong in principle for Tianrui to advance the case before the Court of Appeal that there is no adequate alternative remedy to the petition and that it can only pursue redress for its complaints via the petition as it said, and then by means of writ action and then once it's succeeded in persuading the Court of Appeal of that, it flipped its position and several months later, commenced the writ action...........in the circumstances of this case, it is,...open to[the Court] to say that having procured [that] the petition be reinstated by the Court of Appeal, Tianrui......have ...chosen to pursue their writ, but they can't have both, they can only have one. And in the circumstance of this case, given*



> *the way in which they presented their case, they should be held by the writ and not the*
> *petition... "*[underlining added]

60.   The Company argues that the Court of Appeal had been led to believe (indeed, the Court of Appeal's decision was premised on Tianrui's case being) that any writ action might only be brought if at all after the appointment of liquidators rather than concurrently with the petition itself (and that therefore there was no alternative remedy). The Company says that this is apparent from [37] of the Court of Appeal's Judgment. The Company accepts that it cannot seek to reverse or challenge the decision of the Court of Appeal by the side-wind of a further strike out application in this Court (the outcome of the appeal to the Court of Appeal could only have been changed by a successful appeal to the Privy Council – which is now not possible in view of the Privy Council's dismissal of the application for permission to appeal). However, it argues that it is not seeking to do so. It argues that it is seeking to strike out the Amended Petition without impugning or relying on a collateral attack on the Court of Appeal's Judgment. It does so by basing its application on the principle of election. The Company says, as I have noted, that Tianrui should be *treated as having elected* to pursue the Cayman Writ Action as an adequate alternative remedy in substitution for the Amended Petition. It does not elaborate as to whether such a deemed election is required because the Court is to infer that Tianrui's intention is now to rely on and obtain the relief it seeks by way only of the Cayman Writ Action or because it would be inconsistent for Tianrui to rely on both the Cayman Writ Action and the Amended Petition.

61.   During oral argument, I sought to clarify the precise basis on which the Company put its case and how that case related to the Court of Appeal's Judgment. The following exchange with Mr. Flynn took place on day three of the hearing (see the transcript of the third day of the hearing at pages 41-43):

> *Segal J*   *[I can see that you could argue that the writ is abusive on the basis] that the appeal was decided on an improper basis. I could see why you could say, the Court of Appeal or Justice Mangatal, you've dealt with the strike out application on the basis of a case which has turned out to be improperly put or wrong or false. You shouldn't have decided the strike out application on the basis of a bad or improperly formulated case.*
>
> *Flynn QC:*   *Or the other way of putting is, had that been made clear, the result would have been a different one. So you procure your results on the basis of your argument, which is that there are no alternatives.*

*Segal J:*    Yes, but that's an issue in the strike out application. *Query whether it gives rise to a right of appeal to revisit the decision that was made by the Court of Appeal. But moving beyond that, the Court of Appeal has decided what it's decided. We'll see what the Privy Council says as to your application for leave to appeal, but assuming the Court of Appeal's decision stands, the petition remains effective and continues. Why does the conduct of the petitioner in opposing the strike out application taint its continued maintenance of the petition? Why does that conduct in opposing the strike out application give rise to an abuse as it relates to the continued prosecution of the petition? That's the [issue] in question.*

*Flynn QC:*    Yes. I suppose what it relates really to me is what is the remedy. On this <u>hypothesis, there has been abuse. And the abuse is presenting a case on basis A and then changing it to basis B. And in my submission, the answer to Your Lordship's question is in those circumstances, what is the remedy? I think what Your Lordship is referring to is, well, the remedy must lie in an appeal or reopening of the decision…. And my submission is no, the court isn't bound in that way. If you, as in this case, you issue a writ and that is as a consequence, the court does not have to accept the issue of the writ. The court can conclude, as we're asking Your Lordship to do, that the issue of the writ is an abuse, is part of the abuse, and that should be prohibited. And that is why we say it could also apply to the petition because if you present a case to the court that they are alternatives, when you issue your writ you're electing between the two remedies because you presented that the case to the court as strictly alternatives.</u>

<u>And in my submission, the court isn't in any way prevented from reaching that conclusion as part of its policing of an abuse, and that is why my submission on the first day was I appreciate that it might be an ambitious submission because Your Lordship knows that the Court of Appeal have said you can continue with your petition, but in the light of that judgment, even accepting that judgment, in circumstances where you know that and you nevertheless issue a writ. In those circumstances, in my submission, the right analysis is to say, well these are alternatives. You cannot have both. You are therefore bound. You are choosing the writ in the alternative to the petition by serving that writ.</u>

*And there is a certain, if I could put it this way, poetic justice in that because you procure your result on the basis [that there are] alternatives. You choose one of the alternatives. You've effectively elected or otherwise chosen to pursue that alternative in the alternative to the petition. Now I see that Your Lordship may say that's a stretch too far, but that is open in my submission to Your Lordship, in terms of the powers of the court to police the abuse………*

*But the court is not limited in its powers, in my submission. You're not limited to saying, if Your Lordship is with me, and it is an abuse, and it was presented in the way that we say it was, Your Lordship is not prevented from taking this course. So of course it's a matter for Your Lordship as to how you police that. But it is open to you and that is why.* <u>That is why we say it's even open to Your</u>