> *Lordship to say that they have chosen the writ in preference to the petition. But as I say, I accept that in practical terms, what that means is they've chosen their writ, their writ's defective, they've even given it up during the course of submissions, but that's a consequence of their own action. They should not have issued that writ. That's how we put it.*
> [underlining added]

62.   The Company argues that Tianrui's justification for needing the Cayman Writ Action in addition to the Amended Petition is flawed. Tianrui asserts (as I explain below) that if its shares in the Company were to be sold in the context of the winding up proceedings without obtaining the relief sought in the Cayman Writ Action it would be prejudiced as it would only have a 21% shareholding in the Company rather than a shareholding of 28%. The Company argues that if Tianrui succeeded in the Cayman Writ Action, and in setting aside the issue of the bond and new shares, then Tianrui's percentage shareholding would be restored and it could achieve the corporate divorce it desires by selling its shares without the need for a winding up.

63.   The Company also submits that it is wrong for Tianrui to suggest that its case all along had been it could get different relief as between the Amended Petition and the Cayman Writ Action. That was not its case, whether before this Court in October 2018 or before the Court of Appeal in January 2019. Its case was that a writ action would not be viable and that it could achieve a set-aside of the issue of the bonds, their conversion into shares and the allotment and issue of new shares through the appointment of an independent liquidator via the petition (with the liquidator investigating and if appropriate, bringing claims in respect of the bond issues).

**The First Writ Strike Out Application – the Company's submissions**

64.   In the alternative, the Company submits that the Cayman Writ Action should be struck out on the basis that it is an abuse of the process for Tianrui to pursue both the Cayman Writ Action and the Petition simultaneously.

65.   The Company argues that the Cayman Writ Action and the Amended Petition are directed at the same complaint (or at least, the Cayman Writ Action should be seen as covered by and a subset of complaints made in the Amended Petition). The Company submits that the averments in the Amended Petition, the evidence filed in support of the Amended Petition and the skeleton arguments filed for the hearings before Mangatal J and the Court of Appeal show that it was the

complaint about the bond issues, the conversion of the bonds and the allotment and issue of the new shares that gave rise to the Amended Petition. Tianrui's case is that these steps were inconsistent with the proper purpose rule and thus gave rise to a breach by the Company's board of the fiduciary duties owed to the Company which, in turn, justified Tianrui's petition to wind up the Company on just and equitable grounds.

66.   Furthermore, Tianrui also argued (and resisted the Company's application to strike out the petition on the basis) that it was seeking the appointment of an independent liquidator to conduct an investigation and bring such available claims as might arise out of that investigation – and the need for the investigation (and indeed the very basis on which it was said to be just and equitable for the Company to be wound up) arose, in essence, once again from the issue of the bonds, their conversion into and the issue of the new shares with the consequential dilution in Tianrui's shareholding below the blocking threshold of 25%.

67.   These claims are, the Company submits, in substance, the same as the complaint now made in the Cayman Writ Action. The statement of claim in the Cayman Writ Action deals with: (a) the acquisition of control by CNBM and ACC and the replacement of the board at the EGM on 23 May 2018 through votes cast by ACC, CNBM and CSI and (b) the bond issues, share conversion and the issue of the New Shares, following which Tianrui's shareholding was diluted to less than 25%. The gravamen of Tianrui's complaint in both the Amended Petition and the Cayman Writ Action is thus the same, namely that the current board of the Company allegedly exercised its powers in respect of these matters for the improper purpose of diluting Tianrui's shareholding and allowing CNBM and ACC to acquire control and that the action taken was not in the Company's best interests.

68.   The maintenance of concurrent proceedings which are directed at the same complaint is an abuse of process of the Court, in circumstances where the Court has an overriding obligation to make efficient use of judicial resources. The Company relied on the following statement of the position in *Jameel v Dow Jones & Co Inc* [2005] QB 946 at [54]13, per Lord Phillips of Worth Matravers MR (as he then was):

> *"An abuse of process is of concern not merely to the parties but to the court. It is no longer the role of the court simply to provide a level playing field and to referee whatever game the parties choose to play upon it. **The court is concerned to ensure that judicial and court***

*resources are appropriately and proportionately used in accordance with the requirements of justice." [emphasis added by the Company]*

69.   The Court should give short shrift, the Company argues, to any attempts by Tianrui to present its case on the acquisition of control of the Company (and Shandong Shanshui in particular) as being separate from its complaints about the bond issues and the resulting issue of new shares. That was not borne out by how Tianrui has pleaded and argued its case in the Amended Petition to date. Furthermore, the Company rejects Tianrui's argument, which I summarise below, that it needs and has a legitimate interest in seeking both a winding up order (so as to end its relationship with CNBM and ACC) and the setting aside of the new share issue (which improperly diluted its 28% shareholding in the Company). It does so on the ground that Tianrui cannot both obtain an order setting aside the new share issue at the same time as maintaining its claim to a winding up on the just and equitable ground. Were Tianrui to succeed in setting aside the new share issue and thereby reversing the share dilution it complains of, it would be able to achieve the divorce it seeks by selling its shares without the need for a winding up order (so that its ability to obtain a winding up order would be lost).

**The Petition Strike Out Application and the First Writ Strike Out Application – Tianrui's position**

70.   Tianrui submits that there is no abuse in pursuing the Amended Petition and the Cayman Strike Out concurrently because they seek different remedies. Tianrui argues that the need to bring both sets of proceedings concurrently is testament to the fact that the same relief cannot be obtained by either proceeding alone. Tianrui says that its position is explained and supported by the statements in paragraphs 21 to 22 of Mr. Li's Sixth Affirmation (quoted above). Accordingly, both the Petition Strike Out Application and the First Writ Strike Out Application should be dismissed.

71.   Tianrui submits that there is no inconsistency between the positions it adopted at the hearing before Mangatal J in October 2018, before the Court of Appeal in January 2019, before Mangatal J at the July 2019 hearing and the position it now adopts.

72.   The relief sought in the Cayman Writ Action should not be understood or treated as providing an alternative remedy to the Amended Petition. That relief is independent from and not available within the proceedings relating to the Amended Petition. The Court is unable to order that the issue of the new shares be set aside by way of relief in the Amended Petition. There is therefore no

improper duplication of relief in the two proceedings. Furthermore, Tianrui has a real and legitimate interest in pursuing both the Amended Petition and the Cayman Writ Action. If its shares were to be sold in the context of the proceedings relating to the Amended Petition or after the making of a winding up order without obtaining the relief sought in the Cayman Writ Action it would only have a 21% shareholding in the Company rather than a shareholding of 28%.

73.     A liquidator, if appointed, could bring proceedings to set aside the issue of the New Shares and Tianrui accepts that it had in previous hearings referred to this possibility and that such action would be one benefit to flow from a winding up. However, it submits that it was not required to defer bringing the Cayman Writ action simply because a liquidator if appointed in due course could and might commence similar proceedings and that its action in issuing the Cayman Writ Action was justified in circumstances where:

   (a).    at the time that the Cayman Writ Action was commenced, there was no prospect of the Amended Petition being determined imminently. There was therefore also no prospect of proceedings being commenced by a liquidator to unwind the convertible bond transactions in the immediate future, and a delay in issuing such proceedings could be damaging (due to, among other things, the risk of the loss of evidence).

   (b)     the Cayman Writ Action did not prejudice the position and if a winding up order is made a liquidator can decide whether or not to take over the, or commence similar, proceedings.

   (c).    Tianrui considered that there were other risks in delaying the commencement of proceedings to set aside the issue of the New Shares. The Company, as I have previously explained, had made an application to validate the transfer of the New Shares into the Hong Kong clearing and settlement system, which in Tianrui's view risked putting the improperly issued shares beyond the reach of a liquidator. The fact that steps had already been taken and proceedings issued to validate or give effect to the share transfers highlighted the risks to Tianrui in waiting for a liquidator to bring the proceedings on behalf of the Company. It had concluded that it was important to initiate without further delay the challenge to the validity of the issuing of the bonds and shares.

74. In its written submissions with respect to the Company's applications, Tianrui argued that it was entitled both to seek an end to its association with CNBM and ACC (which could only be achieved by a winding up) and to set aside the allotment and issue of the new shares (which was the relief sought in the Cayman Writ Action). Tianrui submitted that this position was supported by the judgment of Martin JA when giving the Court of Appeal's reasons for refusing the Company's application for special leave to appeal to the Privy Council. Martin JA observed that Tianrui's goal in bringing the petition "*included achieving an end to its relationship with the company and its management, not just the unwinding of the share issue*". The Court of Appeal, Tianrui says, was clearly alive to the availability of both forms of relief as alternative and equally legitimate means to remedy the conduct of the Company; and the fact that neither the Amended Petition nor a writ action alone could grant Tianrui all the available relief or the full range of relief it sought.

75. Tianrui submitted that nowhere in the argument during the hearing before Mangatal J did it assert that it could or would not bring a writ action. In fact, reference was made to the House of Lords' case of *Howard Smith v Ampol* [1974] AC 821 (***Howard Smith***) as authority in support of a personal claim. Nor did it assert that it only sought to reverse the issue of the bonds and the New Shares. Instead, it referred to its wish to have a corporate divorce. Both before Mangatal J and the Court of Appeal, Tianrui argued that there was no complete alternative to a winding up because one of the things it wanted was a divorce. The Cayman Writ Action only addressed the cause of the breakdown and did not provide the separation and divorce that would be the remedy for the breakdown.

76. Furthermore, its submissions were not to the effect that Tianrui did not have a claim but that injunctive relief in support of Tianrui's claim in this case would be difficult and complicated. Tianrui considered that it would be pointless trying to injunct the use of the proceeds of the bond issues and it would be very difficult to maintain a personal claim qua shareholder against the other shareholders in the circumstances of this case. This was the case in particular because Tianrui would need to show that each of the holders of the bonds had the requisite knowledge of the directors' improper purpose or show that the Company's board had no ostensible authority to issue the bonds and the new shares. This would involve additional and potentially difficult factual allegations.

