[underlining added]

(g).  Harman LJ (whose judgment was referred to and relied on by Mr. Justice Kawaley at [29])
viewed the case, and the exercise of powers conferred on the directors for improper motives,
as involving internal irregularities in the conduct of business by the board which could be
ratified by the shareholders (237-238):

> "if directors do acts, as they do every day, especially in private companies, which
> perhaps because there is no quorum, or because their appointment was defective, or
> because sometimes there are no directors properly appointed at all, or because they
> are actuated by improper motives, they go on doing for years, carrying on the
> business of the company in the way in which if properly constituted they should carry
> it on and then they find that everything has been so to speak wrongly done because it
> was not done by a proper board, such directors can by making a full and frank
> disclosure and calling together the general body of shareholders, obtain absolution
> and forgiveness of their sins and provided the acts are not ultra vires the company as
> a whole everything will go on as if it had been done all right from the beginning…….
>
> ………… So it seems to me here that these directors on the assumptions we have to
> make, made this allotment in breach of their duty – mala fide, as it is said. They made
> it with an eye primarily on the exigencies of the take-over war and not with a single
> eye to the benefit of the company, and therefore, it is a bad allotment._ But it is an
> allotment. There is no doubt that the directors had power to allot these shares. There
> is no doubt that they did allot them. There is no doubt that the allottees are on the
> register and are for all purposes members of the company. The only question is
> whether the allotment, having been made as one must assume in bad faith is voidable
> and can be avoided at the instance of the company – at their instance only and of no
> one else, because the wrong, if wrong it be, is a wrong done to the company. If that be
> right, the company which has the right to recall the allotment has also the right to
> approve of it and forgive it; and I see no difficulty at all in supposing that the
> ratification by the decision [of the EGM] was a perfectly good whitewash of that
> which up to that time was a voidable transaction. And that is the end of the matter."

[underlining added]

(h).  both Russell LJ and Harman LJ regarded the case before them as giving rise to a claim only
by the company. For that reason, the judgments in the Court of Appeal are not easy to
reconcile with *Sherborne Park* (in which *Bamford* was not referred to). But the claim, which
the plaintiffs asserted was a personal claim, was not struck out for lack of standing (and at
least at first instance and perhaps in the Court of Appeal, the plaintiffs' standing was not
even challenged). Furthermore, the learned lord justices did not consider the possibility of an
alternative personal claim against the company for a declaration based on either the real

parties in interest analysis or on the infringement of personal rights derived from negative control and the balance of power established by the corporate constitution. In addition, Russell LJ indicated that there could be a different result on different facts, at least in a case involving the exceptions to the rule in *Foss v Harbottle* (one of which of course involves a fraud on the minority where there was wrongdoer control). Moreover, the reasoning of Lord Wilberforce in the Privy Council in *Howard Smith*, delivered a number of years after both *Bamford* and *Hogg*, appears to be inconsistent with the proposition that in a case involving an allotment that deprives the plaintiff shareholders of control they are confined to a derivative claim. It is true, as the Company points out, that in *Howard Smith* the plaintiffs were the majority shareholders and that as a result they were able to prevent ratification by the shareholders. But that does not undermine the significance of the case both for the failure to challenge the standing of the plaintiffs to sue and for the impact of the reasoning of Lord Wilberforce.

(i).   the position is, in my view, well summarised in the following passage from Professor Peter Watts' excellent New Zealand textbook *Directors' Powers and Duties* (LexisNexis, 2nd ed., 2015 at 305-306) (save for the shorthand reference to the duty being owed to the shareholders rather than the breach of duty giving rise to a claim against the company). The passage follows immediately after a favourable discussion *of Fraser v Whalley* and *Sherborne Park*:

> *"It is true that two well-known English cases have held that a majority of shareholders can ratify a breach of the [directors'] duty, at least in so far as it is being used to impugn a share issue, which holding might be taken to imply that the duty is not one owed to individual shareholders at equity [noting in a footnote that Winthrop Investments v Winns [1975] NSWLR 666 assumed the correctness of Bamford and Hogg but expressly did not decide the point]. At the same time, however, the Court also upheld the standing of individual shareholders to sue, in the absence of ratification. The explanation of these cases may yet be that the plaintiff was attempting to challenge a share issue by directors designed to defeat an offer for shares that was contingent on acceptance by enough shareholders to give more than 50% of the voting power. If this is so, the plaintiffs could hardly succeed where their majority colleagues had decided to condone the directors action in driving away the offer. In other circumstances, it may be that the rights of individual shareholders cannot be trumped by majority consent."*

108.   Assuming that a personal claim is permitted, what is the remedy available where the cause of action is against and the defendant is the company? In a shareholder's claim against the company, it is not

necessary to join the directors as parties. The most appropriate remedy would be a declaration (or if proceedings were brought before the challenged allotment, an injunction) against the company (a claim for financial compensation for breach of the articles might be possible – this is not an issue which has been argued - but would face a number of difficulties including the effect of the rule against recovery of merely reflective loss). The declaration would declare that the allotment of shares had been unlawful and improperly made (by the company pursuant to an improper and abusive exercise of the directors' powers). The company would be bound by the order. But third parties would not be. Further proceedings would probably be needed to give effect to the declaration (unless the company accepted the result and took action on its own initiative to reverse the allotment). It might be open to the shareholder to seek additional orders against the company requiring it to take action to protect the company's position in light of the improper and unlawful allotment. However, if the shareholder wished proceedings to be brought against the directors to seek a remedy for the directors' breach of duty, it would need to bring a derivative claim (and satisfy the conditions required for doing so). This would also generally be the case, as was held in *Hogg*, if the shareholder wanted proceedings to be brought against recipients of the improperly allotted shares. The cause of action to set aside the voidable allotment is the company's (see Russell L.J. in *Bamford* at 242E-F). Of course, a shareholder might be able to maintain other claims (not based on corporate law) against the directors or shareholders, for example, in tort for conspiracy (which would also need to avoid being subject to the reflective loss rule).

109. It follows from the characterisation of the claim as being based on a personal right of the shareholder that, as a matter of principle, ratification is not available. If the shareholder has a personal claim, it cannot be defeated by ratification. Ratification only relates to causes of action vested in and prevents claims being brought by the company. (I note that in *Residues* King CJ doubted that *Bamford* was correctly decided and considered that he was not bound by the decision but declined to decide whether the allotment of shares was by a majority at a general meeting and therefore whether or not to depart from *Bamford*). But even if ratification may be available in some circumstances, it seems that it is strongly arguable that it is not in cases of a fraud on the minority coming within the exception to the rule in *Foss v Harbottle*. Tianrui's case, as the Court of Appeal held, is based on serious allegations of wrongdoing by and involving a conspiracy between CNBM, ACC and their representatives on the board (who were in control of board decision making). *Bamford* and *Hogg* are both distinguishable (as Russell LJ noted in the extract from his judgment in

*Bamford* quoted above, none of the factors that admit exceptions to the rule in *Foss v Harbottle* appeared to exist in that case).

110. Furthermore, it seems to me to be wrong to say, as Mr Justice Kawaley does, that the rights of shareholders damaged by an improper allotment of shares designed to dilute their shareholding, are not to be regarded as sufficiently important to justify a personal claim because the shareholders have other avenues of redress via a derivative action. There may be good reasons (of speed and cost as well of course of avoiding the need for leave for a derivative claim) why a shareholder wishes to make its claim against the company (for a declaration of invalidity) rather than bring a derivative claim against the directors (for compensation or other relief). The personal right seems to me to be an important tool for dealing with unfair prejudice and minority oppression. I note that one reason why the Law Commission (at [20.4]) decided that it was unnecessary to recommend the introduction of a legislative definition and list of personal rights was that actions to enforce personal rights had been effectively eclipsed by unfair prejudice proceedings under section 459 of the UK's Companies Act 1985. In my view, in the absence of an independent unfair prejudice remedy in this jurisdiction the Court should be slow to limit shareholder remedies for breach of constitutional rights in the context of alleged minority oppression.

111. For the reasons given above, in my view the Company has failed to show that Tianrui's claim against the Company for relief from the alleged improper exercise of the board's powers is improperly constituted as a personal claim (and therefore that Tianrui does not have standing to sue so that the Cayman Writ Action should be struck out as disclosing no reasonable cause of action). Tianrui now appears to accept that an amendment to the Cayman Writ Action as currently formulated, and an application for permission to amend (in the absence of the Company's agreement) is now required at least in relation to the form of the relief sought. No draft of the proposed amendment has been filed. Nonetheless, Mr. Lowe indicated during oral argument, as I have explained above, that he accepts that the relief sought will need to be confined to declarations concerning the actions of the board (and the abuse of power by the directors) without seeking to deal with the effect of such actions on third parties who are not joined to the proceedings. Since, as I have already explained, the issue giving rise to the need for an amendment does not go to the cause of action relied on but the relief sought and is one which appears, subject to seeing the proposed form of amendment and dealing with an application for permission to amend, to be capable of being resolved by relatively modest amendments, I do not consider that the need for an

amendment affects my decision on the strike out application. A consequence of the judicial restraint that the Court shows when dealing with strike out applications is that if the pleading in question is capable of an amendment which will remedy the deficiency in the case as pleaded, then an application to strike out will not succeed.

