UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
:
:
NEXPOINT DIVERSIFIED REAL ESTATE TRUST   :
:
Plaintiff,   :
:
-against-   :
:
ACIS CAPITAL MANAGEMENT, L.P., U.S. BANK,   :
N.A., JOSHUA N. TERRY, BRIGADE CAPITAL   :
MANAGEMENT, L.P.,   :
:
Defendants.   :
:
-----------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY   FILED
DOC #: _____
DATE FILED: 8/9/2022

1:21-cv-04384-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H.  WOODS, United States District Judge:

## I.      INTRODUCTION

Plaintiff Nexpoint Diversified Real Estate Trust ("Nexpoint") is a closed-end retail fund that

holds notes issued by a portfolio of collateralized loan obligations ("CLOs") that is managed by

defendant Acis Capital Management, L.P. ("Acis").  Plaintiff asserts that Acis, Defendant Brigade

Capital Management L.P. ("Brigade"), Defendant Joshua N. Terry, and Defendant U.S. Bank, N.A.

("U.S. Bank") mismanaged the CLOs and led the CLOs to lose value, causing Plaintiff monetary

losses.  Accordingly, Plaintiff brings claims under the Investment Advisers Act, 15 U.S.C.  § 80b-1 *et*

*seq.*  (the "IAA"), the Trust Indenture Act of 1939, 15 U.S.C.  §§ 77aaa *et seq.*, and also brings claims

for breach of fiduciary duty, breach of contract, conversion, and negligence under state law.

Because Plaintiff has not sufficiently pleaded that the agreement governing the investment

relationship between the parties was made illegally or requires illegal performance, Plaintiff's IAA

claims are dismissed.  Moreover, because Plaintiff has not sufficiently alleged that defendant U.S.

Bank breached any fiduciary duties, and because the Court declines to exercise supplemental

jurisdiction over the remainder of Plaintiff's claims, which are brought pursuant to state law, Defendants' motions to dismiss are granted.

## II.    BACKGOUND

### a.  Factual Background[1]

#### 1.    The Acis CLOs

A CLO is a type of structured financial transaction that pools debt instruments issued by corporations.  Dkt. No. 42 ("SAC") ¶¶ 10–18.  The pooled loans are funneled into a trust entity commonly referred to as a "special purpose vehicle" ("SPV") that raises funds through equity investment and by issuing notes to third-party investors.  *Id.* ¶¶ 11–12.  Cash flow from the CLOs is paid out to noteholders and, subsequently, to equity holders.  *Id.* ¶¶ 13–14.

Acis serves as the portfolio manager for the CLOs at issue in this case (the "Acis CLOs"). *Id.* ¶ 37.  Mr. Terry is the president, owner, and primary advisor of Acis.  *Id.*  As portfolio manager, Acis's role is to identify and purchase CLO assets and to monitor the CLO assets to ensure that they meet various requirements.  *Id.* ¶ 20.  Acis's responsibilities as portfolio manager are set forth in portfolio management agreements (the "PMAs").  *Id.* ¶ 21.  As compensation for its role as the portfolio manager, Acis receives a percentage of the "assets under management," which is determined by reference to the face value of the CLO assets.  *Id.* ¶ 27.

Intervenor Highland Capital Management L.P. ("Highland") originally served as the sub-advisor to the Acis CLOs.  *Id.* ¶ 40.  However, during a 2018 consolidated bankruptcy proceeding in the United State Bankruptcy Court for the Northern District of Texas, Acis appointed Brigade as a sub-adviser and shared-services provider to Acis for all but one of the Acis CLOs.  *Id.* ¶¶ 47, 53.

---

[1] The following facts are drawn from the second amended complaint.  Dkt. No. 42 ("SAC").  The Court "accept[s] all facts alleged in the [amended] complaint as true and draw[s] all reasonable inferences in the plaintiff's favor."  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir.  2008) (per curiam).

After the bankruptcy, Highland remained the advisor for one CLO, Acis CLO-7.  *Id.* ¶ 53. As sub-advisor, Brigade took on certain delegated advisory tasks.  *Id.* ¶¶ 22, 49.  Plaintiff asserts that those tasks included advisory services as well as back- and middle-office functions including accounting, payments, operations, technology, and finance.  *Id.* ¶ 48.  Brigade was also charged with assisting in the negotiation and execution of documents necessary to acquire or dispose of assets under the PMAs.  *Id.* ¶ 49.