77.    Mr. Lowe referred to the transcript of the hearing before Mangatal J at page 70, between letter A and C. Mr. Lowe had said as follows:

> "...the justification is the improper use of the bond. But what that does is it leads to the loss of confidence. A Howard Smith claim might deal with the justification, but it does not deal with the fact that we have now lost confidence. It leaves us in a company, as a result of the misbehaviour, in which we have lost confidence. And the gravamen of our complaint, and the importance of a petition is that we want the company wound up because we have lost confidence, and the justification is - what my learned friend is doing is confusing the justification with the relief we are actually seeking......We are left, we are left with a 28 per cent, or a 20 per cent shareholding. In other words, even if Howard Smith is remedied, we are still stuck in the company. We are a major shareholder and we are still stuck, and that cannot be worked out simply by derivative action."

78.    Tianrui submits that its position before the Court of Appeal was the same as the position it has taken at this hearing. Tianrui had never said that it could not issue a writ. It had said that issuing a writ was complicated because of the need to join the bondholders. Tianrui had told the Court of Appeal that it accepted that it could not seek to set aside the bonds without joining the bondholders and that in any event the relief it sought it the petition was more than that. Tianrui says that it is clear from the Court of Appeal's Judgment that the Court of Appeal understood Tianrui's submissions and position in this way.

**The Petition Strike Out Application and the First Writ Strike Out Application – discussion and decision**

*The Petition Strike Out Application*

79.    It seems to me, taking the Company's written and oral submissions together, that its argument, reduced to its essentials, can be summarised as follows:

  (a).    in the First Strike Out Application, Tianrui adopted the position that there were no alternative remedies available to it.

  (b).    Tianrui took the position that a writ action would not provide it with adequate and suitable remedies and therefore commencing a writ action would be pointless (save after the appointment of and by a liquidator).

(c).   Tianrui's position is to be understood as involving the proposition either that it would not commence a writ action or that a writ action would be an acceptable alternative remedy if it could be used to set aside the issue of the bonds and the new shares (in a manner binding on the holders of those bonds and new shares).

(d).   the Court of Appeal's Judgment was premised and based on Tianrui's position as so stated and these propositions.

(e).   Tianrui subsequently, by issuing the Cayman Writ Action, changed its position.

(f).   such a change of position is an abuse of process.

(g).   the Court has the power, when policing and granting remedies for such abuse, to prevent a party from taking advantage of such improper conduct and the misuse of the Court's processes by requiring the party to act properly and give effect to its stated position.

(h).   in the present case, since Tianrui had previously taken the position that it would not commence a writ action or that such an action if properly formulated, would be an adequate alternative remedy, by filing the Cayman Writ Action it had either (i) acted inconsistently with its previous position and should be prevented from changing its position or (ii) decided that the Cayman Writ Action would, in fact, provide acceptable and sufficient relief in respect of the matters complained of in the Amended Petition and therefore should be treated as having elected to pursue the Cayman Writ Action as an alternative remedy.

80.   The starting point of the argument is clear. It is based on the Company's view as to the position taken by Tianrui before Mangatal J and the Court of Appeal in the First Strike Out Application. However, the next stage in the argument – being the consequences that flow from Tianrui's position as so understood – was formulated in two slightly different ways, as summarised above. On one formulation, Tianrui's change of position is improper and an abuse, so that a remedy for that abuse should now be granted. Tianrui should be prevented from continuing with the Amended Petition since it would be unfair and improper for Tianrui to change its position after having represented to the Court of Appeal that a writ action would not provide it with an adequate

alternative remedy and thereby having procured the reinstatement of the petition. On the other formulation, since it was accepted in the First Strike Out Application that the petition could not proceed if a writ action provided an adequate alternative remedy, Tianrui's decision to go ahead with a writ action must be treated as an election (a choice) by it to pursue an alternative remedy. This is either because the Court should draw the inference, from Tianrui's conduct, that Tianrui had decided to rely on the alternative remedy of the Cayman Writ Action or because Tianrui is only entitled to pursue either the Amended Petition or the Cayman Writ Action (being an adequate alternative remedy) and so Tianrui must choose between them and is to be taken as having chosen the Cayman Writ Action as the later proceeding.

81.    In my view, the Company's claim – on either basis – fails and the Petition Strike Out Application should be dismissed.

   (a).    I do not accept the Company's characterisation of the position adopted by Tianrui on the applications before the Court of Appeal (or Mangatal J). Instead, I accept the submissions of Tianrui on this issue. I would highlight the following points.

   (b).    it seems to me that Tianrui did assert that it could bring a direct claim (based on *Howard Smith*) and did not represent or imply that it would never commence a writ action. Nor should Tianrui, by commencing the Cayman Writ Action, be treated as having decided that the writ action was a complete and preferred remedy for the matters of which it complained.

   (c).    it also seems to me wrong to assert that Tianrui has materially changed its position. Nor is it an abuse or improper for Tianrui to bring the Amended Petition and the Cayman Writ Action in parallel, subject to the case management orders that should be made, and Tianrui accepts should be made, to ensure that the two proceedings are conducted in a manner that avoids unnecessary duplication and expense.

   (d).    the way in which Tianrui presented its position in the appeal can best be tested by looking at its skeleton argument and the way in which the Court of Appeal summarised Tianrui's argument before it. In its skeleton argument Tianrui submitted (at [26]) that the list of alternative remedies identified by Mangatal J in her judgment were "*not at the date of the hearing viable or true alternatives to the relief sought by [Tianrui], which relief is only*

*available by way of a winding up petition.*" Martin JA summarised Tianrui's argument on the appeal by reflecting the written submissions: Tianrui had submitted that "*the alternative remedies identified by the judge were neither viable nor adequate to address the complaints that founded the petition.... Put simply, Tianrui's position as evinced by its petition is that it cannot be expected to remain in association with CNBM and ACC in light of their conduct towards it. None of the remedies identified by the judge deals with that underlying complaint.*" ([36]) (the complaint being based on "*serious allegations of conspiracy by covert agreements and arrangements designed to damage Tianrui, the steps taken to dilute its shareholding being merely the latest stage in the conspiracy*" (see [33]). It was only a winding up that would respond to and deal with Tianrui's complaint and its wish for a corporate divorce. A claim against the Company to declare that the board had abused its powers and had acted improperly and that the Company was in breach of its statutory contract with shareholders would not by itself allow the requisite separation and termination of the corporate association.

(e).  this is still Tianrui's position. The commencement of the Cayman Writ Action is merely a procedural device to permit additional and alternative relief to be granted after the trial of the Amended Petition if the claims made in the Cayman Writ Action are made out. By bringing the Cayman Writ Action, Tianrui is seeking to ensure that if it is unsuccessful on the Amended Petition, and so is unable to achieve the corporate divorce it seeks, it may be able to obtain the alternative relief that can properly be granted in the Cayman Writ Action. Alternatively, if it succeeds in showing that a winding up order should be made the Court can consider whether the claim in the Cayman Writ Action has been made out and whether relief in the Cayman Writ Action would provide Tianrui with an adequate alternative remedy. If a winding up order is made, and a declaration made that the board had acted unlawfully and abused its powers in issuing the bonds and New Shares, it would be open to a liquidator appointed by the Court to decide what further action should be taken and claims brought.

(f).  it does not follow from the proposition that the Amended Petition provides the principal relief sought by Tianrui that cannot be provided by the writ action, that a writ action is inconsistent with the application for a winding up or that by commencing such an action

Tianrui must be taken to have abandoned the proceeding that would provide it with the principal relief sought. Tianrui is not seeking inconsistent remedies.

(g).     nor is Tianrui acting in bad faith or improperly. I do not consider that it can fairly be said that Tianrui misled the Court of Appeal as to its position (it has not been suggested that Tianrui was asked to give or provided any undertaking or gave any clear confirmation that it would not subsequently issue a writ seeking additional and separate relief). Nor does it seem to me that Tianrui can be said to be misusing the Court's procedures by commencing the Cayman Writ Action.

(h).     the Court of Appeal considered that it was legitimate for Tianrui to exercise its statutory right to petition for a winding up order and have the question of alternative remedies (whether the appropriate remedy for the complaints made out at trial was a winding up order or one of the alternative remedies) decided after its complaints had been considered at the trial of the Amended Petition. It is consistent with this approach to allow the Amended Petition and Cayman Writ action to proceed in tandem.

(i).     nor is the argument which founded the successful claim of abuse in *Camulos Partners v Kathrein and Company* [2010 (1) CILR 303] applicable here. In that case, the evidence demonstrated that the petitioner had taken the view that the appropriate remedy for the matters complained of was by way of proceedings commenced by way of originating summons (see [87]). There is no evidence that Tianrui's real object is only to obtain the relief sought in the Cayman Writ Action and to use the Amended Petition as a means of putting the maximum pressure on the Company to assent to the relief so sought (see [97]).

(j).     Mr. Flynn was right in my view to say that this application was an ambitious submission in light of the Court of Appeal's Judgment.

*The First Writ Strike Out Application*

82.     It follows from the conclusions and analysis set out above that the First Writ Strike Out Application should also be dismissed. Tianrui is not seeking inconsistent remedies nor is there any abuse of process in bringing the Cayman Writ Action at the same time as the Amended Petition.