112.  Finally, I would add one further reason for dismissing the Second Writ Strike Out Application. It is well established that it would be wrong to strike out a writ and statement of claim that raises complex issues of law. Accordingly, the claim should not be struck out where it raises an issue in an area of the law that is in a state of uncertainty or development (see *Farah v British Airways*, The Times, 26 January 2000, CA). To strike out, the Court must be satisfied that the claim is bound to fail. Even if I am wrong in my interpretation of the conflicting case law and the status of the authorities discussed above, the legal issues raised are sufficiently complex and the legal principles sufficiently in a state of development to mean that striking out would be inappropriate.

## The Stay of the Petition and Writ Action Application

*The Company's submissions*

113.  The Company has applied for the following orders:

(a).  that the Amended Petition be stayed (subject to periodic review by this Court) until the Hong Kong court has delivered judgment in *both* of the Hong Kong proceedings (see the Company's summons dated 12 June 2019).

(b).  that the Cayman Writ Action (once again subject to periodic review by this Court) also be stayed (subject to periodic review by this Court) until the Hong Kong court has delivered judgment in *both* of the Hong Kong proceedings (see the Company's summons dated 12 August 2019).

114.  The Company's application is for a temporary case management stay until the conclusion of both sets of Hong Kong proceedings. This was confirmed in the Company's first skeleton (see [1.4]). However, as regards the Amended Petition, there were some suggestions that the Company wished to Court to consider a stay until the conclusion of the First Hong Kong Proceedings. The

submissions in the first skeleton set out separately the reasons why a temporary stay to await the outcome of the First Hong Kong Proceedings and the Second Hong Kong Proceedings would be beneficial and justified and prefaced the Company's submissions as to why the stay should also continue until the end of the Second Hong Kong Proceedings with the words "*further or alternatively*" (see [90]). The separate discussion of the two sets of Hong Kong proceedings was followed through to the Company's reply skeleton. But in both skeletons the Company made the submission that it was important to view the Hong Kong proceedings together (to take "*a holistic view of the Hong Kong actions as a whole rather than saucissonnage them [as Tianrui suggested]*" – see [92] of the first skeleton and also see [57] of the reply skeleton). This indicates to me that the Company was seeking a stay of the Amended Petition pending the conclusion, and justified its application for a stay by reference to the common issues arising in, and cumulative effect of, both Hong Kong proceedings. Nonetheless, I shall briefly consider whether a stay pending the conclusion only of the First Hong Kong Proceedings would be justified.

115. The Company relied in particular on the following authorities: the judgment of Moore-Bick J ([1999] 1 All E.R. (Comm.) 40) and the English Court of Appeal ([2000] 1 WLR 173) in *Reichhold Norway ASA v Goldman Sachs International* (*Reichhold*); the judgment of the Court of Appeal in *Ahmad Hamad Algosaibi and Brothers Company v Saad Investments* [2010 (2) CILR 289] (*Saad*); the judgment of the Court of Appeal in *Oriental Knowledge Tank Ltd v Business Intelligence Investment Ltd (sub nom Re Nanfong International Investments International Investments Ltd)* CICA 16/2018, 14 September 2018 (unreported)(*Oriental Knowledge*) and the recent the judgments of Mr. Justice Robin Knowles in English Commercial Court ([2019] EWHC 1151 (Comm)) and in the English Court of Appeal in *Minister of Finance (Incorporated) v 1Malaysia Development Berhad and others* ([2019] EWCA Civ. 2080) (*1Malaysia*).

116. The Company submitted that the legal principles applicable to an application for a case management stay could be summarised as follows:

    (a).   a case management stay may be granted if there are very strong reasons for doing so and the benefits clearly outweigh any disadvantage to the plaintiff: *Reichhold* in the Court of Appeal at 180.

(b).   the power of the court to order a case management stay is "*a discretionary tool that can be used flexibly to avoid the parties being condemned to unnecessary duplication, delay, cost, disorder, uncertainty and the risk of inconsistent decisions resulting from multiple litigation*" per Robin Knowles J in *1Malaysia* at [83], [94] - [95].

(c).   the grant of a temporary stay is a lesser interference with the plaintiff's rights than a stay granted on *forum non conveniens* grounds: *Oriental Knowledge* (at [19], referring to Moore-Bick J's observations in *Reichhold*).

(d).   a temporary stay was granted "*not only because the existence of concurrent proceedings may give rise to undesirable consequences in the form of inconsistent decisions, but also because the outcome of one set of proceedings may have an important effect on the conduct of the other.*" (*Reichhold*, per Moore-Bick J at 179F).

117.   The Court of Appeal applied *Reichold* in *Oriental Knowledge*. *Oriental Knowledge* was a case involving a contributory's winding up petition in this Court. The defendant (Oriental) had appealed to the Court of Appeal against a refusal by Mr. Justice Kawaley to grant a temporary case management stay of a petition for the winding up of Nanfong (a Cayman company). The stay was sought pending the determination of litigation in Samoa involving the issue of whether the presentation of the winding-up petition had been lawfully authorised (at the time of the hearing of the appeal the evidence was that the Samoan court would hold a hearing within two months). The petition had been presented by a shareholder incorporated in Samoa. Oriental argued that the petition had not been properly presented because the resolution of the shareholder's board authorising the presentation of the petition had not been validly passed (since the board meeting had not been properly convened). The Court of Appeal allowed the appeal and granted the stay.

118.   Moses JA (delivering the judgment of the court) held that the essential argument in the case was founded on there being an identical issue in Samoa and the Cayman Islands relating to the authority of the shareholder to present the petition. The judge was being asked to manage the order in which that issue should be determined. A stay would allow the Cayman Court to have the benefit of the Samoan court's ruling on the Samoan law issue of corporate authority of a Samoan company and that decision was likely to be determinative as to the authority point in the winding up proceedings. A stay would therefore avoid the risk of inconsistent decisions. It was also difficult to foresee any

particular disadvantage to the shareholder (petitioner) and a stay could well avoid an unnecessary duplication of costs.

119.   Moses JA set out the legal principles applicable to the grant of a temporary case management stay in the following terms at [17] - [20]:

> "17.   Any stay of the hearing of the petition must therefore be based on principles other than those identified in Spiliada. Those relevant to the grant of a stay on case management grounds are to be found in Reichhold Norway ASA v Goldman Sachs International [2000] 1 WlR 173. In that case the Court of Appeal approved the principles applied by Moore-Bick J who stayed the hearing of an action for negligent misstatement by Goldman Sachs in relation to the sale of shares in a Norwegian Company pending an arbitration in Norway to be brought by Reichhold alleging breach of warranty under the sale agreement. If the arbitration proceedings were successful there would be no need for Reichhold to sue Goldman Sachs, the vendors' advisers.
>
> 18.   Moore-Bick J emphasized that before a temporary stay of proceedings properly started in England should be granted there must be: "very strong reasons for doing so and the benefits which are likely to result from doing so clearly outweigh any disadvantage to the Plaintiff". (p.492)
>
> 19.   Moore-Bick J recognised that the grant of a temporary stay was a lesser interference with the Plaintiff's rights than a stay granted on grounds of forum non conveniens, which in practice determines whether a plaintiff can proceed at all in the jurisdiction of its choice. There is, he said, a "very real burden" on the applicant for a case management stay to satisfy the court that the "ends of justice" would be served by granting a stay, even if no greater than on the grounds of forum non conveniens, but that the factors to be taken into account in a case management decision will differ (p.495).
>
> 20.   Applying those principles, Moore-Bick J concluded that a temporary stay should be granted in order to manage the order in which the proceedings were to be heard: "not only because **the existence of concurrent proceedings may give rise to undesirable consequences in the form of inconsistent decisions, but also because the outcome of one set of proceedings may have an important effect on the conduct of the other.**" (p.491)" [emphasis added by the Company]"

120.   The Company argued that since the First Hong Kong Proceedings had been commenced while Tianrui was in control of the Company, Tianrui could not now assert that Hong Kong was not the most and/or a convenient forum in which to try the issues which are common to both the First Hong Kong Proceedings and the Amended Petition.

121. The Company submitted that in summary the following issues are common to both the First Hong Kong Proceedings and the Amended Petition:

    (a).   the existence of the alleged conspiracy that allowed Mr. Zhang Senior to continue his control over the Company without accounting for his misconduct, and to allow the alleged coconspirators to acquire control without providing fair value and without complying with the regulatory requirements.

    (b).   whether the alleged conspiracy was shown by inter alia the following actions of the alleged co-conspirators:

        (i).   ACC's and CNBM's purchase of the Company's shares at the behest of the alleged co-conspirators and their subsequent concealment of the concerted action, thereby evading the applicable regulatory requirements.

        (ii).   the removal from the Company's board in October 2015, with a stage-managed plan amongst the coconspirators, of Mr. Zhang Senior and two other directors, as a result of which Tianrui's requisition for the complete replacement of the board of directors was defeated.

        (iii).   the application to this Court to wind up and appoint provisional liquidators to the Company by the alleged co-conspirators' representatives on the board, when Tianrui again requisitioned for the replacement of the board. The applications were said to be intended to prevent a new board from taking control of the Company.

        (iv).   the amendment to the articles of association of Shandong Shanshui, procured by Mr. Zhang Junior, with the effect of misappropriating Shandong Shanshui's assets from the Company and its subsidiaries.

        (v).   the alleged misappropriation by the Zhangs of the books and records of Shandong Shanshui and other group companies, and the company seal of Shandong Shanshui.