U.S. Bank serves as the indenture trustee of the Acis CLOs.  *Id.* ¶ 40.  Plaintiff alleges that indenture trustees can use a variety of tests available to monitor the "security and soundness of CLO assets", including the weighted average rating factor ("WARF"), which demonstrates the credit quality of the CLO's entire portfolio, and the weighted average life ("WAL"), which demonstrates the average maturity of the debt instruments in the CLO.  *Id.* ¶¶ 33–35.[2]  CLOTypically, the portfolio manager, advisor, and trustee are parties to an indenture, an agreement that further sets forth their responsibilities to the CLOs.  *Id.* ¶ 19.

### 2.      The Alleged Mismanagement

Between 2014 and 2016, Plaintiff became a noteholder in Acis CLO 2015-6 LLC and Acis CLO 2015-6 Ltd. (together, "ACIS-6").  *Id.* ¶ 38.  ACIS-6 is governed by an indenture between Acis and U.S. Bank.  Dkt. No. 82-2 (the "Indenture").  Plaintiff came to hold equity in Acis-6 valued at approximately $7.5 million.  SAC ¶ 38.  Plaintiff asserts that, beginning on February 15, 2019, Acis, Brigade, U.S. Bank, and Mr. Terry "caused the Acis CLOs . . . to incur astronomic, unprecedented expenses, which were well outside the Acis CLOs' historical expense patterns."  *Id.* ¶ 61.  Plaintiff

---

[2]. As alleged in the second amended complaint, "WARF is calculated by taking the credit rating of each debt instrument in the CLO, determining the percentage of the CLO portfolio that each instrument constitutes, and aggregating those to a factor of the portfolio's notional balance."  *Id.* ¶ 34.  "The better the WARF, the lower the risk to a CLO's investors."  *Id.*  "Calculating the WAL," by contrast, "yields the average number of years for which each dollar of unpaid principal on an investment remains outstanding."  *Id.* ¶ 35.  "This metric is important because, in general, investors want to be paid back sooner rather than later," and "[l]onger payouts typically mean greater exposure to risk because of unforeseen circumstances."  *Id.*  Thus, "the shorter the maturity dates, the better the WAL—and, accordingly, the lower the risk to a CLO's investors."  *Id.*

asserts that under Mr. Terry's management, Acis "replaced shorter-term debt with longer term loans," which resulted in "increased risk," "decreased residual principal value," and "longer, artificially induced periods for interest accrual." *Id.* ¶¶ 67–68. That mismanagement is alleged to have included Acis's purchase of loans that did not maintain or improve the credit quality of the Acis CLOs' portfolio, leading the CLO to register a failing WAL score in violation of the standards set forth in the PMA, *id.* ¶¶ 78–84; Acis's purchase of loans that were "substandard," *id.* ¶¶ 95–100; and making purchases at a time when market conditions were poor, *id.* ¶¶ 101–08. Plaintiff asserts that these actions violated various provisions of the PMA and Indenture, and led to significant financial losses.

Plaintiff asserts that Brigade had "far reaching . . . involvement" in managing the CLOs' portfolios, and that Terry "direct[ed] and control[led]" Acis's conduct. *Id.* ¶ 51. Further, Plaintiff asserts that U.S. Bank permitted the mismanagement by the other defendants, including by allowing the other defendants to take steps to circumvent various collateral quality requirements, and by permitting purchases that contributed to Acis-6's failing WAL scores. *Id.* ¶¶ 124–27.

**b. Procedural History**

Plaintiff filed its first complaint on May 14, 2021. Dkt. No. 1. It amended its complaint on November 22, 2021, Dkt. No. 41, and amended again a day later. . On November 24, 2021, Highland filed a motion to intervene, Dkt. No. 43, which the Court granted on December 7, 2021. Dkt. No. 49. On January 27, each of the Defendants and Highland filed a motion to dismiss. Dkt. No. 79 ("Highland Mot."); Dkt. No. 81 ("U.S. Bank Mot."); Dkt. No. 84 ("Acis Mot."); Dkt. No. 87 ("Terry Mot."); Dkt. No. 89 ("Brigade Mot."). Plaintiff opposed those motions on February 24, 2022, and February 25, 2022. Dkt. No. 92 ("U.S. Bank Opp'n"); Dkt. No. 93 ("Brigade Opp'n"); Dkt. No. 96 ("Highland Opp'n"); Dkt. No. 102 ("Terry Opp'n"); Dkt. No. 103 ("Acis Opp'n"). Each of the Defendants and Highland filed their replies on March 10, 2022. Dkt. No. 107 ("U.S.