**The Second Writ Strike Out Application**

*The Company's submissions*

83.     The Company argues that the Cayman Writ Action is an abuse of process because Tianrui does not have standing to sue the Company for what are essentially claims for breaches by the current board of the fiduciary duties owed by them to the Company. The Cayman Writ Action is in substance (if not in name) a claim by a minority shareholder for breaches by the Company's directors of those duties. The proper plaintiff is the Company. However, Tianrui has not constituted its claim as a claim by the Company and even if it had done so, it would require leave from the Court to pursue the claim, pursuant to GCR O.15, r. 12A, which leave it has not sought or obtained. GCR O.15, r. 12A requires a plaintiff to seek leave to continue an action which is commenced derivatively, that is, by a shareholder on behalf of the Company under the exception to the rule in *Foss v Harbottle* [1843] 67 ER 189.

84.     The Company relies on the recent judgment of Mr. Justice Kawaley in this Court in *Gao v China Biologic Products Holdings, Inc.* (unreported, FSD 157/2018, 10 December 2018) (**Gao**). The Company submits that it is common ground that *Gao* stands as authority for the proposition that a writ action by a minority shareholder (such as Tianrui) in respect of the exercise by the board of directors of the power to allot and issue shares falls to be struck out on the grounds that it did not disclose a reasonable cause of action and/or is an abuse of process.

85.     As regards *Gao*, the Company submits that:

(a).    the facts in *Gao* were similar to the present case – a minority shareholder (i.e. Mr. Gao) brought a writ action against the company in respect of the exercise by its board of directors of the power to allot and issue shares. The company contended that it did not owe any fiduciary, equitable, contractual and/or any other duty to Mr. Gao and applied to strike out the writ on the grounds that it did not disclose a reasonable cause of action and/or is an abuse of process.

(b).   the headnote to the judgment helpfully summarised the decision in, inter alia, these terms: *"whether duty to exercise power to issue new shares for a proper purpose owed to company or to individual shareholders"; "standing of beneficial owner of shares to assert shareholder claim against company"; and "whether action liable to be struck-out on abuse of process grounds".*

(c).   Mr. Justice Kawaley conducted a detailed review of relevant Cayman Islands, English and Australian case law (as well as practitioners' texts and articles) and ultimately struck out Mr Gao's claim for abuse of process, holding that individual minority shareholders have no standing to pursue personal claims against a company for an improperly motivated allotment of shares which dilutes his voting rights.

(d).   Mr. Justice Kawaley's analysis was set out in [29] - [49] of his judgment and was correct. The Company referred to Mr. Justice Kawaley's conclusions in [29] - [30] and [32] as follows:

> *"29.   I find that individual minority shareholders ordinarily have no legal standing to sue for breach of fiduciary duty in relation to a complaint that their voting power has been diluted by a share allotment approved by the directors for an improper purpose. The correct legal principle was accurately stated, strictly obiter, by Smellie J in Argentine Holding Ltd v Buenos Aires et al [1997] CILR 90 at 104. The position is most fully considered and persuasively articulated in the judgment of Harman LJ in Bamford v Bamford [1970] 1 Ch. 212. He regarded it as trite law that directors only ordinarily owe a duty to the company if they misuse their powers and that the company in general meeting can validate any such defects in the exercise of the directors' powers. The relevant analysis occurred in the context of considering an allotment of shares which it was complained was approved in order to dilute the voting power of the plaintiff shareholders. The statements in Bamford do not explain the exceptions to what is properly viewed as a general and perhaps almost invariable rule because these were not relevant to that case. However, Harman LJ (at 239) cited a passage from the Privy Council decision of North West Transportation Co v Beatty (1887) 12 App. Cas. 589 confirming that it is not every breach of fiduciary duty which the company in general meeting can approve.*
>
> *30.   In my judgment both the general rule and the exception are fundamental principles of company law which are central to the way in which companies limited by shares operate. Directors are only answerable to the company for intra vires breaches of fiduciary duty because they are agents of the company appointed on the explicit basis that they owe duties of loyalty to the company. Shareholders ordinarily acquire their shares on the explicit basis that their only*

*means of controlling the management of the company is by way of successfully passing resolutions in general meetings. It would be inconsistent with what is essentially a functional rule, and potentially expose companies to limitless litigation, if individual shareholders were permitted to enforce duties which are not owed to them. This would amount to permitting individual shareholders to participate in the management of the company by intruding into the company's proper sphere of supervising the conduct of the directors. The position is different as regards ultra vires acts because the company itself is not competent to ratify ultra vires acts and may only validly act within its powers. Section 28 of the Companies Law, for example, expressly permits shareholders to set aside ultra vires acts.*

*..................*

32   *A further consideration which weights (sic) against the existence of standing to assert a personal claim with a view to challenging the August 24 Decision is that share allotments will usually affect all shareholders of the affected class in the same way and that there is accordingly no identifiable principled basis upon which to treat this category of breach of an equitable duty as a sui generis one giving rise to concurrent duties being owed to the company and individual shareholders. Directors' fiduciary duties are quintessentially owed to the company and their breach is actionable by or on behalf of the company. I reject the suggestion that the dilution of share voting rights constitutes a freestanding exception to the rule in Foss v Harbottle, which establishes the general rule that claims for damage caused to a company must ordinarily be brought by or on behalf of the company." (emphasis added)*

(e).   Mr. Justice Kawaley had considered each of the authorities relied on by Tianrui, in particular the judgment of Hoffmann J in *Re Sherborne Park Residents Co* [1987] BCLC 82 (***Sherborne Park***), the Privy Council in *Howard Smith*, the decision of the South Australian Supreme Court in *Residues Treatment and Trading Co Ltd v Southern Resources* [1988] 6 ACLC 1160 (***Residues***) and the judgment of the Supreme Court in *Eclairs Group Ltd and another v JKX Oil and Gas plc* [2016] 3 All ER 641 (***Eclairs***). He distinguished them, demonstrated that the issue of whether the shareholder had a personal right had not been argued at all or, if raised, it had not been fully argued, or showed why the reasoning could not be supported. The Company submitted that Mr. Justice Kawaley's approach to these authorities was correct and should be followed. His approach can be summarised as follows:

(i).   as regards *Sherborne Park*, Mr. Justice Kawaley had said the following (at [43(c)]):

> *"However, the petitioner was pursuing a statutory unfair prejudice claim so the issue of standing to advance an equitable claim did not arise for consideration. The decision does admittedly support the view that a personal statutory claim can be pursued to challenge an improperly motivated share allotment. But, as already noted, this was an ex parte application for a pre-emptive costs order so the obiter remarks relied on provide only slight potential support for the principle in support of which it is cited. Moreover, to the extent that Hoffmann J described the personal claim as a means of enforcing the articles, this type of claim is a classic instance of the special circumstances justifying a minority shareholder asserting a personal claim for breach of duties generally owed solely to the company."*

(ii).   *Sherborne Park* involved only *obiter dicta* and "*one should accord far greater weight to judicial statements made in the context of deciding a controversial issue than to mere obiter dicta.*" Furthermore, he did not accept that it had not been approved by the English Court of Appeal in *Peskin v Anderson* [2001] 1 BCLC 372 (**Peskin**). In fact, *Peskin* showed that "special circumstances" were needed to justify an individual right of action by a minority shareholder.

(iii).   *Howard Smith*, when properly understood, offered no support for the existence of a personal right of action by minority shareholders because the issue of standing by a minority shareholder to bring an action was not considered or decided. He said:

> "41.   It remains to consider the text writers upon whom the Plaintiff's counsel understandably heavily relied. 'Gore-Browne on Companies', Issue 142, July 2018, paragraph [44] confidently asserts that "where the directors of the company have exercised their powers for an improper purpose ... the shareholder himself has a personal cause of action..." The only authority cited in support of this proposition by the learned authors is Howard Smith -v- Ampol Petroleum Ltd. [1974] AC 821, which, with respect, provides next to no support for the statement. The House of Lords merely noted that the standing of the shareholder to bring a personal claim was not disputed. Mr Green QC pointed out what I consider [to be the] crucial factor consideration in that case. The plaintiffs were majority shareholders holding 55% of the shares. The central holding in Howard Smith was entirely consistent with the Defendant's central thesis, which I unreservedly accept, that majority shareholders have the right (by way of expressing the will of the company) to disapprove or ratify any intra vires breach of fiduciary duty by the directors.
>
> 42.   There is a fundamental distinction between the rights of the majority and the minority in this regard. It may well be that the most formal way of proceeding would have been for the majority shareholders to have issued derivative proceedings but it is easy to see why no standing challenge was raised. Howard

> *Smith, properly understood, is in no material way inconsistent with the notion that minority shareholders ordinarily have no standing to assert a personal claim in relation to a share allotment which is improperly motivated."*
>
> [underlining added]

(iv). as regards the decision in *Residues*, Mr. Justice Kawaley explained why he declined to follow the reasoning of King CJ:

> *"33. Before dealing with the special circumstances point, I should explain why I decline to follow [Residues].....In my judgment this decision represents a departure from the mainstream of British Commonwealth company law which is not supported by any previous or subsequent authorities to which I was referred. Nor is Residues supported by any coherent principle. King CJ's central thesis was that a shareholder's voting rights were so fundamental that they deserved special protection in the form of a personal action against the company for breach of fiduciary duty. With the greatest of respect, this reasoning fails to acknowledge that individual shareholders can sue the company to set aside ultra vires acts (Companies Law, section 28), and can challenge intra vires share allotments which they consider improperly dilute their voting rights either (a) through a derivative action, or (b) through the instrumentality of a general meeting. The contrary argument also fails to explain how as a general rule a share allotment affects some existing shareholders differently to others. King CJ himself acknowledged (at 201), after referring to various cases which he considered provided some support for his conclusion, that "[n]one of the above cases is decisive of the present point". Mr. Meeson QC suggested that various previous decisions supported the individual shareholder's right to challenge an improperly motivated share allotment, but on careful reading they provided no direct support (as King CJ himself accepted)."*

(v). he did not accept that *Residues* had been applied by Mr. Justice Harris in Hong Kong in *Artan Investments Limited v Bank of East Asia Limited* HCMP 125/2015. He considered that the judge's statements to the effect that shareholders had standing to prosecute proceedings to protect their personal right not to have the voting power of their shares diminished was of minimal persuasive value in relation to the claimed personal claim in equity since Harris J was dealing with a statutory right (a statutory application for discovery).