122. The Company argued that the Hong Kong High Court would be required to resolve in the First Hong Kong Proceedings the issues relating to the relationship between the Zhangs, CNBM and ACC, and whether CNBM and ACC had participated in an alleged conspiracy to take control of the Company.

123. These issues also need to be decided in the Amended Petition. Tianrui alleges in the Amended Petition and the Company alleges in the First Hong Kong Proceedings that CNBM and ACC had been attempting to take control over the Company and to undermine Tianrui since 2014 (and that in doing so, they had collaborated with the Zhangs in misappropriating the assets of the Company and its subsidiaries) and had subsequently issued the bonds and New Shares to dilute Tianrui's interest in the Company. The facts of these two proceedings were therefore intertwined. Furthermore, the conspirators as alleged by Tianrui were parties to the First Hong Kong Proceedings and the Hong Kong court would be in the best position to make determinative findings of the fact as to whether such conspiracy existed.

124. The Company submits that in the circumstances, there are "*rare and compelling circumstances*" which provide "*very strong reasons*" for the Court to order a case management stay of the Amended Petition pending determination of the First Hong Kong Proceedings, given that it was Tianrui which was responsible for having commenced those proceedings. It would be fundamentally wrong, not to mention offensive to the proper administration of justice, to allow a party behind the instigation of proceedings in one jurisdiction to then launch proceedings (in its own name) in a different jurisdiction that covers many of the same issues.

125. In addition, the overlap in issues would give rise to the very real risk of inconsistent findings, not to mention unnecessary duplication, delay, cost, disorder and uncertainty resulting from multiple litigation. The Company would also be forced to have to engage the same issues in two different fora – in Hong Kong in relation to the First Hong Kong Proceedings and in the Cayman Islands in relation to the Amended Petition.

126. Furthermore, it was important to take into account the fact that the gravamen of what is being pleaded by or at the instigation of Tianrui in the Amended Petition and the First Hong Kong Proceedings are allegations of conspiracy against, amongst others, CNBM and ACC. Neither CNBM nor ACC are parties to the Amended Petition. The Court should have serious reservations

about being asked to make findings of conspiracy against persons who are not parties to the proceedings before it. By contrast, both CNBM and ACC (and of course the Company) are parties to the First Hong Kong Proceedings. All of the parties against whom allegations are made are before the Hong Kong High Court. By contrast, it would be highly unattractive for this Court to try those same issues (even more so where they involve allegations of dishonesty) where many of those against whom allegations are made are not, nor could they properly be joined as, parties to the Amended Petition.

127. It was also significant that, although Tianrui was not a party to the First Hong Kong Proceedings, Tianrui will be bound by the outcome of those proceedings as a privy. This was because it had instigated and, up until the appointment of the Company's current board on 23 May 2018, controlled the Company's conduct of the First Hong Kong Proceedings via the board which was controlled by its representatives (and had done so for three years after the First Hong Kong Proceedings were commenced). The Company relied on the decision of the English Court of Appeal in *House of Spring Gardens Ltd v Waite* [1991] 1 QB 241, 252-253 (in which Stuart Smith LJ invoked "*justice and common sense*" to preclude the third defendant in that case, who was not a party to an earlier action, from re-litigating the issue that was determined in that earlier action and held that there was privity of interest between the third defendant and the parties to the earlier action by reason of the fact that the third defendant had an interest in the earlier dispute but had stood by and allowed the subsequent litigation to be conducted by other parties) and the decision of the Privy Council in *Nana Ofori Atta II v Nana Abu Bonsra* II [1958] AC 95, 102-103.

128. The Company also argues that it would suffer serious prejudice if a case management stay of the Amended Petition is not ordered pending determination of the First Hong Kong Proceedings whereas there will be no real prejudice to Tianrui if the Amended Petition is temporarily stayed pending determination of those proceedings. This was particularly the case where the First Hong Kong Proceedings have been listed for an eight-week trial commencing April 2021. In the Company's view, the Amended Petition would not be ready for trial until 2021 at the earliest. The determination of the First Hong Kong Proceedings prior to the trial of the Amended Petition would have an important effect on the conduct of the Amended Petition (which was according to *Reichhold* and *Oriental Knowledge* an important factor to take into account), especially in circumstances where the common issues between both go to the root of what is being alleged in the Amended Petition. It would not only avoid the risk of inconsistent decisions but also avoid

unnecessary duplication and expense. This was to be given additional weight in a case involving a winding-up petition where there was real risk of damage to and a need to avoid unnecessary expense by the Company. The present case was, in substance, no different from that in *Oriental Knowledge* and the temporary stay (subject to periodic review by the Court) would protect and properly balance the interests of the parties.

129.   As regards the Second Hong Kong Proceedings:

(a).   the Company (in the evidence of Chang Ming-Cheng, one of the Company's independent non-executive directors filed before the delays in proceedings in Hong Kong caused by the coronavirus became apparent) estimated it will take two years for the Second Hong Kong Proceedings to reach trial (i.e. by mid-2021). The Company noted that Tianrui considered (in the evidence of Mr. Darton of Tanner De Witt, the firm of solicitors advising Tianrui in relation to the Hong Kong proceedings) that it will take three years for the Second Hong Kong Proceedings to reach trial (i.e. by mid-2022).

(b).   the Company considered, on the basis of the timetable proposed by Tianrui, that the Cayman Writ Action would only be ready to be set down for trial in the second quarter of this year (2020) with a listing of twenty days - which would mean that a trial might not begin until early 2021 at the earliest. However, the Company considered that Tianrui's timetable was unduly optimistic (the length of the trial was more likely to be four to six weeks; the timetable took no account of further interlocutory applications and would probably have to be pushed back significantly - by up to six months if not more - if Tianrui ultimately decided to join the bond holders and/or other parties to the Cayman Writ Action in circumstances where there would be need to be an application to serve any additional parties out of the jurisdiction, followed by a period during which service out will have to be effected).

(c).   in these circumstances, there may be little or no material difference in the length of time it will take either the Cayman Writ Action or the Second Hong Kong Proceedings to proceed to trial. But even if there was a difference, that was not in and of itself determinative. It should be simply one of the different factors to be weighed by the Court in deciding whether to order a temporary case management stay of the Cayman Writ Action.

(d). the Company rejected Tianrui's submission (discussed below) that the recent developments in Hong Kong caused by the coronavirus emergency was of considerable importance because it demonstrated that the Second Hong Kong Proceedings would be delayed and could not be heard within the time estimates previously provided by the Company. The Company submitted that since there would probably not be a material delay to the hearing of the Reverse Stay Application, there would be no impact on the timetable of the First Hong Kong Proceedings and any delay in the Second Hong Kong Proceedings did not affect the underlying justification of a case management stay, the new evidence and recent developments did not have an adverse effect on the Company's application. The Company also submitted that account needed to be taken of possible delays to proceedings in this jurisdiction caused by the coronavirus crisis.

*Tianrui's submissions*

130. Tianrui accepted that the proper approach for the Court to adopt was that set out by Moore-Bick J and the Court of Appeal in *Reichold*. But Mr. Lowe also submitted (both in his written and more extensive oral submissions) that:

(a). the burden on the applicant to satisfy the Court that the ends of justice would be better served by granting a stay has been described as a very real one.

(b). Chadwick P, in *Saad* (at [117] had described the central question for the Court as being:

> *"whether the benefits which were likely to result from imposing a temporary stay so clearly outweighed any disadvantage to the plaintiff that this was one of those cases in which 'rare and compelling circumstances' provided the 'very strong reasons' that justified doing so".*

(c). Chadwick P held that when answering this central question it was material to consider: (i) whether some existing process could be expected to resolve issues between the parties which would otherwise have to be decided in proceedings before the Grand Court; (ii) whether proceedings commenced in a foreign court will lead to a decision determinative of the claims in this jurisdiction within a relatively short time; (iii) whether proceedings commenced in a foreign court will necessarily lead to a resolution of issues which would otherwise have to be

tried in this jurisdiction; and (iv) whether the outcome of proceedings commenced in a foreign jurisdiction would be accepted as binding in this jurisdiction (see *Saad* at [118] – [119]).

(d).    while the risk of inconsistent decisions between the relevant courts is a matter which is capable of amounting to a very strong reason for granting a stay, it is not in any way conclusive, particularly in circumstances where the decision of the court in respect of which a stay is not sought will not bind the parties in the second jurisdiction (*Curtis & Anor v Lockheed Martin UK Holdings Ltd* [2008] EWHC 260 (Comm) (*Curtis v Lockheed*) at [17]-[18]).

(e).    the fact that the relevant issues can be determined conveniently by the foreign court is not a compelling enough reason on its own to grant a stay, and the existence of parallel proceedings in a foreign jurisdiction do not diminish the need to identify compelling reasons for a stay (*Oriental Knowledge* at [24] and [29]). In any event, the extent of overlap between the two proceedings must be of substance to support the grant of a stay (*Fortunate Drift Limited v Canterbury Securities Ltd*, Unreported, Cause No. FSD 227 of 2018, per Kawaley J at [26(a)]).

(f).    it was also important to distinguish between a case management stay and a *forum non conveniens* stay.