Bank Reply"); Dkt. No. 108 ("Highland Reply"); Dkt.  No. 109 ("Acis Reply"); Dkt. No. 110

("Terry Reply"); Dkt. No. 111 ("Brigade Reply").

## III.   LEGAL STANDARD

A complaint need contain only "a short and plain statement of the claim showing that the

pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  However, a defendant may move to dismiss a

plaintiff's claim for "failure to state a claim upon which relief can be granted." *Id.*  12(b)(6).  In

deciding a motion to dismiss under Rule 12(b)(6), courts accept as true all well- pleaded factual

allegations and draw all inferences in the plaintiff's favor.  *See Palin v. N.Y. Times Co.*, 940 F.3d 804,

809–10 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)); *Chase

Grp. All. LLC v. N.Y.C. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010).

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v.

Iqbal*, 556 U.S.  662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A

claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550

U.S. at 556).  "The choice between two plausible inferences that may be drawn from factual

allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Lynch v. City of New

York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162,

185 (2d Cir. 2012)).  "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief

of a complaint's factual allegations." *Id.* (quoting *Twombly*, 550 U.S. at 556).  "[A] well-pleaded

complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable .

. . ." *Twombly*, 550 U.S. at 556.

"To survive dismissal, the plaintiff must provide the grounds upon which his claim rests

through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI*

*Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an

unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation

of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

On a motion to dismiss, a court must generally "limit itself to the facts stated in the

complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v.

County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). But a court may consider "any 'written instrument'

. . . attached to [the complaint] as 'an exhibit' or . . . incorporated in it by reference." *Lynch v. City of

New York*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ. P. 10(c) (other citations omitted)).

## IV.   DISCUSSION

### a.   Plaintiff Has Not Sufficiently Pleaded a Claim Under the Investment Adviser's Act

Plaintiff has not adequately pleaded a claim against any of the defendants under the IAA. As

an initial matter, to the extent Plaintiff argues that it has sufficiently alleged a claim under Section

206 of the IAA, *see* Acis Opp'n at 8–10, there is no private right of action to bring a claim pursuant

to that provision. In *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, the Supreme Court held

that there is no private right of action under § 206. 444 U.S. 11, 19–25 (1979); *see also Omega Overseas*

*Partners, Ltd. v. Griffith*, No. 13-CV-4202 RJS, 2014 WL 3907082, at *3 (S.D.N.Y. Aug. 7, 2014)

(recognizing that there is no private right of action to bring claims under § 206).[3] Despite that

---

[3] In support of Plaintiff's argument that Section 206 would support a claim, Plaintiff cites case decided prior to the Supreme Court's decision in *TAMA*. *See* Acis Opp'n at 9 (citing *Abrahamson v. Fleschner*, 568 F.2d 862, 871 (2d. Cir 1977). Plaintiff also cites *Goldenson v. Steffens*, No. 2:10-CV-00440-JAW, 2014 WL 12788001, at *87 (D. Me. Mar. 7, 2014), but that out-of-Circuit case does not change the analysis here. There, the plaintiff had argued that the defendant

express and binding precedent, Plaintiff argues (without support) that *TAMA* "did not reverse or abrogate the right of investors to bring such a claim [under § 206] as opposed to the fund doing so." Acis Opp'n at 10 n.17.  But *TAMA* made no distinction between investors or the fund: it unequivocally held that there is no private right of action under Rule 206.  *See TAMA*, 444 U.S. at 19 (holding that there is no private right of action under Section 206, noting that "[Section] § 206 simply proscribes certain conduct, and does not in terms create or alter any civil liabilities.  If monetary liability to a private plaintiff is to be found, it must be read into the Act.  Yet it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.").

Thus, Plaintiff may only pursue a claim under Section 215 of the Adviser's Act, but it fails to adequately plead such a claim.  Section 215 provides the following:

> [e]very contract made in violation of any provision of [the IAA] and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of [the IAA], or any rule, regulation, or order thereunder, shall be void . . . .

15 U.S.C.A. § 80b-15.  "[T]here exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment adviser's contract, but that the Act confers no other private causes of action, legal or equitable."  *TAMA*, 444 U.S. at 24; *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1033 (2d Cir. 1992) ("Section 215 of the IAA provides that contracts whose formation or performance would violate the act are void.").  Thus, "rescission of the void contract and restitution [are] the sole private remedy available under the Advisers Act."  *Kahn*, 970 F.2d at 1033.