(vi). as regards *Eclairs*, Mr. Justice Kawaley did not regard the case as supporting the personal right argument as it involved only a derivative claim (see [40(a)]) and did not concern an allotment of shares (see [43(a)]).

(f).    *Gao* was part of Cayman law and should be applied by this Court unless this Court was convinced that the judgment was wrong. The proper approach was set out in *In the matter of Alibaba.com Ltd* [2012] (1) CILR 273, per Cresswell J at [63]:

> *"Decisions of co-ordinate courts*
>
> 63    *I refer to 11 Halsbury's Laws of England, 5th ed., at para. 98 (2009):*
>
> > *"There is no statute or common law rule by which one court is bound to abide by the decision of another court of co-ordinate jurisdiction. **Where, however, a judge of first instance after consideration has come to a definite decision on a matter arising out of a complicated and difficult enactment, the opinion has been expressed that a second judge of first instance of co-ordinate jurisdiction should follow that decision; and the modern practice is that a judge of first instance will as a matter of judicial comity usually follow the decision of another judge of first instance unless he is convinced that that judgment was wrong.** Where there are conflicting decisions of courts of co-ordinate jurisdiction the later decision is to be preferred if reached after full consideration of early decisions." [emphasis added by the Company]*

(g).    in any event, the reasoning and decision in *Gao* was correct and to be preferred to the reasoning in *Sherborne Park*.

86.    The Company submitted that the Cayman Writ Action should therefore be struck out for being an abuse of process. Were it otherwise, it would always be open to a minority shareholder to sue the directors for alleged breaches of fiduciary duties by framing it as an action for breach of terms in or implied into the articles, thus upending the well-established principles of law that make it clear that the Company is the proper plaintiff for claims against the directors in respect of breaches of duties owed to it.

87.    The Company submits that to the extent that Tianrui is bringing the Cayman Writ Action as a derivative action (which it needs to do in light of *Gao*, but which it has not done), it should be struck out since Tianrui has failed to comply with the requirements of GCR, O.15, r.12A. By failing to structure its claim properly or to seek leave to continue the claim, Tianrui was seeking to do an end run around this important procedural gateway and this amounted to yet further abuse.



88.     The Court ought not to permit this disregard of the rules. O.15 r.12A is not simply a technical box to tick. Rather, it is a real and substantive test, which includes requirements that the plaintiff persuade the Court on an *inter partes* hearing that: (a) the plaintiff has a prima facie case on the merits; (b) one of the exceptions to the rule in *Foss v Harbottle* applies; and (c) the plaintiff is acting bona fide (the so-called test in *Nurcombe v Nurcombe*). As noted by Foster J in *Renova Resources Private Equity Limited v Gilbertson*: "*The reason for its introduction was to provide a safeguard to prevent vexatious or inappropriate claims, which were not in the interests of the company concerned to pursue.*" Tianrui ought not to be rewarded for its attempts to work around that safeguard.

*Tianrui's submissions*

89.     Tianrui submits that (a) GCR O.15, r.12A is not engaged in this case, as the cause of action on which it relies in the Cayman Writ Action is its own, personal and not a derivative claim; (b) the decision in *Gao* was plainly wrong and should not be followed; (c) this is because, as a matter of principle, a shareholder has a personal claim against the company to challenge an improper exercise by the directors of the power to issue shares, as breach of the company's constitution and the statutory contract to which the shareholder and company are parties; and (d) even if these arguments are not accepted and it can only proceed by way of derivative claim then it should be given the opportunity to apply to amend its statement of claim in the Cayman Writ Action to reconstitute that action as a derivative claim (and then to apply for permission to continue) – and if a claim can be cured by amendment, then it is not appropriate to strike it out.

90.     Tianrui argues that a member is entitled to commence proceedings in a personal capacity where: (i) the right being enforced is a personal right conferred on the member in their capacity as a shareholder of the company; and (ii) the matter that the shareholder is complaining about is not merely a procedural irregularity (see *Edwards v Halliwell* [1950] 2 AER 1064 at 1066-1069 and Gower's Principles of Company Law (8th Ed) at [16-22]).

91.   Tianrui relies in particular, as I have explained above, on the judgments in *Howard Smith*, *Sherborne Park*, *Residues* and *Eclairs*.

92.   *Howard Smith* was an appeal to the Privy Council against a judgment of the Supreme Court of New South Wales invalidating an allotment of shares made for the improper purpose of reducing the proportionate shareholding of the plaintiff and an associated company in order to facilitate a take-over by another company. The plaintiff and its associate company between them held a majority of the shares and the effect of the impugned allotment would have been to convert their majority shareholding into a minority shareholding. The plaintiff appears to have sued in an individual capacity and its standing was not challenged. Mr. Lowe submitted that nonetheless the dicta and reasoning in the case were high authority that supported the existence of and explained the juridical basis of the shareholder's personal claim. During his oral submissions Mr. Lowe referred me to and relied on the following passage in the speech of Lord Wilberforce (at 837C – 838C):

> *"The purpose found by the judge is simply and solely to dilute the majority voting power held by Ampol and Bulkships so as to enable a then minority of shareholders to sell their shares more advantageously. So far as authority goes, an issue of shares purely for the purpose of creating voting power has repeatedly been condemned: Fraser v. Whalley, 2 Hem. & M. 10; Punt v. Symons & Co. Ltd. [1903] 2 Ch. 506; Piercy v. S. Mills & Co. Ltd. [1920] 1 Ch. 177 (" merely for the purpose of defeating the wishes of the existing majority of shareholders") and Hogg v. Cramphorn Ltd. [1967] Ch. 254. In the leading Australian case of Mills v. Mills, 60 C.L.R. 150, it was accepted in the High Court that if the purpose of E issuing shares was solely to alter the voting power the issue would be invalid. And, though the reported decisions, naturally enough, are expressed in terms of their own facts, there are clear considerations of principle which support the trend they establish. The constitution of a limited company normally provides for directors, with powers of management, and shareholders, with defined voting powers having power to appoint the directors, and to take, in general meeting, by majority vote, decisions on matters not reserved for management. Just as it is established that directors, within their management powers, may take decisions against the wishes of the majority of shareholders, and indeed that the majority of shareholders cannot control them in the exercise of these powers while they remain in office (Automatic Self-Cleansing Filter Syndicate Co. Ltd. v. Cuninghame [1906] 2 Ch. 34), so it must be unconstitutional for directors to use their fiduciary powers over the shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist. To do so is to interfere with that element of the company's constitution which is separate from and set against their powers. If there is added, moreover, to this immediate purpose, an ulterior purpose to enable an offer for shares to proceed which the existing majority was in a position to block, the departure from the legitimate use of the fiduciary power becomes not less, but all the greater. The right to dispose of shares at a given price is essentially an individual right to be exercised on*

*individual decision and on which a majority, in the absence of oppression or similar impropriety, is entitled to prevail. Directors are of course entitled to offer advice, and bound to supply information, relevant to the making of such a decision, but to use their fiduciary power solely for the purpose of shifting the power to decide to whom and at what price shares are to be sold cannot be related to any purpose for which the power over the share capital was conferred upon them. That this is the position in law was in effect recognised by the majority directors themselves when they attempted to justify the issue as made primarily in order to obtain much needed capital for the company. And once this primary purpose was rejected, as it was by Street J., there is nothing legitimate left as a basis for their action, except honest behaviour. That is not, in itself, enough.*

*Their Lordships therefore agree entirely with the conclusion of Street J. that the power to issue and allot shares was improperly exercised by the issue of shares to Howard Smith. It was not disputed that an action to set aside the allotment and for rectification of the register was properly brought by Ampol as plaintiff.*

[emphasis added]

93.   Mr. Lowe also relied on the following passage in the judgment of Hoffmann J. in *Sherborne Park*:

> *I have not heard any opposing argument but I am provisionally inclined to accept all of submissions of counsel for the petition except [the proposition a claim based on a wrongful share issue of the type made in this case can be brought by way of a derivative action]. Although the alleged breach of fiduciary duty by the board is in theory a breach of its duty to the company, the wrong to the company is not the substance of the complaint. The company is not particularly concerned with who its shareholders are. The true basis of the action is an alleged infringement of the petitioner's individual rights as a shareholder. The allotment is alleged to be an improper and unlawful exercise of the powers granted to the board by the articles of association, which constitute a contract between the company and its members. These are fiduciary powers, not to be exercised for an improper purpose, and it is generally speaking improper-*
>
>> *"for the directors to use their fiduciary powers over the shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist". (See Lord Wilberforce in Howard Smith Ltd. v. Ampol Petroleum Ltd. [1974] A.C. 821, at p. 837)."*
>
> *An abuse of these powers is an infringement of a member's contractual rights under the articles. Professor Gower in his Principles of Modern Company Law (4th ed.,1979, at pp. 647–656) distinguishes between the derivative action and the member's personal action. The former is brought when-*
>
>> *"...a wrong has been done to the company and action is brought to restrain its continuance, or to recover the company's property or compensation due to it".*
>
> *In such a case, says Professor Gower, the company is the only true plaintiff. In the member's personal action the dispute is an internal one between those interested in the company. A shareholder in such an action may sue as representative of himself and other shareholders*

> *who have identical interests but he does not in substance assert a right which belongs to the company alone. It is perhaps worth observing that in cases concerning the improper allotment of shares like Howard Smith Ltd. v. Ampol Petroleum Ltd. there is no suggestion that the plaintiff sues on behalf of the company or in any capacity other than individual shareholder."*