131.    Tianrui rejected the Company's submission that there was a serious risk of duplication and inconsistent judgments. It argued that this assumed that there was a substantial overlap between the Hong Kong proceedings and the Cayman proceedings. In fact, the First Hong Kong Proceedings do not deal with any of the events after 2016 or with the grounds relied on for the winding up of the Company in the Amended Petition (nor was it clear that the First Hong Kong Proceedings were being properly prosecuted to reach a conclusion - in reality they were under the control of the board controlled by the representatives of CNBM and ACC and involved claims against parties who were alleged to have been working and conspiring with CNBM and ACC). In addition, the Second Hong Kong Proceedings did not deal with Tianrui's case concerning the issue of the convertible bonds and the new shares. Tianrui says that on the present pleadings the decision to issue and then convert the bonds and issue the New Shares was not a live point in the Second Hong Kong Proceedings. It

also asserts that there were a large number of issues in the Second Hong Kong Proceedings that were of no relevance in the proceedings relating to the Amended Petition. For example, whether Tianrui had honoured its undertaking to this Court and the circumstances in which the Hong Kong court came to appoint the CSI Receivers. Tianrui also rejected the Company's submission that a case management stay would not be prejudicial to Tianrui. It asserts that it will suffer serious prejudice.

132. Mr. Lowe argued that the Defence to the Petition dealt with the conduct and actions of Tianrui - the first forty pages of the Defence to the Petition dealt with events that occurred three years before the filing of the petition. It did not address the core issues that arise in the Amended Petition, of whether Tianrui had a reasonable basis for losing confidence in the Company's management. Furthermore, the Court, at a relatively early stage in the proceedings, was being asked to assume that all the allegations as to Tianrui's conduct were relevant to the issues that need to be dealt with in the Amended Petition. It was not possible or permissible to do that. Mr. Lowe suggested that at some later point in the proceedings, perhaps after the evidence had been filed and the timetable in the Hong Kong and Cayman proceedings was settled, it might be appropriate to make case management directions to determine the order in which certain issues were dealt with.

133. Tianrui's position in relation to the First Hong Kong Proceedings is set out in [7] to [12] of Ms. Li's Sixth Affirmation:

> 7. [The First Hong Kong Proceedings were] commenced on 4 December 2015 (and were amended in April 2016) ......alleging conspiracy and breach of fiduciary duty. The Company sought to remedy the misappropriation of funds from Shandong Shanshui using its missing chop, and to recover the books and records of Shandong Shanshui from [Mr. Zhang Senior and Mr. Zhang Junior].

> 8. Two of the defendants to the First Hong Kong Proceedings, Ms. Wu Ling-Ling ("Ms. Wu") and Mr. Zhangli Chang, are executive members of the current board of the Company. Notwithstanding that they are defendants to the proceedings, they are also members of the board that controls the conduct of the litigation.

> 9. While [Mr. Chang] suggests that the proceedings are being conducted by the so-called independent directors, in circumstances where the Executive Directors, Ms Wu and Mr. Chang Zhangli, are defendants, this does not in my view resolve the serious conflict of interest that arises where the independent directors are presently suing their fellow directors. The fact that they are non-executives and even termed "independent" does not mean that the board members do not have the opportunity to

> *discuss the case in a way that would not be the case if they were adverse parties, or that the nonexecutive directors are prepared to take a position which is adverse and hostile to Ms. Wu and Mr. Chang Zhangli, especially as they are representatives of substantial shareholders.*

> 10. *Since Tianrui has no control of [the First Hong Kong Proceedings], there is no guarantee that the proceedings will not settle (meaning that the issues the Company now says should be determined in [the First Hong Kong Proceedings] will be left unresolved). A settlement is no doubt more likely where members of the same board of directors are on both sides of the proceedings. Moreover, where [Tianrui] is not a party to the proceedings, there is no guarantee that the evidence put before the Hong Kong Court in those proceedings will be the same as the evidence put before the Grand Court in these proceedings.*

> 11. *[The First Hong Kong Proceedings] cannot address all the matters in issue between the parties, whereas the [Amended Petition] can do so. What happened before the [issue of the bonds] is part of a pattern of conduct which culminates in the current board gaining control. Thereafter, in issuing convertible bonds, ACC and CNBM wanted to take over control of the general meeting and consolidate ACC and CNBM's shareholding in the Company. While those issues can all be addressed in the [Amended Petition], they cannot be addressed in [the First Hong Kong Proceedings].*

> 12. *In the circumstances outlined above, [Tianrui] considers that it would be contrary to the interests of justice for the winding up proceedings to be stayed pending determination of [the First Hong Kong Proceedings]."*

134. Tianrui's position in relation to the Second Hong Kong Proceedings is set out in [13] to [18] of Ms. Wi's Sixth Affirmation. In [15] to [18] she said as follows:

> "15. *The claim alleges that [Tianrui] and other third parties who comprised the Company's board from 2015 to 2018 engaged in a conspiracy to gain control of the Company and thereafter engaged in conduct, including self-dealing, which caused loss and damage to the Company. This is presumably part of the conduct on which the Company will rely in defence of the [Amended Petition]. The Company has therefore chosen to formulate its defence [to the Amended Petition] as a positive claim in Hong Kong.*

> 16. *Again, it is highly likely that the complaint in [the Second Hong Kong Proceedings] will be addressed in the course of disposing of the [Amended Petition], but the converse is not true: it is not possible that [Tianrui's] case concerning the convertible bonds can be properly addressed in [the Second Hong Kong Proceedings].*

> 17. *Unlike [the First Hong Kong Proceedings], [Tianrui] is in fact a party to [the Second Hong Kong Proceedings], however [Tianrui] is contesting the jurisdiction of the Hong Kong Court to determine the issues in dispute in the proceedings on the basis that, among other things, these issues are already in*

*dispute in these winding up proceedings. I understand that application will be addressed in an evidence from [Tianrui's] Hong Kong lawyers, Tanner De Witt. Given that [the Second Hong Kong Proceedings were] only issued very recently, it is not appropriate in Tianrui's view that it should take precedence over the [Amended Petition].*

18. *As is the case with [the First Hong Kong Proceedings], the Hong Kong Court's conclusions on many of the issues in dispute in [the Second Hong Kong Proceedings] are irrelevant to the decision before the Grand Court in the [Amended] Petition proceedings. In particular, whether Tianrui and the receivers of CSI inappropriately sought to take control of the Company in 2015 (which is the main issue in dispute in [the Second Hong Kong Proceedings] and is denied) is largely irrelevant to whether now, four years later, it is just and equitable that the Company be wound up."*

135. Mr. Lowe, during his oral submissions, argued that the effect of acceding to the Company's application for a case management stay of the Amended Petition would be to require Tianrui to commence further proceedings in Hong Kong raising its challenge to the issue by the Company of the convertible bonds and New Shares. That would only be permissible if the Company could establish grounds for a *forum non conveniens* stay, which it could not in this case. The Company had accepted that Cayman was a suitable and necessary forum for the winding up proceedings and had been actively engaged in defending those proceedings.

136. Tianrui asserts that a case management stay in relation to the Amended Petition will result in substantial and unjustifiable delay in the conduct of the winding up proceedings.

   (a). Ms. Li deals with the prejudice that Tianrui will suffer in [28] and [29] of her Sixth Affirmation:

   "28. *As at the date of this affirmation, eleven months and one week have passed since the presentation of the Petition and pleadings have yet to close (though the Company has been ordered to serve its defence by 6 September 2019, over its objections). The twelve-month delay in the Court's ability to hear and determine the legitimate issues raised in the [Amended] Petition has already prejudiced [Tianrui]. The suggestion that a further delay of at least two more years would not occasion further prejudice to [Tianrui] is nonsensical.*

   29. *[Tianrui] was entitled to present its Petition and is entitled to have its complaints heard and determined. The Company should not be permitted to obstruct this right for over three years. To the extent that the Company is*

> *concerned about duplication of proceedings, it may seek case management*
> *stays of the Hong Kong Proceedings which either do not involve [Tianrui], or*
> *were commenced many months after the presentation and restoration of the*
> *Petition."*

(b).    Tianrui submits that the length of any delay of the trial in the foreign jurisdiction is an
important consideration for the Court to take into account. Where the proceedings in respect
of which a stay was sought could be heard far quicker than the second proceedings, the likely
prejudice to the claimant mandated against the granting of a stay, as does the fact that the
ends of justice are not usually served by delay (*Curtis v Lockheed* at [21] and [25]). Tianrui
argued that accordingly a key factor in *Oriental Knowledge* was that the fact that the foreign
court (in Samoa) would hear the case within a two-month period.

(c).    Tianrui argues that there is likely to be a considerable delay in the determination of the Hong
Kong proceedings so that a stay of the Amended Petition and/or the Cayman Writ Action
would cause it serious prejudice. According to the Company's own original time estimate,
the determination of the Second Hong Kong Proceedings, as noted above, will take
approximately two years. Tianrui considered this to be an underestimate and relied on the
history of the litigation between the parties in Hong Kong, which suggested that
interlocutory applications and appeals will be inevitable. The fact that the First Hong Kong
Proceedings had already been on foot for nearly four years illustrated the optimistic nature of
the Company's estimate. The Company's earlier estimate for time to trial in the First Hong
Kong Proceedings had also been overly optimistic. In June 2019, Chang Ming-Cheng (in his
Second Affirmation) had said that he had been informed by the Company's legal advisers
that the trial in the First Hong Kong Proceedings was likely to take place during 2020.
Tianrui submitted, in its further written submissions, that the recent delays in Hong Kong
was of considerable importance since it was now clear that, due to an ongoing crisis beyond
any party's control, the Second Hong Kong Proceedings could not now be heard within the
timeframe previously estimated and was likely to be significantly delayed. Tianrui submitted
that a more realistic estimate was now that a trial could not take place before 2022 or 2023
(and the Reverse Stay Application was now unlikely to be heard for some time, even on an
expedited basis). It was therefore now beyond doubt that that the Amended Petition can be
determined well before the Second Hong Kong Proceedings and this was a significant factor
to be taken into account and weighed heavily against the granting of a stay.