In *Omega*, then-District Judge Richard J. Sullivan concluded that Section 215 "voids a contract only where the contract would be invalid under that principle—that is, where the contract was made illegally or requires illegal performance."  2014 WL 3907082, at *3; *see also KDH Consulting*

---

breached a fiduciary duty under Maine common law, not the IAA.  *Id.*

*Grp. LLC v. Iterative Cap. Mgmt. L.P.*, No. 20 CIV. 3274, 2020 WL 7251172, at *10 (S.D.N.Y. June 29, 2020) (same).  Judge Sullivan commented that Section 215(b)'s text "strongly echo[ed] the description of illegal contracts found in the *Restatement of Contracts*, which was published only a few years before the IAA's enactment," reasoning Section 215 "was meant to codify the . . . modest principle that illegal contracts are invalid."  2014 WL 3907082, at *3.  Thus, he determined that "[b]ecause § 215(b) codifies a pre- existing common-law principle, it should be read consistently with that principle."  *Id.*  Accordingly, "under § 215(b), as under the common law, 'if an agreement can by its terms be performed lawfully, it will be treated as legal, even if performed in an illegal manner.'"  *Id.* (quoting 12 Am. Jur. § 153 (1938)).  Judge Sullivan also found persuasive that Section 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78cc(b), "which tracks § 215(b) nearly word for word," similarly had been interpreted to permit a contract to be voided only if the contract was illegally made or could not be legally performed.  *Id.* at *4.  "Consequently," Judge Sullivan determined, "a contract does not become void under § 215(b) merely because an investment adviser defrauded her or his client—rather, a contract is void only if it was made illegally or requires illegal performance."  *Id.*

Here, Plaintiff does not dispute that the PMA was made legally and that it does not require illegal performance.  Instead, Plaintiff asks the court to depart from *Omega's* analysis and conclude that a Section 215 claim may be premised upon a violation of any provision of the IAA, such that defendants' alleged wrongdoing would be sufficient to void the contract under Section 215.  Plaintiff cites a number of cases in support of that argument, but none are persuasive.

First, Plaintiff relies on a number of cases in this district that have dismissed IAA claims on grounds other than those argued by the parties here, such that they have no impact on the Court's analysis.  *See* Acis Opp'n at 16–17 (citing *Rapillo v. Fingerhut*, No. 09-CV-10429 (VSB), 2016 WL 11705140, at *11 (S.D.N.Y. Sept. 14, 2016) (denying IAA claim because the plaintiffs "could not

demonstrate the existence of an investment advisory relationship with [the defendants]"); *Bogart v. Shearson Lehman Bros.*, No. 91 CIV. 1036 (LBS)NG, 1993 WL 33643, at *3 (S.D.N.Y. Feb. 3, 1993) (same); *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 CIV. 4885(SWK), 2005 WL 2677753, at *7 (S.D.N.Y. Oct. 19, 2005), on reconsideration in part, No. 04 CIV. 4885 (SWK), 2006 WL 74439 (S.D.N.Y. Jan. 11, 2006) (denying IAA claim because the plaintiffs had not met demand futility requirements under state law).

Next, Plaintiff turns to pre-*Omega* cases, including *Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp. 2d 382 (S.D.N.Y. 2004); *GPIF–I Equity Co., Ltd. v. HDG Mansur Investment Services, Inc.*, No. 13–cv–547 (CM), 2014 WL 1612004 (S.D.N.Y. Apr. 21, 2014); and *Wellington International Commerce Corp. v. Retelny*, 727 F. Supp. 843 (S.D.N.Y. 1989), that appeared to have adopted Plaintiff's rationale. However, the Court agrees with Judge Sullivan's analysis in *Omega* that those cases were unpersuasive because

> none of those cases addresses this issue at all.  Although several of those cases allowed § 215(b) claims to proceed, those cases did not discuss or explicitly rule on whether § 215(b) voids an investment adviser contract because of subsequent misconduct by the investment adviser.  That is unsurprising, as courts normally address only the arguments parties make, and the parties in those cases . . .did not raise the issue in their briefing.

*Omega*, 2014 WL 3907082, at *7.