> [emphasis added]

94.   Tianrui argues that the reasoning in *Residues* is also correct and should be followed. Mr. Lowe took me to the judgment of King CJ in which, after referring to and discussing *Howard Smith* and various Australian decisions, King CJ said as follows:

> *"None of the above cases is decisive of the present point. There are strong indications in them to my mind, however, of the recognition of a personal right in a shareholder to be protected against dilution of his voting rights in the company by improper action on the part of the directors. This is clearly so where that dilution has the effect of destroying an existing majority and creating a new one……The personal right of a shareholder to which I refer is founded, in my opinion, upon general equitable considerations referred to in the cases cited above arising out of membership of a body whose management is in the hands of directors having fiduciary obligations. It is fortified by the nature of the contract between the company and the members constituted by the memorandum and articles of association and given statutory force by sec. 78(1) of the Companies Code. I do not mean that the relevant right of a shareholder is founded in contract or that his remedies for infringement are remedies for breach of contract. The shareholder's right is founded in equity and is a right to have the say in the company which accrues to him by virtue of the voting rights which are attached to his shares by his contract with the company, preserved against improper actions by the company or the directors who manage its affairs. It is true, as the learned Judge appealed from observed, that a person taking shares in a company must be taken to have agreed to suffer such effects as may flow from the allotment of further shares made by the company, but that is not to say that he is without rights in relation to such further allotment as may be made by the directors for improper purposes.*

> *The rule in Foss v. Harbottle (supra) clearly operates to preclude a shareholder from suing in his personal capacity in respect of a detriment which he suffers in common with other shareholders in consequence of a wrong done to the company. There is a clear distinction, however, between such a detriment and the diminution of a shareholder's effective voting power by an improper allotment of shares by directors acting on behalf of the company. The latter is not merely a breach of duty by the directors to the company, it is also a wrong done to the shareholder by the company acting through its agents. To make that distinction is not necessarily to subscribe to the view that a shareholder has a personal right not to be affected detrimentally by any breach of what is said to be an implied term in the contract between the member and the company that the affairs of the company will be managed without impropriety on the part of the directors. Diminution of voting power stands on a fundamentally different footing from other detriments resulting from abuse of power by directors. A member's voting rights and the rights of participation which they provide in the decision-making of the company are a fundamental attribute of membership and are rights which the member should be able to protect by legal action against improper diminution*

*The rule in Foss v. Harbottle has no application where individual membership rights as opposed to corporate rights are involved....:*

*It must be acknowledged that there has often been a lack of clear differentiation in the cases between the situations in which the company is the only proper plaintiff, the situations in which a shareholder may prosecute a derivative action for a remedy in favour of the company and situations in which a shareholder may bring an action on his own behalf for a personal remedy. There is also a lack of clarity as to the basis upon which individual shareholders have been allowed to sue to have allotments of shares made for improper purposes set aside. I think, however, that there is a clear trend in cases of the highest authority tending to indicate the existence of a personal right in a shareholder, grounded upon equitable principles, to have the voting power of his shares undiminished by improper actions on the part of the directors and of his locus standi to institute and prosecute proceedings to protect that right. I think that the time has come for the courts to give unequivocal recognition to such a right. The view at which I have arrived, that this point in the development of the law has been reached, is reinforced by considered dicta of two single Judges in the past two years [King CJ then refers to Hoffmann J in Sherborne Park and Malcolm C.J. in the Supreme Court of Western Australia in Eromanga Hydrocarbons N.L. v. Australis Mining N.L. & Ors (1988) 6 ACLC 906]…….*

*It has been argued, however, that there is a firm rule of law that a shareholder does not have standing to seek relief in respect of any act of the directors which is capable of ratification by the members in general meeting. My first comment on that proposition is that it is by no means clear to me that the allotment in question, if made for the improper purpose alleged, is capable of ratification. It is clear law that the voting power of a majority may not be exercised in a way which is oppressive of or in fraud of minority shareholders, Allen v. Gold Reefs of West Africa Ltd. (1900) 1 Ch. 656 at p. 671; Peters' American Delicacy Co. Ltd. v. Heath & Ors (1938-1939) 61 C.L.R. 457 at p. 504 et seq. Those cases were concerned with alterations to the articles of association but there appears to be no reason why a similar restraint on the exercise of majority voting power should not exist in relation to other resolutions. In Winthrop Investments Ltd. v. Winns Ltd. (supra) the Court of Appeal of New South Wales held that a general meeting could ratify an exercise of the powers of directors to allot shares which had been made for an improper purpose. An important factor in that decision, however, was that the Court felt constrained to follow a decision to the same effect of the English Court of Appeal in Bamford v. Bamford (1970) Ch. 212, a constraint which is now recognised not to apply to the Supreme Courts of the Australian States[because the High Court of Australia had held that voting powers conferred on shareholders and powers conferred on directors by the articles of association of companies must be used bona fide for the benefit of the company as a whole].*

*If it is correct that a shareholder has a personal right to have the voting power of his shares undiminished by an allotment of shares made for an improper purpose, there is to my mind a substantial argument that an exercise of the voting power of the majority to ratify such an allotment would be beyond the scope of the purpose for which that power exists. This is an issue which may have to be resolved at trial. I have adverted to the issue because I do not wish it to be assumed from my consideration of the submission as to locus standi that I necessarily accept that the allotment is capable of ratification. I think, however, that the*

*submission as to locus standi can be disposed of without resolving the issue as to the capacity of a general meeting to ratify the allotment.*

*The submission as to locus standi is based upon the principle enunciated in MacDougall v. Gardiner (1875) 1 Ch.D. 13 that if an irregularity is capable of being cured by resolution of a general meeting, an individual shareholder may not sue on his own behalf or on behalf of himself and other shareholders to complain of that irregularity. There is no difficulty with that principle where the complaint is of an irregularity in a matter concerning the internal management of the company. <u>The English Court of Appeal in Bamford v. Bamford (supra) applied the principle to an improper allotment of shares. If, however, such an allotment infringes the personal rights of shareholders, it is difficult to see how the potential for ratification can deprive the wronged shareholder of locus standi while the infringement continues. Even if the shareholder's action can be defeated by ratification of the allotment by a general meeting on the basis that the infringement ceases because the shareholder has no right to have the voting power of his shares remain unaffected by the lawful issue of further shares by the company, there appears to be no reason in principle why his locus standi should not exist until the infringement is expunged by ratification. I do not think that the potential for ratification, if it exists, is sufficient reason for depriving the plaintiffs of locus standi."</u>*

[underlining added]

95.   Mr. Lowe submits that the constitutional analysis is supported by *Eclairs* – that a claim based on an abuse of the directors' powers to allot shares is connected with or arises out of the company's articles themselves. Lord Sumption said the following:

> "15.   *The important point for present purposes is that the proper purpose rule is not concerned with excess of power by doing an act which is beyond the scope of the instrument creating it as a matter of construction or implication. It is concerned with abuse of power, by doing acts, which are within its scope, but done for an improper reason. It follows that the test is necessarily subjective. 'Where the question is one of abuse of powers,' said Viscount Finlay in Hindle v John Cotton Ltd 1919 56 SLR 625 at 630, 'the state of mind of those who acted, and the motive on which they acted, are all important'.*
>
> 16.   *A company director differs from an express trustee in having no title to the company's assets. But he is unquestionably a fiduciary and has always been treated as a trustee for the company of his powers. Their exercise is limited to the purpose for which they were conferred. One of the commonest applications of the principle in company law is to prevent the <u>use of the directors' powers for the purpose of influencing the outcome of a general meeting. This is not only an abuse of a power for a collateral purpose. It also offends the constitutional distribution of powers between the different organs of the company, because it involves the use of the board's powers to control or influence a decision which the company's constitution assigns to the general body of shareholders.</u> Thus in Fraser v Whalley (1864) 2 H & M 10 the directors of a statutory railway company were restrained from exercising a power to issue shares for the purpose of defeating a shareholders' resolution for their removal.*

[underlining added]

96.   Mr. Lowe submitted that *Bamford v Bamford* [1970] Ch 212 (***Bamford***) and *Hogg v Cramphorn* [1967] Ch. 254 (***Hogg***), the former a decision of the English Court of Appeal, were distinguishable or should not now be followed. He accepted that these cases indicated that the duty to allot shares for a proper purpose is a duty owed to the Company and that an action for breach could only be brought by the company and that generally no action was available where the breach had been ratified by the general meeting. However, both cases, and in particular, *Bamford* predated the discussion and analysis of the rights of shareholders in *Howard Smith*. It was clear from Lord Wilberforce's analysis in *Howard Smith* that the shareholders complaining of an improperly exercised power to issue shares did not need to proceed by way of derivative claim.

97.   Mr. Lowe also submitted that:

   (a).   Hoffmann J's reasoning in *Sherborne Park* was approved by the English Court of Appeal in *Peskin* at [36].

   (b).   the Australian Courts had applied the *Sherborne Park* analysis (see *Residues*) as had courts in Hong Kong (see *Tsang Wai Lun v Chu King Fai* [2009] 5 HK LRD 105, and *Artan Investments Ltd V Bank of East Asia* [2015] HCMP 125/2015).

   (c).   *Gao* dismissed the argument in *Sherborne Park* as being obiter without noting that it had been approved specifically in *Peskin* (see per Kawaley at 13-14 [34](d)], 16 [39], 17 [43(c)]). Moreover, the fact that Lord Hoffmann's analysis had been obiter did not render it any less cogent.

   (d).   shareholders cannot ratify improper share issues when they themselves share the improper purpose, as is here alleged to be the case (see *North West Transportation Co Ltd v Beatty* (1887) 12 App.Cas 589, PC, *Bamford* at 239, *Clemens v Clemens* [1976] 2 All ER 268, *Winthrop Investments v Winns Ltd* [1975] 2 NSWLR 666, *Ngurli Ltd v McCann* (1954) 90 CLR 425 and *Franbar Holdings v Patel* [2008] BCC 885). This was not the case in *Gao* (see [29]).