*Discussion and decision*

137.   It is common ground that the governing principles are those set out in *Reichold, Saad* and *Oriental Knowledge* (which have been applied by the English Court of Appeal in *1Malaysia*).

138.   A case management stay was granted in *Reichold* and *Oriental Knowledge*. In *Reichold* the claim against Goldman Sachs in respect of which the stay was sought in England was in substance or practice secondary to the claim made by Reichold in the Norwegian arbitration against Jotun. If *Reichold* was successful in the arbitration its claim against Goldman Sachs would fall away. Furthermore, the evidence demonstrated that the arbitration was likely to conclude rapidly (within a year) and before the English proceedings. The court had to consider the order in which proceedings were pursued where concurrent proceedings may give rise to inconsistent decisions and the outcome of one set of proceedings might have an important effect on the conduct of the other (see *Oriental Knowledge* at [43]):

   (a).   Jotun had sold shares in another company to Reichold and Reichold had a claim for breach of certain contractual representations. The contract contained a choice of Norwegian law and an agreement for arbitration in Norway. Goldman Sachs had acted as financial adviser to Jotun and Reichold claimed damages against Goldman Sachs for negligent misstatement. It claimed that Goldman Sachs owed it a duty of care which it had breached by negligently providing Reichold with incorrect financial information on which it had relied.

   (b).   when Reichold had commenced the proceedings against Goldman Sachs Reichold had not taken any steps to pursue a claim in arbitration against Jotun. Reichold only gave notice of arbitration after Goldman Sachs applied for a stay of the English proceedings against it.

   (c).   there was evidence before the court that it was not uncommon for arbitrations of this kind to be completed within a year. Moore-Bick J considered that although the claims Reichold made against Jotun and Goldman Sachs were different it was wrong to assume that they were distinct and would have no effect on each other. Although the arbitration award would not give rise to any estoppel as between the parties to the English action, there was a strong likelihood that in practical terms if Reichold was successful in the arbitration, there was no

reason to think that Jotun would not pay and that once it did so Reichold would no longer be able to pursue its claim against Goldman Sachs. He also noted that if the arbitration were to proceed in tandem with the English proceedings the evidence suggested that the final award would be published well before the action reached its conclusion.

139.  *Oriental Knowledge* involved a winding up petition in this Court. There were also proceedings in Samoa. An identical issue arose in both proceedings, namely, whether the petitioner had authority to present the petition in Cayman. Accordingly, the litigation in Samoa included a discrete issue of Samoan law (the resolution of which involved mixed questions of law and fact) which was of critical importance to the outcome of the Cayman winding up proceedings:

  (a).  the Samoan court had to decide this issue so that the authority issue had to be decided in both jurisdictions. A decision of the Samoan court, if made first, would be likely to resolve the issue of authority in the Cayman proceedings. This Court would have had to decide the issue based on expert evidence of Samoan law.

  (b).  the Samoan proceedings were expected to be completed within a few months of the hearing of the stay application (evidence filed in the appeal showed that the hearing in the Samoan court would take place within two months of the hearing of the appeal in the Cayman Islands which was only relevant on the appeal after the Court of Appeal had decided to set aside the decision of Mr. Justice Kawaley).

  (c).  Moses JA held that the proper approach was to apply the principles identified in *Reichold* without qualification. He held that a temporary stay should be granted, subject to a change in circumstances, to ensure that the issue which fell to be decided by both courts would be decided in the order that would most likely further the interests of justice. While both courts were able to decide the point, the key question was whether the Cayman Court should manage the order in which that issue should be determined and whether the existence of the Samoan proceedings amounted to a rare and compelling circumstance justifying a stay (so the authority issue could be decided in Samoa before the hearing of the Cayman petition).

  (d).  on the one hand, the granting of a stay would result in clear benefits. There was a real risk of inconsistent decisions. If the Cayman proceedings were stayed, the Grand Court would have

the benefit of the Samoan courts' ruling which was likely to be determinative of the authority issue in Cayman. The stay was unlikely to be long as the hearing in Samoa was listed to take place shortly. The stay may well also avoid an unnecessary duplication of costs. On the other hand, it was difficult to identify any particular disadvantage to the petitioner in Cayman. It would suffer only a short delay in the hearing of the petition and would be relieved of the need and cost of litigating the authority issue again in Cayman. In the circumstances, there was a compelling and very strong reason for granting the stay.

140. A stay was refused in *Saad*. *Saad* involved proceedings in Cayman instituted by the plaintiff company and an order made by the Chief Justice for a case management stay of these proceedings pending (i) a decision by a Saudi Arabian adjudicative or investigatory body, the Saudi Committee or (ii) the outcome of proceedings in Saudi which could be commenced by the plaintiff:

   (a).   the plaintiff had brought proceedings against Mr. Al Sanea (who was resident in Saudi) and companies he had controlled alleging that he and they had fraudulently caused the company to suffer substantial losses and to recover monies alleged to have been misappropriated. Mr. Al Sanea had applied to discharge the order granting leave to serve out and to strike out the proceedings on *forum non conveniens* grounds (arguing that Saudi was the appropriate forum).

   (b).   the Chief Justice declined to grant those applications but granted a case management stay instead to allow time for the Saudi Committee to declare its results or to allow the plaintiff to petition the Sharia courts or other Saudi bodies for the resolution of its fraudulent breach of duty claim against Mr. Al Sanea. The precise status of the Saudi Committee, the scope of its activities (it had focused on the debts owed by the plaintiff to Saudi banks rather than the dispute with Mr. Al Sanea) and the nature of the relief that it could grant was disputed).

   (c).   in the Court of Appeal Chadwick P concluded that the Chief Justice had erred in failing to address the core question (posed by Moore-Bick J), namely whether the benefits which were likely to result from imposing a temporary stay so clearly outweighed any disadvantage to the plaintiff that this was one of those cases in which rare and compelling circumstances provided very strong reasons that justified doing so. In his view the answer to that question was "no".

(d).   there was no reason to expect that the Saudi Committee would reach a conclusion which would or might be determinative of the plaintiff's claims. Unlike *Reichold*, this was not a case in which some existing process (short of *lis alibi pendens*) could be expected to resolve issues between the parties that would otherwise have to be decided in the proceedings that had properly been brought and were pending in Cayman.

(e).   nor was the Court confident that proceedings commenced in the Saudi courts would lead to a decision within any measureable period, if at all. Unlike *Reichold*, this was not a case in which it could be said that the stay would delay the Cayman proceedings for no more than a relatively short time.

(f).   it was also impossible to conclude that the outcome of whatever proceedings the plaintiff could commence in Saudi would be accepted as binding by the defendants in the Cayman proceedings, in particular the Cayman incorporated companies that were in liquidation in Cayman. Those companies had indicated that they refused to submit to the jurisdiction of the Saudi courts. Accordingly, there was a real risk that the Cayman proceedings would need to continue in due course and the stay, by facilitating the commencement of and prioritizing the Saudi proceedings, resulted in the real possibility that the underlying issues might be tried in both jurisdictions, leading to the possibility of inconsistent findings.

141.   In my view, the correct approach, based on these authorities, can be summarised as follows:

(a).   it is important to start by noting when a case management stay will be justified. Granting a stay involves the exercise of the Court's inherent jurisdiction and case management powers to control and manage the conduct of litigation to promote the overriding objective and the efficient, fair and cost effective disposition of the proceedings (see *Oriental Knowledge* at [42]). The Court must consider what would be most likely to further the interests of justice in the case at hand.

(b).   in particular, as Moore-Bick J said in *Reichold*, the purpose of the stay is to manage the order in which proceedings are to be heard to avoid inconsistent decisions and because the outcome of one set of proceedings may have an important effect on the conduct of the other.

But, as Moses JA said in *Oriental Knowledge*, a case management stay must be based on principles other than those identified in *Spiliada*.

(c).   it is necessary to identify the benefits to the defendant or respondent which are likely to result from imposing a temporary stay and the disadvantages likely to result to the plaintiff and then decide whether the former clearly outweigh the latter and provide very strong reasons for the stay. There is a very real burden on the applicant for a case management stay to satisfy the court that the ends of justice (how justice can best be done between the parties) would be served by granting a stay.

(d).   the Court is required to have regard to and weigh the different benefits and disadvantages (to undertake, to use Mr. Flynn's phrase, a balancing exercise).

142.   In the proceedings which are the subject of the Company's application it is now clear that certain further procedural steps and matters need to be dealt with:

(a).   Tianrui, as I have explained, accepts that the statement of claim in the Cayman Writ Action requires amendment, at least to amend the terms of the declarations which the Court is asked to make. The amendments need to be drafted and served on the Company. In the absence of agreement (both as to the amendments themselves and costs), there will need to be a contested application for permission to amend. If, however, the only amendments sought are of the type I have described above (to ensure that the relief is limited to declarations relating to the validity and propriety of the board's exercise of its powers), then dealing with them should not materially delay the progress of the Cayman Writ Action. For the purpose of the Company's applications I therefore take into account the fact that amendments to the Cayman Writ Action still need to be sought but, without prejudging Tianrui's application, the application is likely to seek and result in an amendment to the declarations sought of the kind I have already identified.