Indeed, as *Omega* points out, the only case in this district that appears to have addressed this issue and taken the same position as Plaintiff is *In re Evergreen Mutual Funds Fee Litigation*, 423 F. Supp. 2d 249 (S.D.N.Y. 2006).  But, as Judge Sullivan recognized, *In re Evergreen* does not meaningfully analyze the scope of permissible Section 215 claims.  The court in *In re Evergreen* merely commented that "[c]ourts in this Circuit have routinely permitted Section 215 claims to proceed irrespective of whether the contracts themselves violated the IAA," citing *Norman* and other cases in support.  *Id.* at 262; *see also Omega*, 2014 WL 3907082, at *8 (disagreeing with *In re Evergreen*).  As

previously discussed, those cases did not engage with the scope of permissible Section 215 claims. *See Omega*, 2014 WL 3907082, at *8 (commenting that, due to the lack of analysis, "the Court does not believe that the decisions allowing claims to proceed offer any guidance on how those courts would have addressed this issue."). Moreover, the court in *In re Evergreen* ultimately dismissed the Section 215 claim on other grounds, such that *In re Evergreen's* commentary on Section 215's scope amounts only to dicta. *Evergreen*, 423 F. Supp. 2d at 263, 265. Thus, the Court agrees with Judge Sullivan's analysis and conclusion in *Omega*, and declines to follow *In re Evergreen*.

Plaintiff also turns to targeted language in *Kahn*, where the Second Circuit considered the appropriate statute of limitations for claims under the IAA. 970 F.2d. at 1033. In analyzing whether the statute of limitations for IAA claims should be uniform, the Second Circuit commented that "[a] § 215 claim may be premised upon a violation of any provision of the IAA." *Id.* But that statement is taken out of context and does not support Plaintiff's argument. Earlier in the opinion, the Circuit wrote that "Section 215 of the IAA provides that contracts whose formation or performance would violate the act are void." *Id.* And in *Kahn*, the Second Circuit did not consider whether the IAA encompassed claims premised on a violation of any provision of the IAA. The single sentence from *Kahn* upon which Plaintiff's argument relies is consistent with *Omega*: it can be reasonably interpreted to mean that a contract requiring illegal performance under any section of the IAA should be rescinded. More broadly, because *Kahn* did not consider the scope of the private right of action under the IAA, it would be a step too far to interpret its brief commentary to mean that a private party may bring an action for any violation of the IAA. Moreover, as Acis points out, the Second Circuit has recently interpreted the corollary provision in the Investment Company Act of 1940 ("ICA"), to deny a plaintiff's claims to rescind a contract where there was no provision in a contract that required illegal performance under the ICA. *See* Acis Reply at 4–5; *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 109 (2d Cir. 2019) (affirming dismissal of a plaintiff's ICA claims—noting

that the ICA is the "companion legislation to the IAA"—where there was no allegation that the any "provisions of the [parties'] Indenture violate[d] the ICA.").

Finally, Plaintiff makes a textual argument, but that argument is not successful.  Plaintiff points out that Section 215 allows for the rescission of any contract the "performance of which involves the violation of . . . any provision of this title," arguing that the use of the term "involves" suggests that the statute should be broadly construed to permit a private party to bring allegations for any conduct that "involves" a violation of the IAA.  Acis Opp'n at 13–14.  But that argument ignores that the statute expressly permits rescission where the "*performance*" of the contract would violate the ICA.  Thus, a plain reading of Section 215 provides that a private plaintiff may only bring a claim on the basis that a contract was made illegally or requires illegal performance.

Again, Plaintiff does not allege that the PMA was illegally made or requires illegal performance.  Accordingly, Plaintiff has not sufficiently pleaded a violation of the IAA against any defendant.

For that reason, the Court need not address the alternative grounds that Brigade and Highland raise for dismissal of Plaintiff's IAA claim.  Nonetheless, the Court notes that it agrees that, even if Plaintiff had sufficiently pleaded that the PMA was illegally made or required illegal performance, it would still be unable to plead an IAA violation with respect to Brigade.  Brigade is not a party to the Indenture, nor is it a party to PMA.  "Only parties to an investment advisory contract may sue for rescission under section 215."  *Clark v. Nevis Cap. Mgmt., LLC*, No. 04 CIV.2702(RWS), 2005 WL 488641, at *13 (S.D.N.Y. Mar. 2, 2005); *DeBlasio v. Merrill Lynch & Co.*, No. 07CIV318RJS, 2009 WL 2242605, at *16 (S.D.N.Y. July 27, 2009) (dismissing IAA claim where Plaintiff had not "identified investment advisory contracts to which [the defendants] were parties").  Thus, Plaintiff's IAA claim against Brigade fails for the independent reason that Plaintiff has not— and cannot—allege that Brigade was a party to the Indenture or the PMA.

The same is true for Plaintiff's claims against Mr. Terry.  Plaintiff argues only that Mr. Terry owed duties to it under Section 206 of the IAA.  Terry Opp'n at 8.  As previously explained, there is no private right of action under Section 206.  *See TAMA*, 444 U.S. at 247–249 (holding that there is no private right of action under Section 206).