(e).	the existence of a personal claim was supported by a number of leading textbooks. In particular, Chivers, Shaw, Bryant and Staynings in *The Law of Majority Power: Use and Abuse* (OUP, 2nd edition, 2018) where it was stated (at [5.20] – [5.22]) that "*The authorities establish that a minority shareholder may bring a personal action if directors allot shares for an improper purpose*" (citing in footnote 15 *Eclairs*, *Bamford* and *Sherborne Park*). This text had been cited to Mr. Justice Kawaley who had declined to follow the conclusions reached by the authors since, for the reasons explained above, none of the authorities relied on supported the existence of the shareholders' personal right of action. However, Mr. Lowe submitted that Mr. Justice Kawaley had been wrong to reject the conclusions of Messrs. Chivers, Shaw, Bryant and Staynings which gave important textbook support for the existence of the personal claim.  Mr. Lowe also referred to the current edition of Gower's *Principles of Modern Company Law* (Sweet & Maxwell, 10th ed., 2016 written by Professors Paul L. Davies and Sarah Worthington). Gower stated that:

> "*It is clear that [the statutory duty on directors to act within their powers is] owed to the company….and so may be pursued by the company directly or by the shareholders in a derivative claim. But can the defaulting directors be sued by parties other than the company? A failure on the part of the directors to observe express limits on their powers contained in the company's constitution may also put the company in breach of the contract with the shareholders created by the articles…at least some breaches of the articles by the company can be complained of by a shareholder…….Where the breach is of a duty to act for proper purposes…however then allowing a wider class of people to complain has been more poorly defended; no case seems to have turned on standing. In some cases, minority shareholders have been allowed to sue but the question of their standing has often not been argued nor its basis explained [citing Howard Smith]. As a matter of logic and equitable precedent this duty to act for proper purposes owed by directors to the company may also be owed (at common law…) by the directors to a wider class of people entitling this wider class to seek common law or equitable remedies from the directors for breach. Alternatively, or in addition…. <u>the director's wrongs to the company may entitle the shareholders to pursue related or parasitic remedies, such as for breach of the contract in the articles (although note the arguments against) or a claim in unfair prejudice [citing Sherborne Park….[and in the footnote relating to the arguments against: But for the perhaps preferable view that acting for an improper purpose is an abuse of power but not a breach of the articles see Winthrop Investments v Winns [1975] NSWLR 666….[and] also see Rolled Steel Products v British Steel [1986] Ch. 246].</u>*

[underlining added]

During the hearing, I directed Mr. Lowe's attention to the reference in this passage (underlined) to there being arguments against shareholders having standing to bring a claim

for breach of the articles and the suggestion that the exercise of a power for an improper purpose did not result in a breach of the articles. Mr. Lowe submitted that this approach was not right. Where the articles gave the directors a power which impacted on the constitutional rights of shareholders, the exercise of such a power for an improper purpose was impermissible in the same way as the exercise of a power beyond a stated limitation and gave rise to a breach of the articles.

98.   At the hearing, as I have explained above, Tianrui accepted that there were problems with the Cayman Writ Action in its current form. Mr. Lowe accepted that the relief sought (setting aside and declaring to be void the convertible bonds and the New Shares so as to affect the rights of the holders of the bonds and New Shares) was not available in a claim against the Company. He also accepted that Tianrui would need to apply for permission to amend the Cayman Writ Action. However, the cause of action against the Company was properly claimed and it would be wrong to strike out the Cayman Writ Action merely because an amendment to the form of relief sought was needed. He submitted (as I understand his submissions, which were not included in any written submissions) that it was not necessary to file a draft of the amended writ and statement of claim at this stage on the basis that the challenge to the Cayman Writ Action was to the basis of the claim and cause of action (the personal claim by Tianrui) and not to the remedy sought. That challenge failed and the remedial issues could be dealt with on the subsequent application for permission to amend.

*Discussion and decision*

99.   Mr. Justice Kawaley started his judgment in *Gao* by noting that the propriety of the issue of new shares where the voting power of shareholders is diluted had been the subject of litigation for over one hundred years and that the question of the capacity in which a shareholder could seek relief, personally or derivatively on behalf of the company, had elicited different views from judges and textbook writers over the years. I would go further and echo the comments made by a leading academic (Professor Wedderburn) over forty years ago when he referred to a "*conceptual muddle which has overcome company law in the courts*" in this area (see 32 MLR 563, at 563).

100.   The key question that arises on the Second Writ Strike Out Application is as follows: can a shareholder bring a personal claim against the company where the directors allot shares for the

improper purpose of diluting the shareholding of a minority shareholder from above to below 25% where it is alleged that the directors were acting in concert (and were part of a conspiracy with) the majority shareholders in order to achieve that dilution (the ***Standing Question***)?

101. There is a related question: can the majority shareholders ratify the allotment and the breach in such circumstances and if they can do so, does ratification preclude the shareholders' personal claim (the ***Ratification Question***)? The Second Writ Strike Out Application invites the Court to decide that the Standing Question should be answered in the negative and to strike out the Cayman Writ Action for that reason. The Ratification Question does not directly arise on this application. It does arise and is a live issue in the Cayman Writ Action. Tianrui has pleaded (see [64] and [65] of the statement of claim in the Cayman Writ Action, quoted above) that the resolutions passed at the EGM held on 30 October 2018 were not effective to ratify the board's improper issuing of the bonds and the New Shares. The Company has denied this (see [211] of the Defence to the Writ). Even if ratification is in principle effective to preclude the shareholder's personal claim, and it is clearly arguable that it is not on the facts as pleaded in the statement of claim, there are substantial issues of fact that will need to be decided at trial which are relevant to the issue of whether there was an effective and proper ratification. The Ratification Question is however indirectly relevant since it can be argued that *Bamford* and *Hogg* address the Standing Question in the context of a discussion of the ratification issue. Furthermore, one issue arising in relation to the Standing Question is whether the mere availability of ratification precludes a personal claim. In my view, for the reasons explained below, that is not the case (although it is open to the Court in some circumstances to give the shareholders an opportunity to ratify the directors breach of duty, as Buckley J did in *Hogg* when he decided to stand the action over for a period to allow the directors to convene an EGM to vote on the allotment). It also seems to me that to the extent that a shareholder has a personal claim, ratification cannot defeat it.

102. In my view, the answer to the Standing Question is yes. While, save for the decision in *Gao*, the scope and basis of the decisions in the key cases is unclear or disputed, and while the analysis in the leading textbooks is not uniform or always fully argued (the textbook discussions are, with some notable exceptions to which I shall refer, often brief and inconclusive), authoritative dicta in the cases and principle support such a view (I agree with King CJ's comment that *"None of the cases [cited] is decisive of the present point. There are strong indications in them to my mind, however, [at least in cases where the dilution has the effect of destroying an existing majority and*

*creating a new one] of the recognition of a personal right in a shareholder to be protected against dilution of his voting rights in the company by improper action on the part of the directors.").* I accept Tianrui's submissions on this issue. Accordingly, I find that I must disagree with the judgment of Mr. Justice Kawaley. I do so with hesitation, reluctantly and with great respect, as I would usually follow his decisions without demur. However, the requirements set out by Cresswell J in *In the matter of Alibaba.com Ltd* are, in my view satisfied.

103.    I would make the following comments in relation to Mr. Justice Kawaley's judgment in *Gao*:

(a).    it seems to me that the discussion contained in paragraphs [30]-[31] and [44]-[48] of Mr. Justice Kawaley's judgment is important for understanding his analysis and approach. Paragraph 30 was relied on by the Company and is quoted above. Mr. Justice Kawaley referred to the core principle that directors' duties are owed to the company and that directors are only answerable to the company for intra vires breaches of fiduciary duties and stated that it would be inconsistent with this functional rule if individual shareholders were able to enforce duties not owed to them. In paragraph 31, the judge said that the position was different when "*special circumstances*" give rise to an individual right of action in respect of a transaction that affects the shareholder in its own right. This analysis is reiterated and expanded (particularly as regards the meaning of special circumstances) in [44] – [48] as follows:

> "*44.    ………the general rule is that minority shareholders do not (absent special circumstances) have standing to pursue a personal action to set aside or restrain an improperly motivated allotment of shares which would dilute their voting power. Any such breach of fiduciary duty would be actionable by or derivatively on behalf of the company, because the company in general meeting has the right to decide whether or not to affirm or disapprove the improper intra vires actions the directors have taken purportedly on behalf of the company.*
>
> *45.    What then potentially qualifies as special circumstances ousting this general rule? Clearly not the mere fact that a minority shareholder's voting power has been diluted………*
>
> *46.    ……….. the special circumstances principle was perhaps most lucidly explained ……in Peskin-v-Anderson [where Mummery LJ said in a passage underlined by Mr. Justice Kawaley that directors' fiduciary duties owed to the company arise from the legal relationship between the directors and the company and that fiduciary duties owed to the shareholders do not arise from that legal*

*relationship. They are dependent on establishing a special factual relationship between the directors and the shareholders in the particular case.]*

47.   *This clear and cogent reasoning is entirely consistent with what I regard as the mainstream view of this somewhat bedeviled area of the law. The notion that some special relationship is required to result in directors owing fiduciary duties to individual shareholders as opposed to the company (i.e. the shareholders as a whole) has echoes for me of an analogous insolvency law rule.* In the context of an insolvent company and challenges to antecedent transactions, it is well understood that the directors are generally liable to the company for breaches of duty, and it is only in special circumstances that directors are directly liable to creditors.