(b).   Tianrui has also proposed in the Draft Order that a case management order be made to ensure that the Cayman Writ Action proceeds in tandem with the Amended Petition. Mr. Lowe, as I have also explained, during his oral submissions indicated that Tianrui invited the Court to order that the Amended Petition and the Cayman Writ Action be heard together; that the

evidence filed in relation to the Amended Petition stand as evidence in the Cayman Writ Action and that no orders for (further) discovery be made in the Cayman Writ Action. This approach was intended to avoid any additional costs being incurred in dealing with Cayman Writ Action. For the purpose of the Company's applications I therefore take into account the effect of such a case management order on the conduct of the Cayman Writ Action and on the parties.

(c). Tianrui has also proposed in the Draft Order that if the Court dismissed the Company's applications, the Court should make, without the need for a further hearing, the procedural orders required by the CWRs (and previously covered by the Summons For Direction) to provide for the future conduct of the Amended Petition. To date, as I have explained, such mandatory directions have not been given. However, the Summons For Directions had not been listed to be heard at the hearing and no submissions were made by the Company as to the appropriate orders to be made. The Summons For Directions raises at least two important substantive issues, namely whether the Company is properly able to participate in the proceeding or should be treated merely as the subject-matter of the proceeding and whether the proceeding should be treated as a proceeding against the Company or as an *inter partes* proceeding between Tianrui on the one hand and CNBM/ACC on the other as respondents (the ***Substantive Issues***). Based on the Draft Order it appears that Tianrui and CNBM/ACC agree that the Company is properly able to participate in the proceeding and that the Amended Petition should be treated as a proceeding against the Company. However, during the hearing, Mr. Lowe indicated, in response to my suggestion that it was at least arguable that this should be a case in which the proceedings be treated as a dispute between shareholders with CNBM/ACC as respondents, that Tianrui's position may not be settled and they might wish to seek to adopt that approach. In my view, even in the absence of such equivocation, it would be wrong for the Court simply to accept the parties' position on the Substantive Issues without hearing the parties' submissions and the justification for the proposed approach. In a case where the parties' position is not clear, the Court should not assume that the proper order will be that the Company is properly able to participate in the proceeding and that the Amended Petition should be treated as a proceeding against the Company. The issue is complicated by the fact that the Company has already filed the Defence to the Petition and consideration needs to be given to the impact and effect of that. In my view, submissions need to be made and consideration needs to be given to the further

procedural directions to be given for the conduct of the Amended Petition. The question of what orders should be made falls to be considered after the Court has disposed of the Company's applications, as Tianrui acknowledged, and I do not consider it would be appropriate to give directions without requiring the parties to provide further submissions (it may be acceptable for the matter to be dealt with without the need for a further hearing but that will also be a question to be considered in light of the parties' submissions). For the purpose of the Company's applications I must take into account the fact that the Substantive Issues remain to be decided and that it is at least possible that CNBM/ACC could be joined as respondents to the Amended Petition.

143. In considering the benefits to CNBM and ACC that are likely to result from imposing a temporary stay of the Amended Petition, and the disadvantages likely to result to Tianrui, it is appropriate to have regard to the impact of the outcome of the First Hong Kong Proceedings, and secondly the Second Hong Kong Proceedings is likely to have on the Amended Petition and the extent to which the stay would avoid inconsistent decisions. In particular, the following matters need to be considered:

    (a).   the relief sought in, the parties to, and the extent to which there are common issues which arise and fall to be decided in, the First Hong Kong Proceedings, the Second Hong Kong Proceedings and the Amended Petition and therefore:

        (i).   the extent to which the Hong Kong court is likely to reach a conclusion which would or might be determinative of Tianrui's application for a winding up order or resolve a material issue arising in the Amended Petition (can the First Hong Kong Proceedings or the Second Hong Kong Proceedings be expected to resolve issues between the parties arising in the Amended Petition that would otherwise have to be decided in the winding up proceedings)?

        (ii).  the extent to which there is a risk of inconsistent decisions and whether a stay of the Amended Petition would allow an issue properly before the Hong Kong court to be decided first by that court and thereby avoid or significantly reduce the risk of conflicting decisions?

(iii).   the extent to which there is a risk that the Amended Petition will need to continue in due course in any event so that the stay, by facilitating the commencement of and prioritizing the Hong Kong proceedings, may result in the underlying issues ultimately being tried in both jurisdictions (leading to the possibility of inconsistent findings)?

(b).   the procedural timetable applicable to the First Hong Kong Proceedings, the Second Hong Kong Proceedings and the Amended Petition (can the Court be confident that the Hong Kong proceedings will lead to a decision within any measureable period and can it be said that the stay would delay the Cayman proceedings for no more than a relatively short time so that the prejudice to Tianrui is not material or limited?).

144.   I have summarised above the factual allegations made and the relief sought in the Amended Petition, the First Hong Kong Proceedings and the Second Hong Kong Proceedings. I have also summarised the Company's submissions as to why a stay of the Amended Petition is needed. In essence, the Company submits that the First Hong Kong Proceedings and the Second Hong Kong Proceedings need to be viewed together and when this is done it can be seen that there a number of common critical issues of fact that the Hong Kong court must decide which, if decided first, will assist in the cost effective and fair disposal of the Amended Petition by avoiding the need for this Court to have to receive evidence on and decide those issues and which will significantly reduce the risk of additional expense and duplication and inconsistent decisions.

145.   The following points appear to me to be of particular relevance:

(a).   the Amended Petition is based and only relies on some of the conduct occurring during, and a limited period of, the battle for control between Tianrui and CNBM and ACC. The loss of confidence which justifies a just and equitable winding up is said to arise from two particular episodes involving the conduct of CNBM, ACC and their representatives on the board, set out in the Amended Petition under the headings *Control of Shandong Shanshui* and *Improper Share Issue*. This conduct occurred in (or shortly before) December 2015 and August to October 2018. The conduct relied on in the First Hong Kong Proceedings is conduct of the same parties (together with the Zhangs) much of which occurred in a different period, namely the period between the first quarter of 2014 until 1 December 2015. There is however some overlap because the Amended Petition and the First Hong Kong Proceedings

both cover the conduct dealt with in the Amended Petition under the heading *Control of Shandong Shanshui*. The Second Hong Kong Proceedings also cover different conduct and a different period to that covered by the Amended Petition. They relate to Tianrui's conduct in the period from early 2014 to 23 May 2018.

(b).   but the conduct of CNBM, ACC and their representatives on the board and the events which took place outside the time period covered by the Amended Petition (and beyond the conduct directly associated with the actions covered under the heading *Improper Share Issue*) may be of some relevance to the Amended Petition. As the Court of Appeal has held, the case made in the Amended Petition comprises serious allegations of conspiracy by covert agreements and arrangements designed to damage Tianrui with the steps taken to dilute Tianrui's shareholding being merely the latest stage in the conspiracy. Accordingly, the conduct referred to in the Amended Petition may need to be assessed in the context and against the background of the wider range of actions taken by CNBM, ACC and their board representatives. To this extent, the conduct of CNBM, ACC and their directors in other periods, in particular in the period between the first quarter of 2014 until 1 December 2015, may be relevant and relied on to support inferences and findings concerning the purpose and intended effect of the conduct referred to in the Amended Petition, in particular that it was directed against Tianrui. However, the extent to which this will occur depends on the evidence to be filed by Tianrui. Before the filing of witness evidence it is not possible to determine definitively and reliably the extent to which this will be a serious issue.

(c).   there is another way in which conduct beyond that relied on in the Amended Petition (that is conduct of other parties and during a different time period) may be relevant. The Defence to the Amended Petition brings in additional allegations and factual matters. It refers to and relies on Tianrui's conduct in the period before 23 May 2018. The Company asserts that the action complained of by Tianrui in the Amended Petition was neither oppressive nor unfair but instead a necessary and justified response to problems caused by Tianrui's conduct during that period. As Mr. Flynn submitted during his oral submissions, the Defence to the Petition has been specifically pleaded so as to bring in all the issues that arise in both the Hong Kong proceedings and the Second Hong Kong Proceedings in particular. The Company relies on what it claims in the Second Hong Kong Proceedings to be Tianrui's unlawful conduct as the justification for the conduct relied on in the Amended Petition under

the heading *Improper Share Issue*. The Company asserts that, in order to appreciate the reasons for its conduct and to determine the Company's and the board's intentions and purposes in taking the action complained of in the Amended Petition, it is necessary to form a view on the conduct of Tianrui - and all of its conduct - in the period when it was in control of the Company's board. This does mean that the Hong Kong court will need to make findings as to Tianrui's conduct which conduct is likely to be relevant to the issue of whether CNBM, ACC and their representatives on the board acted unfairly, oppressively or improperly during the period and by taking the steps relied on in the Amended Petition. This is clearly an important factor to which weight is to be given.