Moreover, because the Court has concluded that Plaintiff has not sufficiently alleged claims against Defendants Acis, Brigade, and Terry pursuant to the IAA, it need not consider the alternative grounds for dismissal presented by Intervenor Highland—namely, that Plaintiff lacks standing to pursue claims under the Indenture's no action clause.[4]

Accordingly, Plaintiff has not sufficiently alleged a claim against any party under the IAA, and Defendants' motions to dismiss Plaintiff's IAA claims are granted.

### b.  Plaintiff Has Not Sufficiently Pleaded a Claim for Breach of Fiduciary Duty Against U.S. Bank

Because all of the other claims brought against Acis, Brigade, and Mr. Terry are brought under state law, the Court next turns to claims brought against U.S. Bank.  In its opposition to U.S. Bank's motion to dismiss, Plaintiff clarifies that it is pursuing only its claim for breach of fiduciary duty.  U.S. Bank Opp'n at 1.  The Court may properly exercise federal jurisdiction over this claim pursuant to under the Edge Act, 12 U.S.C. §§ 611–631.[5]  However, Plaintiff has not sufficiently

---

[4] Nevertheless, the Court notes that Section 5.8 of the Indenture states that "[n]o holder of any Note shall have any right to institute any Proceedings . . . with respect to this Indenture . . . unless . . . the Holders of not less than 25% of the then Aggregate Outstanding Amount of the Notes of the Controlling Class shall have made a written request to the Trustee to institute Proceedings."  Indenture § 5.8.  As is discussed in more detail below, there is no dispute that Highland, and not Plaintiff, owns the majority of the notes issued by the CLOs.  And there is no dispute that HCLOF has not made a request to the Trustee to institute proceedings.

[5] The Edge Act provides for federal court jurisdiction over certain disputes involving banks chartered in the United States.  *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 779 (2d Cir. 2013).  To exercise federal removal jurisdiction under the Edge Act, (1) the suit must be a civil suit "at common law or in equity;" (2) a bank that is "organized under the laws of the United States" must be a party to the suit; and (3) the suit must arise out of "aris[e] out of" one of three described types of offshore transactions or operations: "transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States, or out of other international or foreign financial operations."  *Id.* at 779–80.  Here, those requirements are met: U.S. Bank, which is chartered in the United States, is a party to this civil lawsuit, and the case arose out of offshore transactions involving the CLOs, which are chartered in the Cayman Islands.

pleaded a claim for breach of fiduciary duty.

It is "well-established under state common law that the duties of an indenture trustee are strictly defined and limited to the terms of the indenture." *Elliott Assocs. v. J. Henry Schroder Bank & Tr. Co.*, 838 F.2d 66, 71 (2d Cir. 1988). Thus, "prior to an event of default, an indenture trustee's duty is governed solely by the terms of the indenture, with two exceptions:  a trustee must (1) avoid conflicts of interest, and (2) perform all basic, non-discretionary, ministerial tasks with due care." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 191–92 (S.D.N.Y. 2011). "After an event of default, the indenture trustee's fiduciary duties expand by operation of New York common law." *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 401 (S.D.N.Y. 2011). In *Beck v. Manufacturers Hanover Trust Co.*, 632 N.Y.S.2d 520 (1st Dep't 1995), "the First Department acknowledged the limits on an indenture trustee's duties before an event of default, but explained that those limits do not apply after an event of default." *LNC Inv., Inc. v. First Fid. Bank, Nat. Ass'n*, 935 F. Supp. 1333, 1347 (S.D.N.Y. 1996) (citing *Beck*, 632 N.Y.S.2d at 527).

After analogizing to similar concepts in New York real property law, *Beck* reasoned that after a default by the obligor "it is clear that the indenture trustee's obligations come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture." *Beck*, 632 N.Y.S.2d at 527. After a default, *Beck* continued, "it is . . . only the trustee who is able to act swiftly and effectively to assure . . . that the rights of the bondholders to recover what they are owed will ultimately be vindicated." *Id.*

Thus, "[f]ollowing a contractually defined 'Event of Default,' the indenture trustee's obligations 'come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture.'" *Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015) (*quoting BNP*, 778 F. Supp.

2d at 401).  However, "[e]ven after the Event of Default, '[t]he scope of the trustee's obligation . . . is still circumscribed by the indenture.  The trustee is not required to act beyond his contractually conferred rights and powers.'"  *Id.* (quoting *Beck*, 632 N.Y.S.2d at 528).  "[T]hough the trustee's obligations remain limited by the scope of the indenture, it now 'must, as prudence dictates, exercise those singularly conferred prerogatives in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation.'"  *Id.* (quoting *Philip v. Rothschild*, No. 90 Civ. 0708, 2000 WL 1263554, at *5 (S.D.N.Y. Sept. 5, 2000)); *see also BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 396 (S.D.N.Y. 2017), *objections overruled sub nom. BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, No. 14CIV10067KPFSN, 2017 WL 3610511 (S.D.N.Y. Aug. 21, 2017) (same).