48.   It is in my judgment impossible to extract from any of the authorities cited before me support for the Plaintiff's counsel's ambitious submissions. Namely, *that what I regard as a generic position of a minority shareholder facing a dilution of his voting power through an improperly motivated share allotment constitutes special circumstances giving rise to a fiduciary duty being owed to the shareholder on the directors' part."*

[underlining added]

(b).   Mr. Justice Kawaley's analysis appears to regard the key question as being whether minority shareholders have direct claims *against the directors*. Paragraph 44 says that the test for deciding whether and when minority shareholders have standing to pursue a personal action to set aside or restrain an improperly motivated allotment of shares is based on whether the special circumstances principle is satisfied. Paragraph 48 characterises the core submission made by counsel for the Plaintiff as raising the question of whether special circumstances, of the kind identified by Mr. Justice Kawaley, existed to justify the plaintiff's personal claim. Paragraph 46 then defines the nature of the requisite special relationship by reference to the judgment in *Peskin* where the test discussed is based on a direct relationship between director and shareholder which may generate, for example by reason of reliance or assumption of responsibility, a separate and independent duty to that owed to the company.

(c).   this, however, does not seem to me to be the right approach. The issue is not whether and when directors owe duties directly to shareholders. The minority shareholder in the present case is not making a claim or asserting a direct cause of action against the directors. The issue is whether and when a shareholder can bring proceedings against the company. Can a shareholder bring a claim in his own name - and therefore does he

have a personal claim - for a breach *by the company* of the statutory contract and the corporate constitution? The position (and the risk of confusion) is summarised by Professor Paul Davies in the recent third edition of his *Introduction to Company Law* (OUP, 2020) at page 282 (a textbook not cited by either Mr Lowe or Mr Flynn as it has only been published after the hearing but one based on the same authorities and arguments they relied on):

> "...[there] seems to have been... a failure by the courts to distinguish between two different aspects of a breach of the articles. If the directors fail to observe the articles they will be in breach of duty to the company...On the other hand, if the directors cause the company to act in breach of its articles, the company will be in breach of [the statutory contract] with the shareholders. In the first case, the company is the claimant and the individual can enforce the company's rights only if she has standing to bring a derivative action. In the second case, the individual shareholder is the claimant and the company is the defendant and the individual's standing to bring a derivative claim is simply irrelevant."

(d).    there is (and can be) no challenge to the basic point that the directors owe their duties to the company (absent an assumption of a direct duty to shareholders in particular circumstances). A breach of such duties will give the company a claim against the directors. But there is a further issue. Where the directors improperly exercise a power given to them by the corporate constitution to take action on behalf of the company, can *the company* be liable to a shareholder whose rights are adversely affected (or focussing on the remedial aspects, can the shareholder bring a claim against the company seeking declaratory relief that the exercise of the powers – the allotment – was unlawful and invalid)?

(e).    if the company can be so liable (can be in breach of the corporate constitution), it becomes necessary to consider when it becomes liable. Can the company be liable before another organ of the company has ratified and assumed responsibility for the improper actions of the directors? It would seem that since the improper action taken by the directors is only voidable (where not ultra vires the company), the action is to be regarded as effective and an act of the company unless and until set aside. Accordingly, the company is in breach of the articles and liable to be sued once the powers have been improperly exercised.

104.   It has been argued (and held, as we will see when I consider *Bamford* below) that a shareholder does not have a personal right to enforce all the provisions of the articles. This is the case where a breach of the articles can be characterised as a mere internal irregularity (which should be left to the majority of the shareholders to deal with either by ratification or action). But I note and agree with what is said on this issue by Professor Davies in the *Introduction to Company Law* (at page 281-282):

> "*Suppose a shareholder does wish to sue directly on the breach of the articles. As with individual claims against directors, the courts have adapted the shareholders' claims against the company to what they see as the exigencies of the company as a collective organisation.....[and] have generated two hurdles for the shareholder who wishes to enforce [the statutory contract] directly of which the first is [that only membership rights can be enforced and this is possibly justifiable] and the second is not and, indeed, is incoherent....[the passage quoted above then follows, being the second hurdle]...the courts have analysed what appear to be similar cases of breaches of the articles sometimes as a complaint of a mere internal irregularity (which can be put right by a decision of the majority of the shareholders i.e. they have applied common law derivative action reasoning)...Even worse the cases have failed to produce a reliable test for predicting which breaches of the articles will be regarded as giving rise to complaints of mere irregularities and which of rights. In principle, the individual shareholder should always be able to insist on correct procedure being followed unless it is clear that even if the proper procedure had been followed the outcome would have been the same. This last point can be catered for by the court not granting a remedy in any case where this is the situation, rather than by depriving the individual shareholder of the right to sue by reference to some ex ante and arbitrary categorisation of the articles into those generating rights and those not.*"

[underlining added]

105.   As a matter of principle:

(a).   I, for my part, find Hoffmann J's analysis in *Sherborne Park* compelling. The shareholder's cause of action in the case of an improper allotment of shares is based on the statutory contract and is to be treated as a personal right because "*the wrong to the company is not the substance of the complaint. The company is not particularly concerned with who its shareholders are. The true basis of the action is an alleged infringement of the petitioner's individual rights as a shareholder.*" This might be classified as the real parties in interest analysis. Where the improper allotment directly affects the rights of a shareholder, and results in the increase in the shareholding of one shareholder (or group of shareholders) and the diminution of the shareholding of another shareholder (or group of shareholders), the real dispute is between the shareholders and it is the shareholders' rights, and not the company's

rights, that have been interfered with. This approach seems to me to be consistent with Professor Davies' analysis.

(b).    where the shareholders who have suffered from the improper allotment have control rights, even negative control rights, because they have a sufficient shareholding to block special resolutions the position is *a fortiori*. So even if it were right that improper allotments which did not affect control rights did not result in personal claims, such claims would arise where control was in issue. An interference with a shareholder's right to block special resolutions (to exercise negative control) by dilution of his shareholding seems to me to affect a core entitlement granted by the corporate constitution to the shareholder and the constitutional balance of power *between shareholders* thereby affecting fundamental rules regulating corporate governance. This is why Lord Wilberforce in *Howard Smith* referred to the use by directors of their fiduciary powers over the shares in the company for the purpose of destroying an existing majority, or creating a new majority which did not previously exist, which interfered with that element of the *company's constitution* which *is separate from* and set against their powers and King CJ followed him in saying that the indication in the authorities that a personal claim existed was clear where the challenged dilution had the effect of destroying an existing majority and creating a new one.

(c).    I find the analysis of King CJ in *Residues* persuasive (which does heavily rely on Hoffmann J's reasoning) and the suggestion that his judgment has been critically received as unfounded. Before Mr. Justice Kawaley, it was argued and Mr. Justice Kawaley accepted, that *Residues* had "*not exactly received a ringing endorsement*" and, by reference to one article in 1989, had been "*academically doubted*." However, that criticism seems to me to be overstated. I would note, for example, that it is cited without criticism in the latest (Australian) edition of Ford, Austin and Ramsay's *Principles of Corporation Law* (LexisNexis, 18th ed., 2018 at 10.235.15]). The judgment of King CJ seems to me to be right and to address in a convincing way most of the arguments against the existence of a personal claim (which is why I have quoted extensively from it and underlined the key passages above).

(d).    I note the hesitation in Gower and the authors' tentative argument (that perhaps the preferable view was) that acting for an improper purpose is an abuse of power but not a

breach of the articles. It seems to me that Lord Sumption's analysis in *Eclairs* supports a contrary conclusion. Lord Sumption (in the passage quoted and highlighted above) was discussing the use of the directors' powers for the purpose of influencing the outcome of a general meeting. This he said was not only an abuse of a power for a collateral purpose but also a breach of the company's constitution, because it involved the use of the board's powers to control or influence a decision which the company's constitution assigned to the general body of shareholders (and he cited *Fraser v Whalley* (1864) 2 H & M 10, being a case where the directors were restrained from exercising a power to issue shares for the purpose of defeating a shareholders' resolution for their removal). An improper allotment in order to dilute the shareholding of a shareholder with negative control also seems to me to result in a breach of the corporate constitution and the articles. It may not undermine the decision making process established by the corporate constitution quite as directly as the case where the allotment is designed to affect voting at a specific and forthcoming meeting but it does so nonetheless by affecting such shareholder's ability to block special resolutions and its voting at meetings which are no doubt in the contemplation of the board (and their associates) making the allotment. Furthermore, such an allotment affects the constitutional balance of power in the company.

106. As a matter of authority, as I have said, I think the position is summarised well by King CJ in *Residues*. There are strong indications in the authorities, at least in cases where the dilution has the effect of destroying an existing majority and creating a new one, of the recognition of a personal right in a shareholder.

(a). support for this analysis can be found from the various cases in which individual shareholders have been permitted to bring a claim, individually or as a representative of other shareholders and in which their standing to do so has not been challenged. I accept that, as Mr. Justice Kawaley explained, reduced weight is to be given to cases in which issues are either not decided either because there was no challenge to a claimant's standing or arguments or not part of or necessary to the court's decision and therefore *obiter*. But it does not follow that no weight is to be given to decisions in which a point is assumed to be correct and in which, if the point was considered to be doubtful, a challenge could have been expected and would have been an obvious point to take. The main cases I have in mind are the following:

(b).   in *Mutual Life v Rank* [1985] BCLC 11 (an authority which I drew to the attention of counsel during the hearing) there was no challenge to the standing of individual shareholders to bring a claim against the company (for damages) seeking to invalidate an alleged improper exercise of the power to allot shares (on the basis that an offer and allotment of shares discriminated against shareholders resident in the US and Canada in breach of the statutory contract contained in the company's constitution).