(d).    however, it is not clear that there is a substantial overlap between the Amended Petition and the Second Hong Kong Proceedings. As Tianrui submits, it is not clear that all or a substantial percentage of the matters relied on in the Defence to the Petition are responsive or provide answers to the allegations relied on by Tianrui, in particular the core issue of whether Tianrui had a reasonable basis for losing confidence in the Company's management and conduct of its affairs. As Mr. Lowe submitted, the Court is being asked, on an application in which a detailed review of the factual disputes raised in the pleadings is inappropriate, to assume that all (or a material part of) the allegations as to Tianrui's conduct are relevant to the issues that need to be dealt with in the Amended Petition and it is not possible or permissible to do that. But the Court can and must assess matters as they appear on the face of the pleadings. By that standard, Tianrui's conduct and the main events occurring during the takeover battle are clearly relevant background to an assessment of the position faced by the Company and the motivation of CNBM, ACC and their board representatives. And this Court will need to form a view as to the state of mind and intentions of CNBM, ACC and their board representatives when taking, and the purpose of, the action complained of in the Amended Petition. But the main focus is the conduct complained of in the Amended Petition and it seems to me that, at least based on the materials currently before the Court, there is a good chance that the Court can dispose of the Amended Petition and make the requisite findings of fact and form a view on the allegations of unfair and oppressive conduct and as to the probity of management's conduct, without needing to decide every factual question and resolve every factual dispute that occurred during the whole period of the takeover battle and that are raised in the Second Hong Kong Proceeding (and the Defence to the Petition).

(e).    the legal issues raised by and which fall to be decided in the Amended Petition and the Hong Kong proceedings are different so that the factual disputes are formulated differently and the findings of fact required in and relevant to the Hong Kong proceedings will be different from and may not be determinative or reliable without further investigation for the purposes of the Amended Petition. In order to show that the grounds for the making of a winding up order exist, Tianrui will need to establish the factual allegations on which it relies and show that they demonstrate a relevant and sufficient lack of probity on the part of the Company's management or unfairness/oppression in the conduct of the Company's affairs. Probity will often but not always require conduct that constitutes a breach of duty or civil wrong. Oppression (resulting from the conduct of the board controlled by or of controlling shareholders) also does not require such conduct. The Amended Petition does not depend on establishing the commission of a tort or actionable wrongdoing by CNBM, ACC and their respective directors (or the Zhangs) as claimed in the First Hong Kong Proceeding. Nor is it necessary for this Court to decide that Tianrui is liable in tort and was a party to an unlawful means conspiracy in order to judge whether Tianrui's conduct created the conditions in which the Company, CNBM, ACC and their representatives on the board were required to act in the manner complained of in the Amended Petition or whether such conduct meant that it would be wrong to characterise the behaviour of the Company, CNBM, ACC and their representatives as unfair or oppressive towards Tianrui or otherwise improper.

(f).    Tianrui is not a party to the First Hong Kong Proceedings. The question therefore arises as to whether the findings of fact and decisions made in those proceedings will raise an estoppel against Tianrui and be determinative of similar issues to the extent they arise in the Amended Petition. The Company argues, as I have explained, that nonetheless Tianrui will be bound by the outcome of those proceedings as a privy since it had instigated and, up until the appointment of the Company's current board on 23 May 2018, controlled the Company's conduct of the First Hong Kong Proceedings. However, it seems to me that the authorities on which the Company relies relate to very different circumstances and do not clearly establish that an estoppel will arise in the present context. In *House of Spring Gardens Ltd v Waite* [1991] 1 QB 241 damages had been awarded in the Irish court against three defendants. The first two defendants applied in Ireland to set aside the judgment for fraud. That application was dismissed. The plaintiffs then sought to enforce the judgment in England and obtained

summary judgment before the Master, who held that the Irish court's judgment dismissing the application to set aside raised an estoppel against the third defendant which prevented him from raising fraud as a defence to the enforcement action. The English Court of Appeal upheld the Master's decision. The third defendant had an interest in the application to set aside but had stood by and allowed others with the same interest to make the application. An estoppel will bind those who are privy to the parties in the previous proceedings. One basis for establishing privity, is privity of interest. This will arise where having regard to the nature of the dispute, there was a sufficient degree of identification between the parties and person alleged to be estopped to make it just to hold that the decision to which one was party should be binding in proceedings to which the other was a party. Reference was made by Stuart Smith LJ to *Nana Ofori Atta II v Nana Abu Bonsra* II [1958] AC 95 in which it was held that an estoppel could arise where a party actively participated in the prior proceedings, received an actual benefit from them or stood by and watched them fight out (or gave evidence for one side or the other). An estoppel would be raised where a person, knowing what was happening in other proceedings, stood by content to see his battle fought by someone else in the same interest. He should then be bound by the result and not allowed to re-open the case. In the present case, Tianrui has had no involvement in or control over the management of the First Hong Kong Proceedings since 23 May 2018 although the First Hong Kong Proceedings Statement of Claim had been settled and filed before then. Tianrui instigated the First Hong Kong Proceedings and will indirectly benefit if they are successful. But it will have no involvement or control over the conduct of the proceedings before (including the gathering and filing of evidence) and at trial. Tianrui now has no ability to intervene in the First Hong Kong Proceedings. The proceedings are being conducted by a party, the Company (to whom Tianrui is said to be privy) which is controlled by the opposing party to the litigation in this jurisdiction. The Company has filed evidence to say that the First Hong Kong Proceedings are being managed by the Company's independent non-executive directors but Tianrui has challenged the Company's evidence that the arrangements in place are effective to remove conflicts of interest or prevent significant decisions with respect to the litigation being taken by the board controlled by CNBM and ACC's representatives. The critical question is whether Tianrui is a privy of the Company for the purposes of the First Hong Kong Proceedings and whether there is a sufficient degree of identification between the Tianrui and the Company to make it just to hold that the decision in the First Hong Kong Proceedings, to which the Company was party, should be

binding on Tianrui in proceedings in which the Company and Tianrui are adverse. In my view, it is strongly arguable that it would not be just to raise an estoppel against Tianrui in these circumstances. In any event, whether an estoppel is to be raised is likely to depend on which issue is in question and further evidence as to Tianrui's role in the relevant part of the First Hong Kong Proceedings and in formulating it and providing evidence to support it. I do not consider that at present I can conclude, for the purpose of the Stay of the Petition and Writ Action Application that findings of fact or decisions made by the Hong Kong court will or are likely to be binding and give rise to an estoppel against Tianrui.

(g).   it is not possible to conclude, based on the evidence filed to date, when the trial of the Second Hong Kong Proceedings will take place and therefore how long the Amended Petition will be stayed for, should a stay be ordered pending judgment at trial of both the First Hong Kong Proceedings and the Second Hong Kong Proceedings. The Company originally estimated that the trial of the Second Hong Kong Proceedings was likely to occur by mid next year. Tianrui estimated that it will take at least a year beyond that so that the trial was only likely to occur by mid-2022. Both the Company and Tianrui accept that the impact of the coronavirus on the activities of the Hong Kong court has been severe and that serious delays have resulted. Tianrui argues that this is of great significance while the Company submits that further delays are just one factor to be weighed and taken into account and may be matched by delays in proceedings in this jurisdiction caused by the coronavirus crisis and should not be determinative. In my view all the original time estimates were unreliable and speculative, and the Company's estimate appeared to me to be optimistic. But it did seem reasonable to conclude that there was likely to be a substantial delay of a number of years before the Second Hong Kong Proceedings reached trial. The recent evidence suggests that there will be a longer delay. Precisely how long is unclear. I accept that the length of time to trial and the further delays in Hong Kong are not determinative. However, the impact of waiting for the conclusion of the Second Hong Kong Proceedings is a material factor to be taken into account and the risk of additional delays which are difficult to estimate increases the prejudice that Tianrui could suffer if a stay was to be granted.

(h).   the position is different as regards the First Hong Kong Proceedings since, subject to the risk of an adjournment resulting from the problems caused by the coronavirus, this has a listing in April next year (just over a year from now).

(i).    the procedural timetable for and likely progress of the Amended Petition is also subject to a number of uncertainties. As I have explained, the Substantive Issues need to be dealt with. I have concluded that written submissions would be required, if the Amended Petition is allowed to proceed. If CNBM and ACC were to be made respondents to the Amended Petition, the issue of leave to serve out would (as the Company has pointed out) arise for decision and time might be needed to effect service out. But I do not see that dealing with the open procedural directions including the Substantive Issues need result in substantial delay (it should be possible for submissions to be filed and the Court to decide on the appropriate directions within say two months if the need for a hearing is dispensed with or three months if a hearing is required). There would then be a delay while service out was effected although with the cooperation of CNBM, ACC and their directors that process could be expedited. Following service, a timetable for discovery and the filing of evidence can be established. In view of the extensive work that has already been done in the preparing the pleadings in the proceedings in both this jurisdiction and Hong Kong, there should not be the need for significant delays. Tianrui has already proposed a procedural timetable in the Draft Order. The Company has said that it considers that this is optimistic and that more time and a longer trial will be required. Further submissions on and proper consideration of these matters will obviously be required. But I am not presently convinced that the trial in the Amended Petition will need to be as long or as complex as the trial in the First Hong Kong Proceedings or that the trial of the Amended Petition cannot take place before or at around the same time as the trial in the First Hong Kong Proceedings. In this Court, since the Amended Petition is already assigned to me, there is some flexibility in fixing a trial date. There is a risk that the coronavirus could impact on the date of a trial of the Amended Petition, because even though hearings in the Financial Services Division are being dealt with by video-link such an approach would not be suitable for a long trial of the kind needed for the Amended Petition. However, as matters currently stand, there is no reason to believe that the coronavirus will prevent a trial of the Amended Petition in, say, one year's time. I appreciate that the history of the dispute to date provides strong grounds for believing that there will be further delays to deal with appeals and additional interlocutory skirmishes, but I do not consider that the mere possibility of such further applications, about which it is only possible at this stage to speculate, should be given much weight. In any event, in my view it is right to assume that

the Amended Petition will come on for trial well in advance of the trial of the Second Hong Kong Proceedings.