The indenture agreement that governs U.S. Bank's duties as trustee (the "Indenture") echoes this principle.  Section 6.1(b) of the Indenture states the following:

> In case an Event of Default known to the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from a Majority of the Controlling Class, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

Indenture § 6.1(d).  As is relevant here, the Indenture defines an "Event of Default" as follows:

> a default, in a material respect, in the performance, or breach, in a material respect, of any other material covenant or other agreement of the Issuer or the Co-Issuer in this Indenture (it being understood, without limiting the generality of the foregoing, that any failure to meet any Concentration Limitation, Collateral Quality Test, Interest Reinvestment Test, or Coverage Test is not an Event of Default), or the failure of any material representation or warranty of the Issuer or the Co-Issuer made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith to be correct in all material respects when the same shall have been made, and the continuation of such default, breach or failure for a period of 30 days after notice to the Applicable Issuers and the Portfolio Manager by registered or certified mail or overnight courier, by the Trustee, or to the Applicable Issuers, the Portfolio Manager and the Trustee by a Majority of the Controlling Class, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder; provided that, if the Issuer or the Co-Issuer, as applicable (as notified to the Trustee by the Portfolio Manager in writing) has

> commenced curing such default, breach or failure during the 30 day period specified
> above, such default, breach or failure shall not constitute an Event of Default under
> this clause (d) unless it continues for a period of 45 days (rather than, and not in
> addition to, such 30 day period specified above) after notice to the Applicable Issuers
> and the Portfolio Manager by registered or certified mail or overnight courier.

Indenture § 5.1(d).

Thus, to the extent Plaintiff relies on pre-Event of Default conduct to sustain its claim for a breach of fiduciary duties, that claim is dismissed.  Moreover, the Indenture expressly states that the failure to meet "any Concentration Limitation, Collateral Quality Test, Interest Reinvestment Test, or Coverage Test is not an Event of Default."  Indenture § 5.1(d).  Thus, to the extent Plaintiff alleges that U.S. Bank breached its fiduciary duties because the CLOs failed to meet certain collateral quality tests, see SAC ¶¶ 113–128, those failures cannot form the basis of its claim for breach of fiduciary duty.

Next, under the express terms of the Indenture, for U.S. Bank to owe fiduciary duties to Plaintiff, U.S. Bank must receive notice of a material default or breach by a "Majority of the Controlling Class."  The Indenture defines a "Majority" as "the Holders of more than 50% of the Aggregate Outstanding Amount of the Notes of such Class."  Indenture § 1.1.  It defines "Controlling Class" as "[t]he Class A Notes (voting as a single class), so long as any Class A Notes are Outstanding; then the Class B Notes (voting as a single class), if there are no Class A Notes Outstanding."  Id.  Here, the parties do not dispute that Highland—and not Plaintiff—owns the majority of the subordinated notes issued by the Highland CLOs.[6]  Plaintiff does not allege that Highland provided any notice of default to U.S. Bank.  Indeed, Plaintiff does not dispute that it itself did not allege that it provided notice to U.S. Bank.  Instead, Plaintiff asserts that it sent a letter to

---

[6] Nexpoint holds $7.5 million of the subordinated notes issued by ACIS-6.  SAC ¶ 38.  The Indenture provides that approximately $59.9 million subordinated notes were issued.  See Indenture § 2.3.  Plaintiff admits that "[Highland] owns approximately 87.5% of the Acis CLO's equity, and Nexpoint owns the other 12.5%."  Highland Opp'n at 2.

U.S. Bank on August 6, 2019 that constituted proper notice under the Indenture.  *See* U.S. Bank Opp'n at 11; Ex. B to U.S. Bank Opp'n ("August 6 Letter"); Ex C to U.S. Bank Opp'n ("August 19 Letter").  But that letter is not mentioned in any respect in the Complaint, so the Court declines to consider it here.[7]  *See Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 202 (2d Cir. 2013) ("We do not consider matters outside the pleadings in deciding a motion to dismiss for failure to state a claim.").

Accordingly, U.S. Bank's motion to dismiss Plaintiff's breach of fiduciary duty claim is granted.