(c).   in *Fraser v Whalley* (1864) 2 H&M 10, 71 ER 361 (one of the earliest cases to challenge an improper issue of shares) Page Wood V-C indicated that a shareholder's right to challenge an improper share issue was not subject to company control and the rule in *Foss v Harbottle*. The case involved an issue of shares for the express purpose of creating votes to influence an upcoming general meeting. The court held that an injunction would be granted on an application by a shareholder to restrain the issue of such shares since the issue was not one relating to the internal management of the company, but an attempt on the part of the directors to prevent such management from being legitimately carried on. However, it appears that the shareholder plaintiff and his nominees were in effect the majority shareholders (they were said to control approximately £140,000 of the £240,000 of issued shares).

(d).   *Fraser v Whalley* was applied in *Punt v Symons* [1903] 2 Ch 506 where shares had been issued by the directors, not for the general benefit of the company, but for the purpose of controlling the holders of the greater number of shares by obtaining a majority of voting power. Byrne J said:

> "On the evidence I am quite clear that these shares were not issued bona fide for the general advantage of the company, but that they were issued with the immediate object of controlling the holders of the greater number of shares in the company, and of obtaining the necessary statutory majority for passing a special resolution while, at the same time, not conferring upon the minority the power to demand a poll. I need not go through the affidavits. I am quite satisfied that the meaning, object, and intention of the issue of these shares was to enable the shareholders holding the smaller amount of shares to control the holders of a very considerable majority. A power of the kind exercised by the directors in this case is one which must be exercised for the benefit of the company…… [in] Fraser v. Whalley…...the directors of a railway company acted on an old resolution which authorized the issue of shares

*for a particular purpose. The particular purpose had ceased, and, the directors being afraid that at a general meeting they would be removed, were attempting to issue shares to enable them to be supported, and kept in office……...It is true that [Fraser v. Whalley] is a case relating to a railway company, and not to a company under the Joint Stock Companies Act, and it is also true that the plaintiffs were in time to prevent the issue of the shares in question; but the principle appears to me to apply. <u>If I find as I do that shares have been issued under the general and fiduciary power of the directors for the express purpose of acquiring an unfair majority for the purpose of altering the rights of parties under the articles, I think I ought to interfere. I propose to grant an injunction, but to confine it to restraining the defendants from holding this confirmatory meeting.</u>*

[underlining added]

(e).  in *Howard Smith* an individual shareholder was allowed to bring proceedings against the company, its directors and a bidder to challenge an allotment of new shares to the bidder. Two companies, Ampol (**A**) and Bulkships (**B**), held 55 per cent of the issued shares of Millers (**M**), which required more capital. A made an offer for all the issued shares of M, and another company, Howard Smith, announced an intention to make a higher offer for those shares. M's directors considered A's offer too low and decided to recommend that the offer be rejected. A and B then stated that they intended to act jointly in the future operations of M and would reject any offer for their shares. Howard Smith then applied to M for an allotment of 4.5 million ordinary shares; M's directors decided by a majority to make the allotment and immediately issued the shares. The effect of that issue was that M had much needed capital; A and B's shareholding was reduced to 36.6 per cent of the issued shares and H was in a position to make an effective takeover offer. A challenged the validity of the issue of the shares to H. A sued as plaintiff against fourteen defendants, which included Howard Smith, Millers and eleven directors or alternative directors of Millers.

(f).  I do accept, however, that Tianrui is going too far when it argued that *Sherborne Park* had been approved by the Court of Appeal in *Peskin* - the most that can be said is that it was referred to without disapproval.

107.  There is a further and important point on the authorities. The question arises as to whether *Bamford* (and *Hogg*) compel a different conclusion because they hold that in at least some cases the directors' breach of duty resulting from an improper allotment can be ratified and that because of the ability to ratify or actual ratification, the shareholder cannot sue to challenge the allotment;

(a).  in my view neither *Hogg* nor *Bamford* compel the conclusion that a shareholder is unable to sue in his personal capacity. They do, I accept, raise the separate (and, as I have characterised it, the second) question, namely whether such a personal claim can be defeated by ratification (to which question I shall revert shortly).

(b).  *Hogg* supports the existence of the shareholder's personal (or at least a representative) claim. In *Hogg* an individual shareholder suing in a representative capacity was allowed to bring proceedings against the company and certain shareholders to challenge an allotment of new shares – although he did not have standing to bring proceedings against the allottee to set aside the allotment. The company's directors, after a general offer had been made to acquire all the company's shares, acting in good faith and what they believed to be the company's best interests, implemented a scheme whose purpose was to ensure that the bid would fail. They established an employee share trust and issued preference shares to the trustees. Attached to the shares was 10 votes per share on a poll. They also caused the company to lend the purchase price to the trustees. As a result, the directors could rely on the support of more than half the total votes at an EGM. Proceedings were commenced by a shareholder on behalf of all but three of the shareholders against the company and those other three shareholders, who were also directors. The plaintiff only sought declaratory relief (although they did seek a declaration that would be binding on third parties). The plaintiff claimed and Buckley J agreed that, on the true construction of the articles, the directors had no power to attach the special voting rights to the shares issued to the trustees. But the plaintiff did not thereby have the right to have the allotment set aside. That was a matter as between and for the company and trustees. The plaintiff, whether suing on his own behalf or in a representative capacity was not competent to procure the allotment to be set aside (264G – 265A). The plaintiff also claimed that the allotment had been made for an improper purpose. Buckley J asked himself whether such a manipulation of the voting position was a legitimate act on the part of the directors. He held it was not. The court would not permit directors to exercise fiduciary powers in such a way as to interfere with the exercise by the majority shareholders of their constitutional rights. It was not open to the directors to justify their actions by saying that they genuinely believed that their seeking to prevent the majority doing harm to the company (a majority was entitled to pursue what course it chose within the company's powers provided it does not unfairly oppress other members). He also rejected

the defendants' challenge to the plaintiff's standing to bring the action, both with respect to the allotment on the one hand and the establishment of the trust and advance of the loan on the other. All were elements of one scheme whose primary object had been to deprive members who did not support the board of their position as a majority in the company. So a representative claim was justified even as regards the advance of the loans (the company's money) in respect of which the company would prima facie be the proper plaintiff.

(c).   in *Bamford* a claim by shareholders which they considered to be made in their personal capacity was not struck out on standing grounds and was allowed to proceed, subject to the ratification point, although the precise characterisation of the claim being made was not clearly dealt with. It appears that counsel for the plaintiffs argued that the shareholders were making a personal claim; counsel for the defendants argued that the plaintiffs were making a derivative claim that could have been challenged, but was not, on the basis that it did not come within an exception to *Foss v Harbottle* and that the Court of Appeal accepted that the claim was the company's claim for which the company was the proper plaintiff and for which ratification was available (although at first instance Plowman J regarded the action as a derivative action).

(d).   *Bamford* involved a family business owned and run by members of the Bamford family. The plaintiffs were Rupert and Anthony, who were shareholders. The first three defendants were Henry, Richard and John, shareholders and directors of the company. Proposals for an amalgamation had been received from another Bamford company (*JCB*), controlled by a cousin of the plaintiffs and defendants. The proposals had not been favourably received by the board. Nonetheless, JCB went ahead and made a bid to acquire all the company's shares. To defeat the bid, the directors allotted shares to the company's principal distributor, who was considered to be supportive. The plaintiffs issued a writ against the three defendants as directors, as well as the company and the distributor, claiming a declaration that the allotment was invalid (void) and of no effect on the ground that the directors in making the allotment had made it as a tactical move to block the bid from JCB (and so had acted in bad faith and from an improper motive). The case involved a trial of a preliminary point of law as to whether, assuming that the directors had acted in bad faith as alleged by the plaintiffs, the allotment was capable of being ratified by a general meeting of shareholders (and it was held

by the English Court of Appeal that any impropriety on the directors' part could be and had been waived by a majority of the votes of the shareholders at a general meeting).

(e).  the standing point was directly raised and the claim was not struck out on that ground. At first instance, the plaintiffs said that they were suing in respect of their own individual contractual rights so that the rule in *Foss v Harbottle* did not apply, and the defendants did not challenge that proposition (see the judgment of Plowman J at 217). In the Court of Appeal, counsel for the plaintiffs (the minority shareholders) argued (at 231D) that "*the rule in Foss v Harbottle [did] not preclude the bringing of these proceedings because the minority shareholders…. are suing in respect of their own individual contractual rights and also in a representative capacity to enforce their contractual rights, and therefore can bring these actions.*" Counsel for the directors argued (at 234F) that the directors could have challenged the minority shareholders' right to bring the representative action on the ground that it did not come within an exception to *Foss v Harbottle*.

(f).  Russell LJ said that the defence was not explicitly based on the argument that the claim was bad because it was a derivative claim which failed on *Foss v Harbottle* grounds. But it was closely related to the principles underlying *Foss v Harbottle*. The harm done by the improper allotment was done to the company and only the company could complain. He said as follows (at 242E-H):

> "*It is true that the point before us is not an objection to the proceedings on Foss v Harbottle grounds. But it seems to me to march in step with the principles that underlie the rule in that case. None of the factors that admit exceptions to that rule appear to exist here. The harm done by the assumed improperly-motivated allotment is a harm done to the company of which only the company can complain.* It would be for the company by ordinary resolution to decide whether or not to proceed against the directors for compensation for misfeasance. Equally, assuming that the allottee could not rely upon Royal British Bank v Turquand…it would be for the company to decide whether to institute proceedings to avoid the voidable allotment; and again this decision would be one for the company in general meeting to decide by ordinary resolution. To litigate or not to litigate, apart from very special circumstances, is for decision by such a resolution. If, as I consider, the company could validly decide by ordinary resolution not to institute proceedings to avoid the voidable allotment – a resolution which could not possibly be said to contradict or alter the articles – it seems to me to support entirely the view that an ordinary resolution…. would be effective, having as it would the same purpose and effect as a resolution not to bring proceedings to avoid the allotment.*"