(j).    the Company argued that there were benefits in giving precedence to the Hong Kong proceedings because more of the key players were amenable to the jurisdiction of the Hong Kong court and parties to the Hong Kong proceedings and that it would be more convenient and easier for witnesses to attend and be required to give evidence in the Hong Kong proceedings. It was said that it was not possible for the key players to be made parties to the Amended Petition and it might not be possible for key witnesses to be required to give evidence in the Amended Petition on issues where such evidence and cross examination was critical, such as allegations of dishonesty and illegality. In some cases, the Company's arguments impermissibly amounted to a *forum non conveniens* plea. In others, the Company failed to take into account the ability of the Court to order that CNBM and ACC become parties to the Amended Petition. In my view, there is no basis for concluding that the Amended Petition cannot be fairly decided or that critical witnesses will not give evidence.

146.  The Company submits that the present case is materially similar to the position in *Oriental Knowledge*. I cannot agree. In *Oriental Knowledge*, as I have explained, the stay was granted to allow a single discrete and critical issue governed by Samoan law to be decided first and rapidly by the Samoan Court in proceedings to which the petitioning creditor in Cayman was a party. The Grand Court would have the benefit of the Samoan courts' ruling which was likely to be determinative of the authority issue in Cayman. The stay was unlikely to be long as the evidence showed that the Samoan court was likely to decide the issue within a few months. In these present case, for the reasons discussed above, the stay is sought to allow the Hong Kong court to make findings of fact on a wide variety of issues in two sets of proceedings in circumstances where it is at least unclear whether the decisions in one set of proceedings will be binding in the Amended Petition and determinative of issues which this Court has to decide, where the two sets of proceedings cover a number of disputes which are not (directly) relevant to, or at least the resolution of which may well not be needed to dispose of the Amended Petition, and where the length of the delay caused by the stay is at least difficult to measure and may be a number of years. Furthermore, there is good reason to believe that the trial of the Amended Petition can take place before the trial in the Second Hong Kong Proceedings.

147.   Nor is this case similar to *Reichold*. The stay there was likely to be a period expected to be about one year, considerably less than the period needed here to allow the Second Hong Kong Proceedings to be concluded, and there was the real prospect that the Norwegian arbitration would decide *all* the issues arising in the English proceedings and remove the cause of action on which they relied (even though the arbitration award would not give rise to any estoppel as between the parties to the English action). Therefore, the delay was measurable, reasonably short and the potential benefits derived from the stay were considerable since the English action would be resolved in its entirety. For the reasons I have given, there is no similar prospect in the present case.

148.   Like *Saad* there are concerns in the present case over the length of time it will take for the Second Hong Kong Proceedings to be concluded so that the Court cannot be confident that the foreign proceeding will lead to a decision within any measureable period.

149.   Nor does the decision of the English Court of Appeal in *1Malaysia* provide support for the Company's submissions. The following points arise and are relevant to the present application:

   (a).   it is true that Mr. Justice Robin Knowles had granted a case management stay to permit certain factual issues which arose in the English actions (challenging under sections 67 and 68 of the Arbitration Act 1996 a consent award made in an earlier arbitration which was constituted pursuant to certain settlement deeds) to be decided in a second and subsequent arbitration and on the basis that the court would exercise a form of continuous supervision over the second arbitration by means of regular reports on its progress (which the Company has asked this Court to do in relation to the Hong Kong proceedings). But the basis on which he came to these conclusions was overturned or rejected by the Court of Appeal.

   (b).   In addition, there had been a clear common issue which arose in both the court proceedings and the second arbitration, namely whether settlement deeds which authorised the first arbitration, pursuant to which the consent award had been made, were void or otherwise not binding on the claimants. Mr. Justice Robin Knowles had held that the court had a supervisory jurisdiction and the second arbitration a concurrent jurisdiction, and this issue was material in both sets of proceedings. The court's jurisdiction under sections 67 and 68 ultimately derived from party autonomy as did the jurisdiction of the second arbitration. There were clear benefits in allowing the second arbitration to make the relevant findings of

fact, in particular the avoidance of duplication and parallel proceedings and the court could and should monitor the progress of the second arbitration.

(c).    the Court of Appeal, in overturning the judgment, focused on the importance of, and the court's responsibility in relation to, applications under section 67 and 68. The right to commence and progress properly brought applications of this kind was in the public interest. In circumstances where the second arbitration was a reaction to the claimants' court proceedings and where the claimants have a statutory right to bring those proceedings which could not be ousted by contract it would be illogical to give precedence to the second arbitration unless there were other strong reasons for doing so. The principle established by *Reichold* that stays should only rarely be granted applied with particular force to such applications.

(d).    furthermore, the judge had been wrong to conclude that the stay would avoid unnecessary duplication. The question of duplication would depend on whether the second arbitration gave rise to issue estoppels which were determinative of the court applications. The position was unclear and if no such issue estoppels arose and the decision in the second arbitration was adverse to the claimants, nothing would have been achieved by the stay except delay. The court applications would have to proceed with at least the risk of conflicting decisions. Furthermore, the judge had been wrong to rely on monitoring to support the stay as in doing so he sought to exercise supervision over the second arbitration whereas the claimants had invoked the court's jurisdiction only over the first arbitration.

150.    Ultimately, of course, the decision on whether to grant a case management stay requires an assessment of the facts of the present case rather than a simple application of precedents. The question is whether the benefits which are likely to result from imposing the temporary stay so clearly outweigh any disadvantage to Tianrui that this is one of those cases in which rare and compelling circumstances provide very strong reasons that justified doing so. In my view, after a careful assessment and balancing of all the factors set out above, neither a stay of the Amended Petition or the Cayman Writ Action to await the conclusion of both the Hong Kong proceedings is justified in this case. The prejudice to Tianrui resulting from the delay to the disposal of the Amended Petition would be substantial. The likely delay is difficult to measure but is likely to be a number of years. In the meantime, Tianrui will be required to remain in the Company and unable to

exercise its statutory right to a winding up and corporate divorce, in circumstances where the Court of Appeal has already dismissed a strike out application. The benefits of such a long delay are at this stage difficult to calibrate. There could be some material benefits, particularly in deciding some factual issues which are relevant and potentially important to the Amended Petition, avoiding the risk of inconsistent decisions and duplication (thereby saving costs). But the extent of those benefits is difficult to calibrate and there are a number of serious uncertainties surrounding them. The risk of duplication of proceedings and the reduced risk of inconsistent decisions do not in themselves amount to unusual and compelling circumstances justifying a stay (as Mr. Justice Andrew Smith held in *Citigroup Global Markets Ltd v Amatra Leverged Feeder Holdings Ltd* [2012] EWHC 1331 (Comm) at [79]). Nor is this a case in which the effect of granting a stay will be to require a claimant who has commenced proceedings in two jurisdictions raising essentially the same issues to choose which action to pursue, in particular because after losing control of the Company's board, Tianrui can no longer control the pursuit or settlement of the First Hong Kong Proceedings. In all the circumstances of this case, I do not consider that the Company has met the very real burden and high threshold which needs to be satisfied to justify a stay. The benefits said to flow from the stay are insufficiently substantial or clear to constitute rare and compelling circumstances and I do not consider that the balance of benefits/prejudice as between the Company and Tianrui mean that the ends of justice require or justify a stay.

151. Granting a stay of the Cayman Writ Action would also result in a substantial delay and, if a stay of the Amended Petition is not also granted, prevent the two sets of Cayman proceedings from being dealt with in tandem in the manner described above. The benefits that would flow from the stay are subject to the same uncertainties and difficulties as arise with respect to the benefits said to flow from staying the Amended Petition to allow the Hong Kong proceedings to proceed first.

152. I do not consider that Tianrui's Reverse Stay Application changes the analysis. It will be a matter for the Hong Kong court to decide in due course whether to grant that application.

153. I also do not consider that a stay of the Amended Petition until the conclusion of the First Hong Kong Proceedings is justified. While the delay will be shorter and is much easier to measure (subject to the risk of delays resulting from appeals), the benefits are less because of the limited scope and relevance of the First Hong Kong Proceedings and subject to the uncertainties and issues I have discussed above. Furthermore, the Company has argued that the proper approach is to view

the Hong Kong proceedings together – to take a holistic view – as together they cover the whole territory. This seems to constitute an acknowledgement that the case for a stay based only on one of the two sets of proceedings is significantly weaker than the case for a stay pending the conclusion of both Hong Kong proceedings.

154. Mr. Lowe did submit during oral argument that while it was not appropriate on this application to make case management directions to determine the order in which certain issues were dealt with, it could be appropriate to do so at some later point in the proceedings, after the evidence had been filed and the timetable in the Hong Kong and Cayman proceedings was settled. While I do not wish to encourage unnecessary further applications, it does seem to me that this is a sensible approach so that further consideration could be given to the making of such orders on an issue by issue basis once matters have become much clearer, and if there was a substantial justification for doing so.

**Mr. Justice Segal**
**Judge of the Grand Court, Cayman Islands**