### c.  The Court Declines to Exercise Supplemental Jurisdiction Over the Remaining Claims

Because Plaintiff is not pursuing any other claims against U.S. Bank (over which the Court has jurisdiction pursuant to the Edge Act), the only remaining claims in this case are claims brought pursuant to state law.  The Court declines to exercise supplemental jurisdiction over those claims. The Court has discretion to hear such claims pursuant to 28 U.S.C. § 1367(a), which states that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  However, under 28 U.S.C. § 1367(c)(3), the exercise of supplemental jurisdiction over a party's remaining state law claims is within the Court's discretion if it has "dismissed all claims over which it has original jurisdiction."  The Second Circuit counsels against exercising supplemental jurisdiction in this circumstance: "[I]f the federal claims are dismissed

---

[7] Though the Court need not decide the issue here, the Court notes that the Indenture requires that, for an Event of Default to occur, a notice of default be sent by a "Majority of the Controlling Class."  Indenture § 5.1(d).  The August 6, 2021 letter was sent by Plaintiff, which is not a Majority owner of the CLOs—rather, Intervenor Highland CLO is the majority owner.  Moreover, August 6 Letter asserts as one basis for default that U.S. Bank allowed "continued failure of the collateral quality test," August 6, 2019 Letter at 2, but the Indenture expressly states that the failure of collateral quality tests is *not* an event of default.  Indenture § 5.1(d).

before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004) (quoting *Castellano v. Bd. of Trs.*, 937 F.2d 752, 758 (2d Cir. 1991)).

Because the Court has dismissed all of Plaintiff's claims based on a federal question under 28 U.S.C. § 1331, and because the Court has dismissed the only claim that Plaintiff is pursuing against U.S. Bank, over which it may exercise federal jurisdiction pursuant to the Edge Act, the Court declines to exercise its supplemental jurisdiction over any state law claims that the SAC may be construed to assert. *See* 28 U.S.C. § 1367(c)(3).[8]

### d.  The Parties Will Bear their Own Costs

The Court will not order Plaintiff to pay Acis's attorney's fees.  Section 5.15 of the Indenture provides the following:

> all parties to this Indenture agree, and each Holder of any Note by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as the Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant . . . .

Indenture § 5.15.  Here, Plaintiff initiated this lawsuit to enforce its rights under the Indenture, and Plaintiff has asserted that the Trustee failed to take actions in line with the Indenture.  Thus, under Section 5.15, the Court would be free, in its discretion, to order the payment of attorneys' fees by Plaintiff, or to impose other costs on Plaintiff.  The Court declines to do so.  While the Court is dismissing Plaintiff's federal claims, those claims are not so unmeritorious to be frivolous.  Nor does

---

[8] Acis argues that the Court should nonetheless retain jurisdiction over the remaining claims, including because a related case involving the parties and similar issues is currently pending before the Court.  However, the existence of this related case—which involves parties in addition to those in this action, and also involves claims that are not at issue in this case—is insufficient to override the Second Circuit's guidance that district courts should decline to exercise supplemental jurisdiction where federal claims are dismissed early in the litigation.

the Court conclude on the present record that these claims were brought in bad faith.  Accordingly, each party will bear its own costs.

## V.       LEAVE TO AMEND

Although Plaintiff has already amended its complaint once, Dkt. No. 40, the Court grants Plaintiff leave to replead the dismissed claims.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  Leave to amend may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (citation omitted).  Here, any amendment to Plaintiff's IAA claim would be futile, since Plaintiff does not attempt to assert that the PMA was made illegally or requires illegal performance as would be required to sufficiently plead a claim.  Thus, the Court denies Plaintiff leave to amend its IAA claim.  In addition, because the Court has not considered any of Plaintiff's state law claims brought against defendants other than U.S. Bank, Plaintiff is not granted leave to amend those claims.

Instead, Plaintiff is granted leave to amend only its claims against U.S. Bank over which the Court exercises its jurisdiction pursuant to the Edge Act.  Any amended complaint must be filed no later than August 22, 2022.  If no amended complaint is filed by that date, the Court will remand this case to state court.

## VI.      CONCLUSION

As discussed above, Plaintiff has not sufficiently alleged IAA claims against any of the Defendants, nor has it sufficiently alleged a breach of fiduciary duty against U.S. Bank.  The Court declines to exercise supplemental jurisdiction over the remaining claims.  Therefore, the Defendants' and Highland's motions to dismiss are GRANTED.

The Clerk of Court is directed to terminate the motions at Dkt. Nos 78, 80, 83, 86, and

88.

SO ORDERED.

Dated:  August 9, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge